**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **APPEAL** |
| TXCO RESOURCES, INC. | § | Civil Action No. 09-CA-569-FB |
| DEBTOR. | § | |

| | | |
|---|---|---|
| WEATHERFORD INTERNATIONAL, INC. | § | |
| | § | |
| APPELLANT | § | |
| | § | |
| v. | § | |
| | § | |
| TXCO RESOURCES, INC., *et al.* | § | |
| APPELLEES | § | |

---

## BRIEF OF APPELLANT

---

Edward L. Rothberg
SBN 17313990
Hugh M. Ray, III
SBN 24004246
WEYCER, KAPLAN, PULASKI & ZUBER, P.C.
11 Greenway Plaza, Suite 1400
Houston TX 77046
(Telephone)  713-961-9045
(Facsimile)   713-961-5349

ATTORNEYS FOR APPELLANT

**ORAL ARGUMENT REQUESTED**

# CERTIFICATE OF INTERESTED PERSONS

I certify that the following is a list of all persons who or which are financially interested in the outcome of this appeal, and the names and addresses of the opposing law firms and/or counsel to the parties of this appeal.

Weatherford International, Inc. (appellant) is an affiliate of Weatherford International, Ltd., Inc. The stock of Weatherford International, Ltd., Inc. is publicly traded as "WFT" on the New York Stock Exchange.

Weatherford's principal address is:
Alpenstrasse 15
Zug,  6300
Switzerland

TXCO Resources, Inc. was publicly traded as TXCO on the NASDAQ, but is now traded on the "pink sheets" as TXCOQ.pk.
The TXCO family of companies are Chapter 11 Debtors jointly administered under the TXCO Case.  The TXCO debtors are: TXCO Resources Inc. Eagle Pass Well Service, L.L.C., TXCO Drilling Corp., Charro Energy Inc., Texas Tar Sands Inc., TXCO Energy Corp., Output Acquisition Corp., OPEX Energy, L.L.C., PPL Operating, Inc., Maverick Gas Marketing, Ltd., and Maverick-Dimmit Pipeline, Ltd.  Collectively, they are referred to herein as "TXCO" or "Debtors".

The Debtors principal address is:
777 E Sonterra Blvd, Suite 350
San Antonio, TX 78258

The Debtors retained the following counsel of record:

Deborah D. Williamson
Patrick L. Huffstickler
Lindsey D. Graham
Cox Smith Mathews Incorporated
112 East Pecan Street, Suite 1800
San Antonio, Texas  78205

SIGNED:      August 3, 2009

_____
Hugh M. Ray, III

## ORAL ARGUMENT REQUESTED

Weatherford requests the Court hold oral argument on this appeal before the Debtors have time to confirm a plan of reorganization and claim the relief sought herein is moot. Conversely, Weatherford anticipates that the Debtors and Debtor-in-Possession lender will seek a delay in an effort to side-step a final determination of this issue. Equity requires that the Appellant not be deprived of its day in court by the legal maneuvering of the Debtors.

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS ....................................................................i

ORAL ARGUMENT REQUESTED .................................................................................. ii

TABLE OF CONTENTS ................................................................................................. iii

TABLE OF AUTHORITIES ............................................................................................iv

I. STATEMENT OF BASIS OF APPELLATE JURISDICTION ....................................2

II. STANDARD OF REVIEW .........................................................................................2

III. STATEMENT OF ISSUES PRESENTED FOR REVIEW.........................................3

    *Issue One* - Whether a bankruptcy court may authorize the payment of prepetition unsecured claims absent confirmation of a Chapter 11 Plan.  If the answer to this question is yes, then what standards must the bankruptcy court apply to grant such relief?..........................................................................3

    *Issue Two* -    Whether the bankruptcy court violated Bankruptcy Rule 6003(b) by authorizing payment of pre-petition claims before the passage of 20 days from the date the Chapter 11 petition was filed?. ......................3

    *Issue Three* – Whether the Bankruptcy Court based its decision chiefly on inadmissible evidence admitted over Weatherford's objection...........................................................................3

IV. STATEMENT OF THE CASE AND PROCEEDINGS BELOW.................................3

    *A. Nature of Case; Course of Proceedings and Disposition Below*...............................3

    *B. Statement of Facts- Background* ..............................................................................5

    *C.  Debtors' Evidence in Support of Prepetition Royalties* ............................................6

    *D. Objections of Weatherford and Others to Testimony*................................................7

    *E.  Evidence relating to Joint Interest Billings* .............................................................9

    *F.  Closing Arguments* .................................................................................................11

    *G.  The Lower Court's Decision* ..................................................................................13

V. ARGUMENT ............................................................................................................14

    *A.  The Bankruptcy Court, as a matter of law, cannot authorize a payment of prepetition debt outside of the Bankruptcy Code's distribution scheme.*..............................................................14

    *B. If CoServ could use Section 105 and the "Doctrine of Necessity", the Appropriate Legal Standard was not Followed.* ...............................................................................18

    *C. The Court Improperly Admitted Testimony about the Leases in Lieu of the Leases Themselves, which was the Bulk of the Evidence in Support of the "Necessity" of Payment.*...................................21

    *D. The Bankruptcy Court Ignored the Strictures of Bankruptcy Rule 6003(b).*......................24

VI. CONCLUSION.........................................................................................................26

CERTIFICATE OF SERVICE .......................................................................................27

# TABLE OF AUTHORITIES

## Cases

*Baker Hughes Oilfield Operations, Inc. v. Cage (In re Ramba, Inc.)*, 416 F.3d 394, 402 (5th Cir. 2005) ................................................................................................ 22

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 454 (1999).... 17

*Bethea v. Robert J. Adams & Associates*, 352 F.3d 1125, 1128-29 (7th Cir. 2003).................... 16

*Cahill v. Walker & Patterson, P.C.*, 428 F.3d 536, 539 (5th Cir. 2005) ..................................... 22

*Fosdick v. Schall*, 99 U.S. 235, 25 L. Ed. 339 (1878) ................................................................ 16

*In re Aweco*, 725. F.2d 293, 298 (5th Cir. 1984) ............................................................. 3, 18, 22

*In re B&W Enterprises, Inc.*, 713 F.2d 534 (9th Cir. 1983) ........................................................ 15

*In re Boston & Providence R. R. Corp.*, 673 F.2d 11 (1st Cir. 1982).......................................... 18

*In re CEI Roofing, Inc.*, 315 B.R. 50, 58 (Bankr. N.D. Tex. 2004)....................................... 17, 18

*In re Chicago, Milwaukee, St. Paul & Pacific R.R.*, 791 F.2d 524, 528 (7th Cir. 1986)............. 15

*In re CoServ*, LLC, 273 B.R. 487 (Bankr. N.D.Tex. 2002)........ 4, 5, 11, 13, 14, 17, 18, 19, 21, 26

*In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993) ................................................... 15

*In re Kmart Corp.*, 359 F.3d 866, 871 (7th Cir. Ill. 2004).......................................... 4, 15, 16, 17

*In re Louisiana World Exposition, Inc.,* 832 F.2d 1391, 1395-96 (5th Cir. 1987) ......................... 2

*In re Mirant Corp.*, 296 B.R. 427 (Bankr. N.D. Tex. 2003).................................................. 17, 20

*In re Mirant Corp.*, 440 F.3d 238, 251 (5th Cir. 2006) ............................................................. 20

*In re Oxford Mgmt., Inc.,* 4 F.3d 1329, 1334 (5th Cir. 1993)............... 4, 12, 13, 15, 16, 17, 18, 19

*In re Scotia Dev., LLC*, 2007 Bankr. LEXIS 3262 (Bankr. S.D. Tex. Sept. 21, 2007) ............... 17

*In re Stratford of Tex., Inc.*, 635 F.2d 365, 368 (5th Cir. 1981) ................................................... 2

*In re Timberhouse Post & Beam, Ltd.*, 196 B.R. 547, 550-551 (Bankr. D. Mont. 1996)............. 18

*Jamo v. Katahdin Fed. Credit Union (In re Jamo)*, 283 F.3d 392, 403 (1st Cir. 2002) ............... 15

*Lamie v. United States Trustee*, 157 L. Ed. 2d 1024, 124 S. Ct. 1023, 1031 (2004).................... 16

*Langes v. Green*, 282 U.S. 531, 541 (1931) ........................................................................... 3, 22

*Matter of Killebrew,* 888 F.2d 1516 (5th Cir. 1989)..................................................................... 2

*Miltenberger v. Logansport Ry.*, 106 U.S. 286, 27 L. Ed. 117, 1 S. Ct. 140 (1882) .................... 16

*Northwest Bank Worthington  v. Ahlers*, 485 U.S. 197, 206, 99 L. Ed. 2d 169, 108 S. Ct. 963 (1988) ....................................................................................................................................... 15

*Official Comm. of Unsecured Creditors v. Farmland Indus. (In re Farmland Indus.)*, 397 F.3d 647 (8th Cir. 2005) .................................................................................................................. 22

*Official Committee of Equity Security Holders v. Mabey*, 832 F.2d 299 (4th Cir. 1987)............. 15

*Railroad Management Company, LLC v. CFS Louisiana Midstream Co.*, 428 F.3d 214 (5th Cir. 2005) ............................................................................................................................. 23

*U.S. v. Scott*, 262 F.3d 455 (5th Cir. 2001) ......................................................................... 23, 24

*United States v. Noland*, 517 U.S. 535, 542, 134 L. Ed. 2d 748, 116 S. Ct. 1524 (1996) ...... 15, 16

*United States v. Parsee*, 178 F.3d 374, 379 (5th Cir. 1999) ....................................................... 21

*United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242-46, 103 L. Ed. 2d 290, 109 S. Ct. 1026 (1989) .............................................................................................................................. 16

*United States v. Sutton*, 786 F.2d 1305, 1308, (5th Cir. 1986) ................................................... 15

**Statutes**

11 U.S.C. § 726 .......................................................................................................................... 16

11 U.S.C. § 105 ......................................................................... 4, 5, 11, 14, 15, 17, 18, 19, 26

11 U.S.C. § 1123 .................................................................................................................... 16, 17

11 U.S.C. § 1126 .......................................................................................................................... 16

11 U.S.C. § 1129 .......................................................................................................................... 16

11 U.S.C. § 1143 .......................................................................................................................... 16

11 U.S.C. § 362 ............................................................................................................................ 20

28 U.S.C. § 158 ............................................................................................................................... 2

**Rules**

Fed. R. Bankr. P. 4001 ........................................................................................................... 24, 25

Fed. R. Bankr. P. 6003 ..................................................................................................... 3, 12, 24, 25

Fed. R. Ev. 1002 ................................................................................................................. 21, 22, 23

Fed. R. Ev. 1003 .......................................................................................................................... 22

Fed. R. Ev. 1004 .......................................................................................................................... 22

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **APPEAL** |
| TXCO RESOURCES, INC. | § | Civil Action No. 09-CA-569-FB |
| DEBTOR. | § | |

| | |
|---|---|
| WEATHERFORD INTERNATIONAL, INC. | § |
| | § |
| APPELLANT | § |
| | § |
| v. | § |
| | § |
| TXCO RESOURCES, INC., *et al* | § |
| APPELLEES | § |

---

**FINAL ORDER APPEALED FROM**
**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

---

# BRIEF OF APPELLANT

TO THE HONORABLE FRED BIERY, UNITED STATES DISTRICT JUDGE:

This is an appeal from an order of the Bankruptcy Court approving the payment of up to $2 million pre-petition debt outside the Bankruptcy Code's formal distribution scheme under the judicially-created "doctrine of necessity". The Appellant is Weatherford International, Inc. ("Weatherford"), a creditor who is owed $8.3 million on a pre-petition basis and who was not a recipient of these payments. The Appellees are the Debtors – TXCO Resources, Inc. and its affiliates[1].

## I. STATEMENT OF BASIS OF APPELLATE JURISDICTION

This Court has jurisdiction based on 28 U.S.C. § 158, as an appeal from a final order of the United States Bankruptcy Court for the Southern District of Texas.[2] *In re Louisiana World Exposition, Inc.,* 832 F.2d 1391, 1395-96 (5th Cir. 1987).

## II. STANDARD OF REVIEW

There are three issues on appeal.[3] The first two issues present questions of law as to whether the judicial doctrine of necessity can override the Bankruptcy Code's distribution scheme and whether the order violates the law. These issues of law are reviewed on a *de novo* review basis. *Matter of Killebrew,* 888 F.2d 1516 (5th Cir. 1989). If this Court rules in favor of the Appellant on the first two of issues, then the Court need not deal with the remaining issue. If the Court rules in favor of the Appellees on the first set of issues, and reaches the third, then the decision of the bankruptcy court may only be reversed for an abuse of discretion. The term

---

[1] The entire TXCO family is jointly administered under the TXCO case, but the debtors include the following entities: TXCO Resources Inc. ("TXCO"), Eagle Pass Well Service, L.L.C. ("Eagle Pass"), TXCO Drilling Corp. ("Drilling"), Charro Energy Inc. ("Charro"), Texas Tar Sands Inc. ("Tar Sands"), TXCO Energy Corp. ("Energy"), Output Acquisition Corp. ("Output"), OPEX Energy, L.L.C. ("OPEX"), PPL Operating, Inc. ("PPL"), Maverick Gas Marketing, Ltd. ("Maverick Gas"), and Maverick-Dimmit Pipeline, Ltd. ("Maverick-Dimmit").

[2] Herein referred to as "Bankruptcy Court" or "lower court" or "Court".

[3] As a practical matter, the issues fall into two categories. Essentially, the issues are whether 1) there is a "doctrine of necessity" such that violations of the bankruptcy code can be countenanced by an equitable judicial construction and 2) assuming the law allowed it, whether the admissible evidentiary basis in this case met that judicially-created exception to the statute.

"discretion" however, means a sound discretion, that is to say, a discretion exercised not arbitrarily or willfully, but with regard to what is right and equitable under the circumstances and the law, directed by reason and conscience to a just result.  *See Langes v. Green*, 282 U.S. 531, 541 (1931) cited with approval in *In re Aweco,* 725. F.2d 293, 298 (5th Cir. 1984).

## III. STATEMENT OF ISSUES PRESENTED FOR REVIEW

*Issue One -* Whether a bankruptcy court may authorize the payment of prepetition unsecured claims absent confirmation of a Chapter 11 Plan.  If the answer to this question is yes, then what standards must the bankruptcy court apply to grant such relief**?**

*Issue Two -*  Whether the bankruptcy court violated Bankruptcy Rule 6003(b) by authorizing payment of pre-petition claims before the passage of 20 days from the date the Chapter 11 petition was filed?.

*Issue Three* – Whether the Bankruptcy Court based its decision chiefly on inadmissible evidence admitted over Weatherford's objection.[4]

## IV. STATEMENT OF THE CASE AND PROCEEDINGS BELOW

*A. Nature of Case; Course of Proceedings and Disposition Below*

This is a Chapter 11 Bankruptcy of a network of oil and gas companies including operators, production and exploration companies.  As operator, the Debtors operate oil and gas wells and sell the products, distributing proceeds to royalty owners and working interest owners.  As non-operator working interest owner in some wells, the Debtors occasionally receive Joint Interest Billings and proceeds.

---

[4]  The issue is not a mere violation of the rules of evidence, but the fact the improperly admitted evidence was the fulcrum for the lower court's opinion and the lower court therefore abused its discretion.

TXCO operates with many affiliate companies, but those entities are being jointly administered as Chapter 11 Debtors and they sought the relief appealed herein collectively. The Debtors filed voluntary petitions seeking Chapter 11 Bankruptcy protection on May 17, 2009.

The Debtors filed 20 motions on the first day of the case seeking emergency consideration. (docket #7 to28)  In chapter 11 parlance, these are traditionally called "first day motions".  A hearing on the first day motions was held May 19-20, 2009 – 48 hours after the case was filed (Docket #28, 29, 31).

The thirteenth of these first day motions was entitled "*Motion for Authority to Pay or Honor Prepetition and Postpetition Royalty Obligations and Other Obligations under Oil & Gas Lease*" ("Motion for Authority", Docket #25) which sought authority under Section 105 of the Bankruptcy Code to pay prepetition royalty claims and which was based on the case of *In re CoServ*, LLC, 273 B.R. 487, 498 (Bankr. N.D.Tex. 2002).

Weatherford filed its objection to the Motion as part of an omnibus objection to first day motions.  (Docket #32).  In its objection, Weatherford cited *In re Oxford Mgmt., Inc.,* 4 F.3d 1329, 1334 (5th Cir. 1993)*; and In re Kmart Corp*., 359 F.3d 866, 871 (7th Cir. Ill. 2004).  *Kmart* notes: "Every circuit that has considered the question has held that [Section 105] does not allow a bankruptcy judge to authorize full payment of any unsecured debt, unless all unsecured creditors in the class are paid in full."  *Kmart* relied on the Fifth Circuit's opinion in *Oxford Management.*

On May 19-20, 2009, the lower court heard argument and took evidence.  Weatherford appeared at the hearing and objected to the relief and cross-examined the witnesses.  The evidence consisted almost entirely of the testimony of the Debtors' representative, Mr. Conly. As to the motion presented herein, the testimony was that some oil and gas leases that the Debtor

operated had forfeiture clauses and that the leases would be lost if royalties were not paid. The Leases themselves were not offered into evidence and Weatherford objected under the best evidence rule to the witness testifying without having a lease in evidence. The Court admitted the testimony over Weatherford's objection.

After reviewing that testimony and argument, the court relied on the *Coserv* opinion, found that the imminent threat of losing leases met the *Coserv* standards for paying prepetition critical debt, and entered its Order authorizing payment under Section 105. (Docket #67)

Weatherford filed a timely notice of appeal challenging the order authorizing the Order

### B. Statement of Facts- Background

**<u>Background</u>**    Weatherford is an oilfield service company. Weatherford ships supplies and performs services for drilling and production of oil and gas. Weatherford has not been paid for approximately $8.3 Million in goods and services provided to the Debtors. Weatherford has claimed liens on the Debtors' oil wells under Texas Law and has filed to perfect its statutory liens.

The Debtors filed chapter 11 because the price of oil had fallen to historic lows. According to the Debtors, they had substantial assets and revenue:

> Debtors' Proved Oil and Natural Gas Reserves were 55.3 billion cubic feet ("Bcf") and 10.7 million barrels of oil ("mmBbls") as of March 31, 2008. The 2009 Value of Estimated Future Reserves (PV-10) for 2009 is $268 million based upon DeGolyer and MacNaughton and William Cobb & Associates reports using Nymex 3-year strip prices. Operating Revenues for 2008 were approximately $143,736,000.00, with oil sales of 1,132,000 Bbls and 2,422,000 thousand cubic feet ("mcf") of gas. Gross Revenues for the three (3) months ending March 31, 2009 were approximately $15,632,000 with sales of approximately 2,580 Bbls and 517.2 thousand mcf cubic feet of gas. The estimated value for undeveloped acreage is dependent on (a) the identity of the specific acreage, and (b) the market for such acreage. There are no quantities of oil or natural gas subject to long-term supply or similar agreements with foreign government authorities.

Declaration of Albert Conly. Docket #7 at ¶11.

However, the Debtors were simply unable to pay debts because their cash flow had constricted and their debt load was based on a large presumed value for their assets.

### C. Debtors' Evidence in Support of Prepetition Royalties

The Debtors have a multi-faceted production and exploration company. Among other functions, the Debtors collected oil and gas from wells and sold it, paying proceeds to royalty interest owners, override royalty interest owners and holders of working interests. The Debtors were frequently oil and gas operators. Naturally, there is a significant delay between the sale of the assets and collection of money and payment to those owed the money. The Debtors admitted that, for royalty owners, the number was approximately $2 Million:

> As of the Petition Date, the Debtors estimate that they owe $2 million to the Royalty Interest Owners and ORRI Owners for current royalty obligations.' The Debtors' payments to Royalty Interest Owners and ORRI Owners were approximately $1,146,000 for the month prior to the Petition Date and will be $1,065,367 for the Royalties attributable to oil and gas revenues received by the Debtors in the month prior to the Petition Date.

Declaration of Albert Conly at ¶111.

The Debtor sought authority to pay this $2 Million prepetition debt because to not do so would allegedly jeopardize some oil and gas leases and anger creditors:

> 112. Non-payment of Royalties and ORRIs could jeopardize some oil and gas leases. Also, purchasers of production may be reluctant to timely pay to Debtors oil and gas receipts if Royalty Interest Owners and ORRI Owners are not paid. Payments to the Royalty Interest Owners and ORRI Owners are in paid arrears and should be paid promptly.

Declaration of Albert Conly at ¶112.

On cross-examination of this statement, the Debtors representative provided the following testimony that the prepetition royalties needed to be made to avoid an "upset" royalty owner:

Q. (By Mr. Rothberg) And I think your testimony was verbally, and also in Paragraph 112 of the -- of the declaration, that nonpayment of prepetition royalties could jeopardize some of the oil and gas leases. Now, do you mean by that statement that the leases would automatically terminate if the royalty's not paid?

A. They could.

Q. Okay. **Do you have any copy of any single lease to show the Court today that has such a provision in it?**

A. **I do not have a copy of a lease**, but it's my experience that leases include that sort of language.

Q. Some do and some don't.

A. Perhaps. I've not seen one that didn't.

Q. Now, I think you also said that the -- if the royalty owners didn't get paid, they'd be upset. Is that a fair characterization?

A. I believe, based on my experience, they will be upset, yes.

Q. Okay. Do you think any of the other creditors, prepetition creditors, who are not getting paid are also going to be upset?

A. Perhaps.

Transcript of May 20, 2009 hearing, page 99-100.

The Debtor's testimony did not state that any particular lease would be forfeit by the non-payment of the royalties and no lease evidencing such a clause was admitted into evidence.

### D. Objections of Weatherford and Others to Testimony

**Evidentiary Objections** On several occasions, an objection was posed to the testimony of the Debtors' representative that the payment of royalties and lease operating expenses is necessary to avoid losing the lease. Specifically, the written lease was the best evidence of the alleged forfeiture clause and testimony about the terms of lease was not admissible to show the contents of it:

Q. [by Debtor's counsel] And would some of that acreage be lost in the next four weeks?

A. Yes.

Q. And what acreage would be lost in the next four weeks?

A. Certain -- Well, the -- the Paloma lease that we've discussed before, the Fitsimmons lease, which is located down here, right here.

MR. SCOTT ROSE: Your Honor, if I could renew our objection with respect to the best evidence. He's testifying, as Mr. Rothberg pointed out, from his knowledge, not from the actual documents. And I don't have to remind this Court that, in this very courtroom, not too long ago, there was an order that was entered based on a witness's recollection of what a document said. That proved to be inaccurate, which resulted in over a year of litigation with respect to that particular order of the Court. So, I would renew --

THE COURT: Which case?

MR. SCOTT ROSE: In the Lothian case, --

THE COURT: Okay.

MR. SCOTT ROSE: -- with respect to a 363 sale in the first week -- first week of the case. Mr. Campbell was dragged through the mud for 18 months following that order based on erroneous testimony of the witness. So... But, again, we renew our objection. And I know that you've already overruled it once, but we'd asked you -- we would ask you to carefully consider the credibility of this testimony, which is crucial for this Debtor, based solely upon his recollection, and not the actual document.

MS. WILLIAMSON: It's -- It's his opinion.

THE COURT: His understanding. Overruled.

Transcript of the May 19, 2009 hearing pp. 251-252.

The objection was raised multiple times and overruled every time. Each time the

Debtors' testimony was about about the contents of a lease that was not in evidence and how that

lease would be lost if the payments were not made and wells were not drilled:

Q. Okay. Now, in the next four weeks, I see four wells to be drilled, --

A. That's correct.

Q. -- two Anadarko, one EnCana, and one Paloma. Now, the Paloma well is only $500,000. What is that well, and why do you need to drill it?

A. The Paloma lease is a 33,000-acre lease located in what we call the Northern area. It has Georgetown potential, Austin Chalk potential, Pearsall and Eagleford potential. That lease has been kept in force and effect by the company for several years by continuous drilling. It's -- **We're required to drill one well every six months**.

MR. ROTHBERG: Your Honor? I have to object, your Honor. He's testifying from an exhibit -- a document that's not in evidence. It's hearsay. It also violates

the best evidence rule for him to recite the terms of the lease that we haven't had an opportunity to look at.

MS. WILLIAMSON: Your Honor, I asked him his understanding of why he needs to drill the well. He's giving his understanding about why he thinks he needs to drill this well.

MR. ROTHBERG: He's also giving --

MS. WILLIAMSON: It's his business judgment.

MR. ROTHBERG: He's also giving a legal conclusion of that, as well.

MS. WILLIAMSON: He's not giving a legal conclusion. He's not --

THE COURT: Overruled.

Transcript of May 19, 2009 hearing pp. 220-221.

Again and again the issue of the best evidence was raised to this testimony and it was

repeatedly overruled:

Q:  So, you can hold the entire acreage by drilling another well, but for drilling the --

A. For six months.

Q. The least amount that you can --

MR. ROTHBERG: Objection again, your Honor.  She's asking him about a document that holds acreage.

THE COURT: His understanding. Overruled.

With that under- -- With that stipulation that it's your understanding, you're not rendering a legal opinion.

THE WITNESS: No.

THE COURT: Right.

Transcript of May 19, 2009 hearing pp. 222-223.


### E.  Evidence relating to Joint Interest Billings

Usually the Debtors are the operator and thus collecting revenue and paying royalties.

Occasionally, the Debtors are holder of non-operating working interests that can be assessed

Joint Interest Billings ("JIB's").

In the Motion seeking approval of the payment of pre-petition royalties under the premise that leases would terminate, the Debtors also sought authorization to pay pre-petition JIB's under the premise that it would severely impact the Debtors' business not to:

> 11.   Where the Debtors hold non-operating working interests in wells under various joint operating agreements ("JOAs"), the Debtors receive payments representing their share of production revenues.  The Debtors then reimburse the operator for their share of the production costs through the payment of joint-interest billings ("JIBs").  The failure to timely pay JIBs may provide grounds for the operator to assert contractual or statutory lien rights against the Debtors' interest in the well. Therefore, the Debtors request authority to continue to satisfy these JIBs as they arise in the ordinary course of business.

> 12.  If the Debtors stop satisfying JIB, JOA and LOE obligations as they become due, the Debtors operations will be severely impacted and production may completely cease for certain wells.  These occurrences would directly, immediately and negatively impact the Debtors' creditors and other parties in interest.

Motion for Approval (docket # 25) at ¶11-12.

The basis given by the Debtors for payment of JIB's was the effort to avoid having the business "severely impacted".  The Debtors introduced no leases or documentary evidence in support of the claim.  The explanation at trial was lukewarm:[by Counsel for the Debtors] "We have a small amount of JIBs, 20 joint interest billings. It's only about ninety --well, $98,270 over the entire four-week period." Transcript of the May 19, 2009 hearing at p. 156.  The Debtors' representative testified that if he failed to pay JIB's the operator would probably put future payments in suspense:

> Q. And, so, nonpayment of LOEs threaten the production revenue?

> A. Correct.

> Q. Okay. And what about current joint interest billings, JIBs?

> A. Certainly we've had that problem already, but --but not paying -- not paying our partners for dollars that they've incurred on wells that we're in, at some point they're going to either withhold our -- our revenue from that well or refuse to work with us on any basis going forward.

Transcript of May 19. 2009 hearing at p. p.250.

Thus, the Debtors concluded with a closing argument that the payment of JIB's and Royalties was a "critical" expense and that the Court should authorize their payment in full, immediately, based on Section 105, the "doctrine of necessity" and the *CoServ* opinion.

### F. Closing Arguments

As discussed more fully below, the Debtor's counsel argued in closing that Section 105 and the *CoServ* standards justified paying the prepetition debt, based on the evidence of irreparable injury and risk that the leases would be lost if royalties and joint interest billings were not paid:

> Your Honor, again, what we're attempting to do is to pay the royalties. I think you made a good point, your Honor, which is, if you're a large landowner and you've negotiated leases that have termination provisions, then you're better situated than someone who doesn't have that particular protection.  I think Mr. Campbell recognizes that, and there may be very good reasons to pay those people.
>
> **I can tell you that, in fact, from the testimony, we do, in fact, have leases with large landowners.  It is my understanding that the majority of our leases have termination provisions if royalties are not paid.**  I will say that those provisions probably have a notice and cure period, in most instances.  But we'll get them noticed, and if they have to, they can lift the stay, and submit the notice.  And then we're faced with those parties coming forward, seeking to terminate their leases because we haven't paid the royalties.
>
> Again, what we've talked about, and what – the issues the Court has to address are, is there -- If you look at it from the standpoint of, can you pay a prepetition debt, if you look at the *CoServ* standards, which I think is something the courts are looking at these days here in Texas, the Debtor has to show three elements. First, it's critical that the Debtor deal with the claimant. Well, here, it's pretty obvious that we have to deal with these claimants.  You heard the testimony from both Mr. Grinsfelder and Mr. Conly that we have to negotiate new leases, we have to renew leases, that if we can't pay royalties, we're not going to be able to do that.
>
> There is actually no testimony that we won't be harmed.  The testimony is, if we can't pay royalties, we will be harmed.  And that's the second part of the test.  Second, unless it deals with the claimant, the Debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate of the Debtor's going

concern value which is disproportionate to the amount of the claimant's prepetition claim. We're talking about paying one month's royalty or we may lose an entire lease that has much more value.

And then the third is, there's no practical or legal alternative by which the Debtor can deal with the claimant other than by payment of the claim. I don't see how we deal with royalty payments other than to pay the royalty.

**So, for those reasons, we think that paying the royalties, and paying them now, Rule 6003 allows us, if there's irreparable injury, to pay a prepetition debt within 20 days. You heard the testimony.** Frankly, your DIP order and your decision on the DIP order shows irreparable injury. It's all part and parcel of the same thing, that if we're not continuing to run this company the way we need to run it, that the Debtor's going to be damaged, and irreparably harmed. And this is another part and parcel of that.

So, that's the argument on the royalties. The other thing we asked for in the motion, your Honor, is to pay LOEs. We're simply going to pass that issue because, as Mr. Conly pointed out, we don't know who's going to come forward and say, I won't perform services if you don't pay me my prepetition debt. We're probably going to have to come back and do those on a one-off basis, or we may have to prepay them. And we'll just deal with that, and that amount is in the budget.

The other issue that we've asked for in the motion is the right to pay joint interest billings. **We have the same sort of issue with respect to the joint interest billings,** but there the issue is, we are making payment to people who, in turn, then, as they operate the wells, are paying us once the revenues come in. **It seems to me that, if you don't pay those people, they're simply going to be able to recoup**. And, so, it gets paid sooner or later, so we might as well just be able to pay it now and keep current with those people.

So, for those reasons, we think that the royalty motion can be paid. And, again, there is evidence upon which the Court can look at and say, this is irreparable injury, the only way to deal with these claimants is to pay their royalties. And, again, there's no evidence to the contrary.

Transcript of May 20, 2009 hearing at p. 257-260 (emphasis added)

The rebuttal was simple – that the evidence did not support sidestepping the Fifth Circuit's *Oxford Management* decision and circumventing the Bankruptcy Code's prohibition on paying prepetition debt outside of the statutory distribution scheme (which requires a plan of reorganization):

MR. ROTHBERG: Your Honor, it's an issue that there was no evidence that there was no harm. With all due respect to Mr. Huffstickler, we got this on one-day notice. The burden of proof is on them. I asked Mr. Conly if he could

show me one single lease that had a termination provision. He had nothing. Okay? The *CoServ* case goes into excruciating detail regarding each particular vendor. And Judge Lynn made them go through their vendor list and say who do we really need to pay, who do we not. And the debtor there went out and culled down who really didn't need to be paid, and then came up with three or four vendors that needed to be paid. And Judge Lynn allowed it on a few and disallowed it on the others.

We haven't had any kind of a showing like that on the royalties, or the LOEs, or the taxes, or anything like that. They just want to come in and say, "Judge, we have certain creditors we want to pay because we like them better than you, and we just want authority to pay them." And that's the argument. And I don't think that even -- That doesn't even come close to satisfying the burden to overrule, effectively, *Oxford Management*, the Fifth Circuit, to say that we can pay -- we're not supposed to pay prepetition creditors to the prejudice of others without a plan, or some extraordinary reason.

Trancript of May 20, 2009 hearing at p. 261-262.

Other counsel joined in the objection of Weatherford's counsel and reiterated the impropriety of granting the relief, especially given the evidentiary record.

## G. The Lower Court's Decision

The lower court's approved payment of royalties based on the risk of lease termination should the royalties not be paid:

THE COURT: Well, I would like to go ahead and grant the motion to pay the royalty interest owners, with the exception of any unrecorded or unperfected royalty -- overriding royalty interest that Mr. Sigmon has.

If he's got a perfected royalty interest that's well-documented, there's division orders, recorded, et cetera, he gets paid along with everybody else. But if there's something that's either unwritten, or unrecorded, or unperfected, then I guess you need to go back and look at those, and we'll hold up on that. I'm not saying he won't get it, ultimately, I'm just saying, at this time, I'm not authorizing payment.

But I think that we do need to pay the royalty owners. And there may not be a legal equitable ownership by the royalty owners, but I think that the flow of business is just going to be so much smoother if we keep the royalty owners paid in the ordinary course of business. **I think it would cause irreparable harm to the Debtor not to pay them, because there could be possible termination actions,** certainly adverse effects with lessees, farm-out arrangements, et cetera, if royalty owners aren't paid. And it certainly doesn't help the Debtor going out soliciting new properties, either. So, I mean, if they're not -- if they're not paying

their royalty owners, that gets around in the industry. So, I think we'll pay the royalty owners, with the exception of any unperfected or unfiled overriding royalty interests owned by insiders, which would be Mr. Sigmon.

Transcript of May 20, 2009 hearing p. 269-270.

Likewise the court authorized the Debtor to pay joint interest billings:

MR. HUFFSTICKLER: Right. It's not capital. And it's not LOEs, it's -- actually, it's the joint interest billings.

THE COURT: Joint interest billings. Okay.

MR. HUFFSTICKLER: Right. They're operating the well, so they're incurring the costs. We're just --

THE COURT: Another party is operating the well, --

MR. HUFFSTICKLER: The other party.

THE COURT: -- not the Debtor?

MR. HUFFSTICKLER: We're just ponying up our share, as we're required to do under the operating agreement.

HE COURT: Which could be offset?

MR. HUFFSTICKLER: Which they could offset. And what we'd like to do is just keep paying it in the normal course of business.

THE COURT: Yeah. You can pay those.

MR. HUFFSTICKLER: Thank you, your Honor.

THE COURT: That's fine.

MR. HUFFSTICKLER: Thank you, your Honor.

Transcript of May 20, 2009 hearing, p. 271-272.

From the Final Order authorizing payment of Royalty Claims and Joint Interest entered

as Docket #67, Weatherford appeals.[5]

# V. ARGUMENT

**A. The Bankruptcy Court, as a matter of law, cannot authorize a payment of prepetition debt outside of the Bankruptcy Code's distribution scheme.**

11 U.S.C. §105 and the *CoServ* opinion is mentioned by the Debtors as the basis to

---

[5] Weatherford sought to have the present appeal certified for direct appeal to the Fifth Circuit, but that relief was denied without comment (Docket # 214).

authorize the Motion to pay Prepetition Royalties.    Section 105, like the all writs act, authorizes

the Court to issue orders to effectuate the Code – but not to expand it.  See, e.g., *United States v.*

*Sutton*, 786 F.2d 1305, 1308, (5th Cir. 1986); see also *Jamo v. Katahdin Fed. Credit Union (In re*

*Jamo)*, 283 F.3d 392, 403 (1st Cir. 2002) ("But section 105(a) does not provide bankruptcy

courts with a roving writ, much less a free hand.  The authority bestowed thereunder may be

invoked only if, and to the extent that, the equitable remedy dispensed by the court is necessary

to preserve an identifiable right conferred elsewhere in the Bankruptcy Code.").

The Fifth, Fourth, Ninth and Seventh Circuits have all explicitly found that bankruptcy

Court's powers under 11 U.S.C. §105 do not include the power to pay prepetition unsecured

creditors unless all other unsecured creditors are paid in full:

> Section 105(a) allows a bankruptcy court to "issue any order, process, or
> judgment that is necessary or appropriate to carry out the provisions of" the Code.
> This does not create discretion to set aside the Code's rules about priority and
> distribution; the power conferred by § 105(a) is one to implement rather than
> override.  See *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 99 L. Ed.
> 2d 169, 108 S. Ct. 963 (1988); *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th
> Cir. 1993).  Cf. *United States v. Noland*, 517 U.S. 535, 542, 134 L. Ed. 2d 748,
> 116 S. Ct. 1524 (1996).  **<u>Every circuit that has considered the question has
> held that this statute does not allow a bankruptcy judge to authorize full
> payment of any unsecured debt, unless all unsecured creditors in the class
> are paid in full</u>**. See *In re Oxford Management Inc.*, 4 F.3d 1329 (5th Cir. 1993);
> *Official Committee of Equity Security Holders v. Mabey*, 832 F.2d 299 (4th Cir.
> 1987); *In re B&W Enterprises, Inc.*, 713 F.2d 534 (9th Cir. 1983).  We agree with
> this view of § 105. "The fact that a [bankruptcy] proceeding is equitable does not
> give the judge a free-floating discretion to redistribute rights in accordance with
> his personal views of justice and fairness, however enlightened those views may
> be." *In re Chicago, Milwaukee, St. Paul & Pacific R.R.*, 791 F.2d 524, 528 (7th
> Cir. 1986).

*In re Kmart Corp.*, 359 F.3d 866, 871 (7th Cir. Ill. 2004) (emphasis added).

Likewise, the Fifth Circuit has been explicit:

Neither the appellees nor the bankruptcy court cited a specific provision of the
Code that would   allow the payment of post-petition funds to satisfy pre-petition
claims. By commanding payment, the bankruptcy court elevated the status of the
appellees above that of the other general unsecured creditors and deviated from

the pro rata scheme of distribution envisioned by the Code. See 11 U.S.C. § 726(b) (Law.Co-op.1987). This order effectuated an impermissible substantive alteration of the Code's provisions. For this reason, we find that the bankruptcy court was in error when it used its equity powers to command the payment of the appellees' commissions.

*Oxford Management*, 4 F.3d at 1334.

*Oxford Management* and *Kmart* both reject the "doctrine of necessity" which has been used in some lower bankruptcy courts to pay "critical vendors" and which is just a fancy name for making up one's own law:

> A "doctrine of necessity" is just a fancy name for a power to depart from the Code. Although courts in the days before bankruptcy law was codified wielded power to reorder priorities and pay particular creditors in the name of "necessity" -- see *Miltenberger v. Logansport Ry.*, 106 U.S. 286, 27 L. Ed. 117, 1 S. Ct. 140 (1882); *Fosdick v. Schall*, 99 U.S. 235, 25 L. Ed. 339 (1878) -- today it is the Code rather than the norms of nineteenth century railroad reorganizations that must prevail. Miltenberger and Fosdick predate the first general effort at codification, the Bankruptcy Act of 1898. Today the Bankruptcy Code of 1978 supplies the rules. Congress did not in terms scuttle old common-law doctrines, because it did not need to; the Act curtailed, and then the Code replaced, the entire apparatus. Answers to contemporary issues must be found within the Code (or legislative halls). Older doctrines may survive as glosses on ambiguous language enacted in 1978 or later, but not as freestanding entitlements to trump the text. See, e.g., *Lamie v. United States Trustee*, 157 L. Ed. 2d 1024, 124 S. Ct. 1023, 1031 (2004); *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242-46, 103 L. Ed. 2d 290, 109 S. Ct. 1026 (1989); *Bethea v. Robert J. Adams & Associates*, 352 F.3d 1125, 1128-29 (7th Cir. 2003). See also *Noland* (courts lack authority to subordinate creditors that judges, as opposed to legislators, believe should be lower in the hierarchy).

*In re Kmart Corp.*, 359 F.3d 866, 871 (7th Cir. Ill. 2004).

Lest there be any doubt, the Bankruptcy Code is explicit in several places that no money is to be paid to unsecured creditors outside of a statutory distribution[6], all the money must be distributed pro-rata to creditors of the same class[7], and all distributions must follow the "absolute priority rule" that administrative and priority claims are paid in full before unsecured claims are

---

[6] 11 U.S.C. §726, 11 U.S.C. §1123 (a)(4); 11 U.S.C. §1126, 11 U.S.C. §1129, 11 U.S.C. §1143.
[7] 11 U.S.C. §726, 11 U.S.C. §1123(a)(4).

paid anything.  11 U.S.C. §1123; *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,* 526 U.S. 434, 454 (1999).

In Weatherford's objection to the Motion to pay prepetition royalties and joint interest billings, Weatherford cited the *Kmart* and *Oxford Management* cases. The lower court gave no explanation as to why the Fifth Circuit's decision in *Oxford Management* was not dispositive.

Instead, the basis for the relief was Section 105 and an opinion by the Bankruptcy Court for the Northern District in *CoServ*, which held "critical vendor" payments are permitted under Section 105, assuming (1) "it must be critical that the debtor deal with the claimant," (2) "unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's pre-petition claim," and (3) "there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim." *CoServ*, 273 B.R. at 498.  The same bankruptcy judge followed his *CoServ* opinion in his subsequent opinion in *In re Mirant Corp.*, 296 B.R. 427 (Bankr. N.D. Tex. 2003).

Interestingly, however, *CoServ* has not been widely embraced as a controlling statement of the law.  See *In re Scotia Dev., LLC*, 2007 Bankr. LEXIS 3262 (Bankr. S.D. Tex. Sept. 21, 2007) (refusing to apply *CoServ* to claims by former employees); *In re CEI Roofing, Inc.*, 315 B.R. 50, 58 (Bankr. N.D. Tex. 2004) (limited to prepetition employee wage claims).  It also should be noted that *CoServ* and *Mirant* were published before the Seventh Circuit's opinion in *Kmart*.

*CoServ* itself explained that the Bankruptcy Court could not violate the Bankruptcy Code's distribution scheme:

> Payment of general unsecured claims other than under a plan is also, in this Court's view, inconsistent with the Fifth Circuit's holding in *In re Aweco*, 725

F.2d 293 (5th Cir. 1984), cert denied, 469 U.S. 880, 83 L. Ed. 2d 182, 105 S. Ct. 244 (1984). In that case the Court of Appeals reversed approval of the pre-plan compromise and satisfaction of an unsecured claim on the basis that the settlement violated the absolute priority rule. See id.; see also *In re Boston & Providence R. R. Corp.*, 673 F.2d 11 (1st Cir. 1982).

*In re CoServ, L.L.C.*, 273 B.R. 487, 495 (Bankr. N.D. Tex. 2002)

The test developed by the *CoServ* opinion comes very close to directly contravening the Fifth Circuit holding in *Oxford Management*. *CoServ* attempts to resurrect the authority of Section 105 and the "doctrine of necessity", which has been uniformly rejected by circuit courts as a basis to pay prepetition debt on the first day of the case.

As applied to employee wage claims, perhaps payment is acceptable assuming that the pro-rata distribution can be guaranteed. See *CEI Roofing*, supra (prepetition employee wage have statutory priority over general unsecured claims, which may justify paying those claims early). But as applied to general unsecured claims like royalties and joint interest billings, *CoServ* does violence to the plain language of the statute in the name of necessity.

**B. If CoServ could use Section 105 and the "Doctrine of Necessity", the Appropriate Legal Standard was not Followed.**

*CoServ* is, as set forth above, another foray into Section 105 as a basis of authority to pay critical vendors. *CoServ* is not good law. But if it were, the standards set forth by *CoServ* were not followed.

*Co*Serv acknowledged that the Fifth Circuit has a tough line against paying prepetition claims:

> Though courts in the Second, Third and Seventh Circuits have authorized payment of prepetition debt, the Fifth Circuit, among others, has come perilously close to the view of the bankruptcy court for the District of Montana. Citing decisions rendered by the Ninth Circuit and the bankruptcy courts for the Middle District of Pennsylvania and the Eastern District of Missouri, the court in *In re Timberhouse Post & Beam, Ltd.*, 196 B.R. 547, 550-551 (Bankr. D. Mont. 1996)

adopted a "bright line rule. . .that a prepetition unsecured claim cannot be elevated to an administrative expense. . ."

*CoServ*, 273 B.R.at 495 (Bankr. N.D. Tex. 2002).

But the *CoServ* court concluded that *Oxford Management* did not restrict the Court's use of Section 105 when payment of the prepetition claim was required to fulfill the Debtor's fiduciary duty to preserve estate assets, when payment of the claim was "absolutely necessary".

*CoServ*, 273 B.R. at 497.

Finally, the *CoServ* Court created, from whole cloth, a judicial standard for payment of prepetition claims.

(1) "it must be critical that the debtor deal with the claimant,"

(2) "unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's pre-petition claim," and

(3) "there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim."

*CoServ*, 273 B.R. at 498.

The Debtors did not even come close to meeting this standard.  The first element requires that it be "critical" for the debtor to deal with the claimant.  As indicated above, this element generally requires a showing that a vendor is supplying some critical product or service to the debtor that cannot be obtained elsewhere.  There is nothing critical about dealing with a royalty owner since a royalty owner provides nothing to a debtor.  A royalty owner is strictly a creditor who is owed money for past consideration.  The royalty owner is not providing anything "critical" to the reorganization.

The second element is that the debtor risks a probability of harm disproportionate to the amount of the claim.  The Debtors could possibly have met this test if they established that valuable leases subject to the royalties would automatically terminate if the royalties were not

paid.  As discussed below, the Debtor did not put on any competent evidence that any particular

lease would be lost nor the value of such a lease.  In fact, as noted above, Debtors' counsel

admitted in oral argument that such lease probably would not automatically terminate.  She

stated as follows:

> I can tell you that, in fact, from the testimony, we do, in fact, have leases
> with large landowners.  It is my understanding that the majority of our leases have
> termination provisions if royalties are not paid.  I will say that those provisions
> probably have a notice and cure period, in most instances.  But we'll get them
> noticed, and if they have to, they can lift the stay, and submit the notice.  And
> then we're faced with those parties coming forward, seeking to terminate their
> leases because we haven't paid the royalties.

Transcript of May 20, 2009 hearing at p. 257-58 (emphasis added).

The underlined portion of the quote admits that the leases do not have automatic

termination clauses.  Rather, they have clauses which require notice of default and cure.  The

automatic stay of 11 U.S.C. § 362(a) prohibits parties from taking actions to collect debts post-

bankruptcy:

> Except as provided in subsection (b) of this section, a petition filed under section
> 301, 302, or 303 of this title, . . .**operates as a stay**, applicable to all entities of—
> (3) any act to obtain possession of property of the estate or of property
> form the estate or to exercise control over property of the estate;
> (6) **any act to collect, assess, or recover a claim** against the debtor that
> arose before the commencement of the case under this title:

11 U.S.C. §362(a) (emphasis added).

Obviously, the issuance of a notice to pay a pre-petition royalty on penalty of losing the lease

would be contrary to both §362(a)(6) as the sending of such a notice would constitute "any act to

collect" the royalty; and, it would violate §362(a)(3) because the affect of such a notice if the

claim was not paid would be to terminate the lease.  The Fifth Circuit has expressly held that

such terminations must be preceded by a motion for relief from stay.  *See In re Mirant Corp.*,

440 F.3d 238, 251 (5th Cir. 2006).

Since any notices issued by a royalty owner to terminate a lease are stayed, by admission, there could not be any "automatic" lease termination. Instead, the royalty owner would have to file a motion with the bankruptcy court for permission to issue the termination notice. The Debtors would have a chance to respond. The parties could look at a particular lease and make an informed determination as to whether or not it was appropriate to pay the royalty owner or provide some other form of adequate protection. Instead, the Debtors argued and the Court ruled the way it did so they could avoid having to deal with such motions. Perhaps that is true. But, it is not a sufficient reason to upset the system of statutory priorities so carefully set out by Congress in the Bankruptcy Code.

The third element is that there is no legal or practical alternative for dealing with the claimant. As just stated, the Bankruptcy Code has an alternative which is both legal and practical for dealing with these issues. The alternative is for the royalty owner to file a motion with the Court.

In summary, the Debtors have failed to establish any of the three elements, much less all three actually required by the *CoServ* opinion.

### C. The Court Improperly Admitted Testimony about the Leases in Lieu of the Leases Themselves, which was the Bulk of the Evidence in Support of the "Necessity" of Payment.

The Bankruptcy Court based is decision on verbal testimony indicating that the leases in question would automatically terminate if the royalties were not paid. As stated above, Weatherford and other creditors objected under Fed. R. Ev. 1002 to the witness testifying about an exhibit that was not in evidence. The Bankruptcy Court overruled these objections. An appellate court reviews the decision to allow admission of evidence for abuse of discretion. *United States v. Parsee*, 178 F.3d 374, 379 (5th Cir. 1999). As a general rule, decisions made by the Bankruptcy Court are left to the sound discretion of the bankruptcy court and can only be

overturned for abuse thereof.  See, e.g., *Official Comm. of Unsecured Creditors v. Farmland Indus. (In re Farmland Indus.)*, 397 F.3d 647 (8th Cir. 2005).

The term "discretion" means a sound discretion, that is to say, a discretion exercised not arbitrarily or willfully, but with regard to what is right and equitable under the circumstances and the law, directed by reason and conscience to a just result.  *See Langes v. Green,* 282 U.S.  531, 541 (1931)*,* cited with approval in *In re Aweco*, 725. F.2d 293, 298 (5th Cir. 1984).

Further, a trial court can abuse its discretion by using an improper legal standard.  See *Cahill v. Walker & Patterson, P.C.*, 428 F.3d 536, 539 (5th Cir. 2005).

Discretion can also be abused when a trial court bases its decision on finding of facts that are clearly erroneous.  *Id.*  A finding of fact is not clearly erroneous "if it is plausible in the light of the record read as a whole." *Baker Hughes Oilfield Operations, Inc. v. Cage (In re Ramba, Inc.)*, 416 F.3d 394, 402 (5th Cir. 2005).

 Here, the Bankruptcy Court abused its discretion by admitting evidence contrary to the Federal Rules of Evidence, and then basing it decision on such inadmissible evidence.  As discussed above, the Bankruptcy Court permitted the Debtors to prove up the contents of oil and gas leases through verbal testimony.  This is prohibited by Fed. R. Ev. 1002 which reads as follows:

> To prove the contest of a writing, recording or photograph, the original writing, recording or photograph is required, except as otherwise provided in these rules or by Act of Congress.

Fed. R. Ev. 1002.

The major exceptions to this rule are contained in FRE Rule 1003 and 1004, which state that copies can be admitted in lieu of originals or that documents are not necessary of they are lost, destroyed or unobtainable.  None of these exceptions apply.  The Debtors have

copies of the leases in their files.  For some reason, they simply failed to introduce even one into evidence.   Instead, they offered the self-serving testimony of an individual that does not work.

This issue was directly addressed in two Fifth Circuit Cases.  The first case is *Railroad Management Company, LLC v. CFS Louisiana Midstream Co.*, 428 F.3d 214 (5th Cir. 2005).  There, the Fifth Circuit affirmed the decision of a trial court which excluded certain affidavits (i.e. verbal statements) concerning the contents of an agreement.[8]   The appellate court discussed Rule 1002 and established the following factors which a trial court must look to with respect to its application.

> (a) the relative importance of content in the case, (b) the simplicity or complexity of content and consequent risk of error in admitting a testimonial account, (c) the strength of the proffered evidence of content, taking into account corroborative witnesses or evidence and the presence or absence of bias or self-interest on the part of the witnesses, (d) the breadth of the margin for error within which mistake in a testimonial account would not undermine the point to be proved, (e) the presence or absence of an actual dispute as to content, (f) the ease or difficulty of producing the writing, and (g) the reasons why the proponent of other proof of its content does not have or offer the writing itself.

*Railroad Management* at 219.

Under the law, the Court should have sustained the objection or required the Debtors to produce copies of the leases.   Oil and gas leases are typically large and complex documents.   As a result, risk of error in admitting a testimonial accounts is high.   This statement is corroborated by the closing argument, when the Debtors' counsel contradicted the evidence of her own witness and stated that the lease had notice and cure provisions.  *See also, U.S. v. Scott*, 262 F.3d 455 (5th Cir. 2001), where the Fifth Circuit reversed a decision of

---

[8] The lower court admitted the affidavits for the purpose of proving up the existence of the agreement, but not the contents.

the trial court which admitted testimony regarding information contained in a document which was not placed in evidence.  Here, the Court stated,

> While recognizing that a district court is given great latitude in determining admissibility under this rule, we simply cannot conclude that the oral testimony of Antoine, a cooperating witness, with respect to his memories of notations of drug sales apparently drafted by someone else several years earlier and destroyed soon thereafter had sufficient indicia of trustworthiness. If we allowed this testimony, we would, in effect, be allowing an end run around the rule against hearsay and the requirements of the business records exception. This we are unwilling to do.

*Scott* at 462.

In both of these 5th Circuit cases, the document were unavailable for one reason or another and the evidence was excluded.  Here, the oil and gas leases could easily have been admitted into evidence, but the Debtors simply chose not do so.  As a result, the objecting parties were deprived of their right to review those documents and provide the Court with proof that there would be no irreparable harm if payment of the royalty claims were delayed pending plan confirmation.  Hence, the Bankruptcy Court abused its discretion and committed reversible error by basing its decision on inadmissible testimony.

### D. The Bankruptcy Court Ignored the Strictures of Bankruptcy Rule 6003(b).

The Bankruptcy Court's Order authorizing payment of the pre-petition claims was entered within 20 days of the bankruptcy filing.  Bankruptcy Rule 6003(b) specifically prevents the entry of such orders within 20 days of the filing of the petition.  It states,

> Except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 20 days after the filing of the petition, grant relief regarding the following:
> (a) . . .
> (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, <u>including a motion to pay all or part of a claim that arose before the filing of the petition</u>, but not a motion under Rule 4001;

The underlined portion of the rule specifically prohibits entry of an order to pay debts that arose prior to the case absent proof of immediate and irreparable harm.  This rules was added on December 1, 2007.  There are no cases interpreting this rule.  The advisory committee note states,

> **Notes of Advisory Committee.** There can be a flurry of activity during the first days of a bankruptcy case. This activity frequently takes place prior to the formation of a creditors' committee, and it also can include substantial amounts of materials for the court and parties in interest to review and evaluate. <u>This rule is intended to alleviate some of the time pressures present at the start of a case so that full and close consideration can be given to matters that may have a fundamental impact on the case.</u> The rule provides that the court cannot grant relief on applications for the employment of professional persons, motions for the use, sale, or lease of property of the estate other than such a motion under Rule 4001, and motions to assume or assign executory contracts and unexpired leases for the first 20 days of the case, unless it is necessary to avoid immediate and irreparable harm. This standard is taken from Rule 4001(b)(2) and (c)(2), and decisions under those provisions should provide guidance for the application of this provision.  This rule does not govern motions and applications made more than 20 days after the filing of the petition.

The underlined portion of the Notes indicates that the Rule was intended to alleviate time pressure so that full and close consideration can be give to the matters that may have a fundamental impact on the case.  Here, the order approving the payment of $2 million in unsecured debt was entered five days after the case was filed.  There was absolutely no time for anybody to give this important mater close consideration.  The Bankruptcy Court decided to ignore the rule because the Debtors would otherwise incur irreparable harm.  For the reason discussed above, the Debtors did not come close to establishing irreparable harm.  Thus, under Rule 6003(b), the motion should have been denied.

# VI. CONCLUSION

In summary, all the Circuit Courts which have reviewed this issue, including the 5th Circuit, have held that a Chapter 11 debtor may not use Section 105 to pay one group of pre-petition unsecured claims in full, when other unsecured claims must wait for confirmation of a Chapter 11 plan. Nevertheless, the bankruptcy courts have continued to use Section 105 to permit discrimination between unsecured claimants based on the long-dead "doctrine of necessity". In effect, these lower courts are reversing a statutory priority. Following the Bankrutpcy Code may be inconvenient, but it is the law. "Necessity" alone cannot justify modifications to the priority scheme Congress crafted.

Moreover, even if Congress intended to give bankruptcy courts the power to violate the Bankruptcy Code using Section 105, and even if the *CoServ* standard were the proper justification for promoting some "necessary" unsecured creditors to full and immediate payment, the Debtors did not come close to meeting the C*oServ* standard. There was no proof that the failure to make such payments would irreparably harm the Debtors' ability to proceed to confirmation of a successful reorganization. The evidence admitted as proof of irreparable harm was admitted in violation of the rules of evidence and over objections.

Therefore, Weatherford submits that the decision of the Bankruptcy Court should be reversed and that the Debtors should be ordered to retrieve any and all funds paid out pursuant to that order.

Dated: August 3, 2009

Respectfully submitted,

WEYCER, KAPLAN, PLUAKSI & ZUBER, P.C.

By:_____
Edward L. Rothberg
SBN  17313990
Hugh M. Ray, III
SBN 24004246
11 Greenway Plaza, Suite 1400
Houston TX 77046
(Telephone)  713-961-9045
(Facsimile)   713-961-5349

ATTORNEY FOR APPELLANT,
WEATHERFORD INTERNATIONAL, INC.

## CERTIFICATE OF SERVICE

I certify that on August 3, 2009, I sent a copy of the Appellant's brief via first class U.S. mail to the counsel of record that are listed below.

Deborah D. Williamson
Patrick L. Huffstickler
Lindsey D. Graham
Cox Smith Mathews Incorporated
112 East Pecan Street, Suite 1800
San Antonio, Texas  78205

_____
Hugh M. Ray, III