IN THE

# United States District Court

FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

### Civil Action No. SA-09-CA-569-FB
_____

IN RE:
TXCO RESOURCES INC.

WEATHERFORD INTERNATIONAL, INC.

*Appellant*

— V. —

TXCO RESOURCES INC., ET AL.

*Appellees.*

APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS, SAN ANTONIO DIVISION

## BRIEF OF APPELLEES

Deborah D. Williamson
Leslie Sara Hyman
Thomas Rice
COX SMITH MATTHEWS INCORPORATED
112 E. Pecan St., Suite 1800
San Antonio, Texas 78205
(210) 554-5500
(210) 226-8395 (Fax)

*Attorneys for Appellees*

# TABLE OF CONTENTS

Table of Contents ................................................................................................... i

Table of Authorities ............................................................................................... ii

I. Standard of Review ............................................................................................. 1

II. Statement of the Case ........................................................................................ 2

      A. Nature of the Case ...................................................................................... 2

      B. Course of Proceedings, Disposition Below, and Statement of Facts .......... 3

III. Authority and Argument ................................................................................ 19

      A. Summary of Argument ............................................................................. 19

      B. Weatherford Lacks Standing to Appeal the Royalty Order ...................... 19

      C. The Bankruptcy Court Can Authorize Payment of Prepetition Debt
      under § 105(a) and § 363 of the Bankruptcy Code ......................................... 22

      D. The Debtors Demonstrated the Propriety of Authorizing
      Payment of these Prepetition Debts Prior to Confirmation ............................ 28

      E. In the Alternative, the Royalty Order Should be Affirmed Because
      Royalties held in the Debtors' Segregated Bank Account Are not
      Property of the Estate ...................................................................................... 33

      F. The Bankruptcy Court Properly Relied Upon Admissible Evidence
      in Granting the Royalty Motion ...................................................................... 36

      G. The Bankruptcy Court Properly Determined that the Debtors
      Would Suffer Immediate and Irreparable Harm as Required by
      Rule 6003(b) ................................................................................................... 39

IV. Conclusion .................................................................................................... 40

# TABLE OF AUTHORITIES

## CASES

*Consol. Gas & Equip. Co. of Am. v. Thompson*,
  405 S.W.2d 333 (Tex. 1966), *rehr'g denied,* 80 S.W.2d 741 (Tex. 1935) ...................29

*C.P. Interests, Inc. v. California Pools, Inc.*,
  238 F.3d 690 (5th Cir. 2001) .......................................................................37

*Gibbs & Bruns LLP v. Coho Energy, Inc. (In re Coho Energy, Inc.)*,
  395 F.3d 198 (5th Cir. 2004). .................................................................20, 21

*Greater Houston Bank v. Conte*,
  641 S.W.2d 407 (Tex. App.--Houston [14th Dist.] 1982, no writ)...............................30

*Harker v. Troutman (In re: Troutman Enters., Inc.)*,
  286 F.3d 359 (6th Cir. 2002) ......................................................................21

*In re All Trac Transportation, Inc.*,
  306 B.R. 859 (Bankr. N.D. Tex. 2004).........................................................27

*In re American Plumbing & Mechanical, Inc.*,
  323 B.R. 442 (Bankr. W.D. Tex. 2005).......................................................27

*In re Antweil*,
  154 B.R. 982 (Bankr. D.N.M. 1993) .........................................................34

*In re Babcock & Wilcox Co.*,
  274 B.R. 230 (Bankr. E.D. La. 2002) ........................................................27

*In re CEI Roofing, Inc.*,
  315 B.R. 50 (Bankr. N.D. Tex. 2004).........................................................27

*In re CoServ, LLC*,
  273 B.R. 487 (Bankr. N.D. Tex. 2002)................................................. passim

*In re El San Juan Hotel*,
  809 F.2d 151 (1st Cir. 1987) .....................................................................20

*In re Hess,* 61 B.R. 977
  (Bankr. N.D. Tex. 1986) ...........................................................................22

*In re Kmart Corp.*,
  359 F.3d 866 (7th Cir. 2004) ............................................................. passim

*In re MCZ, Inc.*,
    82 B.R. 40 (Bankr. S.D. Tex. 1987) .......................................................................... 34

*In re Mirant Corp.*,
    296 B.R. 427 (N.D. Tex. 2003)...................................................................................27

*In re Oxford Management*,
    4 F.3d 1329 (5th Cir. 1993) .............................................................................. passim

*In re Scotia Dev., LLC*,
    Case No. 07-20027, 2007 Bankr. LEXIS 3262 (Bankr. S.D. Tex Sept. 21, 2007)........27

*In re Tropical Sportswear Int'l Corp.*,
    320 B.R. 15 (Bankr. M.D. Fla. 2005) ........................................................................24

*Kelly Oil v. Svetlik*,
    975 S.W.2d 762 (Tex. App.--Corpus Christi 1998, *pet. denied*) ..................................29

*Onyx Refining Co v. Evans Prod. Corp.*,
    182 F. Supp. 253 (N.D. Tex. 1959) ..........................................................................22

*Perry v. Dearing (In re Perry)*,
    345 F.3d 303 (5th Cir. 2003) .................................................................................1, 2

*Raspanti v. Keaty (In re Keaty)*,
    397 F.3d 264 (5th Cir. 2005) .....................................................................................1

*Rodriguez v. Riddell Sports, Inc.*,
    242 F.3d 567 (5th Cir. 2001) ...................................................................................37

*Rohm & Hass Texas, Inc. v. Ortiz Bros. Insulation, Inc.*,
    32 F.3d 205 (5th Cir. 1994) ...............................................................................20, 22

*Sheffield v. Hogg*,
    77 S.W.2d 1021 (Tex. 1934), *reh'g denied,* 80 S.W.2d 741 (Tex. 1935).....................29

*Thompson v. Thompson*,
    236 S.W.2d 779 (Tex. 1951)....................................................................................28

*Tompkins v. Cyr*,
    202 F.3d 770 (5th Cir. 2000) ....................................................................................2

*Wilkins v. Fecht*,
    356 S.W.2d 855 (Tex. Civ. App.-San Antonio 1962, writ ref'd) ..................................22

**FEDERAL STATUTES**

11 U.S.C. § 67(c) (1976) ............................................................................................20

11 U.S.C. § 105 .................................................................................................. passim

11 U.S.C. § 108 ............................................................................................................33

11 U.S.C. § 362 ............................................................................................................32

11 U.S.C. § 363 .................................................................................................. passim

11 U.S.C. § 541 ............................................................................................................34

11 U.S.C. 1107 .........................................................................................................3, 26

**STATE STATUTES**

Texas Natural Resources Code § 91.402 ....................................................................31
Texas Natural Resources Code § 91.403 ....................................................................31
Texas Natural Resources Code § 91.404 ....................................................................31
Texas Natural Resources Code § 91.406 ....................................................................31

**RULES**

Federal Rule of Bankruptcy Procedure 6003 .......................................................... passim

Federal Rule of Evidence 1002 ...................................................................................35

TXCO Resources Inc. ("TXCO") and certain of its affiliates and subsidiaries[1] (collectively, the "Debtors") file this Brief of Appellees in response to the Brief of Appellant filed by Weatherford International, Inc. ("Weatherford").

## I.  Standard of Review

The issues Weatherford raises on appeal have varying standards of review.  As to the matters asserted by Weatherford as Issue One, the *de novo* standard of review applies to the question of whether a bankruptcy court may authorize the payment of unsecured claims absent confirmation of a plan.  *Raspanti v. Keaty (In re Keaty)*, 397 F.3d 264, 269 (5th Cir. 2005). Similarly, the issue of what factors a bankruptcy court should consider to determine the appropriateness of allowing such payment is a question of law subject to *de novo* review.  *Id*.  As to the Bankruptcy Court's findings of fact underpinning its decision to authorize the Debtors in this case to pay prepetition royalties, the standard of review is clearly erroneous.  *Perry v. Dearing (In re Perry)*, 345 F.3d 303, 309 (5th Cir. 2003) (holding that an appellate court must determine whether the bankruptcy court's findings are supported by evidence and set them aside only if the appellate court is left with "the definite and firm conviction that a mistake has been committed").

Weatherford's second issue, concerning whether the Bankruptcy Court violated Rule 6003(b) of the Federal Rules of Bankruptcy Procedure by granting relief to the Debtors prior to the passage of 20 days after the petition date, is a question of fact subject to a clearly erroneous standard of review.  *Id.*  As such, reversal of the Bankruptcy Court's determination that the requirements of Rule 6003(b) were met because the failure to make royalty payments would

---

[1] The debtors and the debtors-in-possession in the jointly administered case styled *In re TXCO Resources Inc., et al.,* Case No. 09-51807, are TXCO Resources Inc., Eagle Pass Well Service, L.L.C., TXCO Drilling Corp., Charro Energy Inc., Texas Tar Sands Inc., TXCO Energy Corp., Output Acquisition Corp., OPEX Energy, L.L.C., PPL Operating, Inc., Maverick Gas Marketing, Ltd., and Maverick-Dimmit Pipeline, Ltd..

cause the Debtors irreparable harm is permissible only if upon review this Court is left with "the definite and firm conviction that a mistake has been committed." *Id.*

Regarding Weatherford's third issue, the Bankruptcy Court's decision to admit evidence over Weatherford's objection is reviewable under an abuse of discretion standard. *Tompkins v. Cyr*, 202 F.3d 770, 779 (5th Cir. 2000) (holding that if the party charging reversible evidentiary error raised the appropriate objection at trial, admission of evidence must rise to an abuse of discretion in order to qualify as "error"). Even if the Court determines that the Bankruptcy Court abused its discretion, that decision may only be reversed if not harmless. *Id.* (holding that admission of evidence, even if erroneous, is reversible only if not harmless).

## II. Statement of the Case

### A.     Nature of the Case

This is an appeal from the Bankruptcy Court's *Order on Motion for Authority to Pay or Honor Prepetition and PostPetition Royalty Obligations and Other Obligations Under Oil and Gas Leases* (the "Royalty Order").[2] In the Royalty Order, the Bankruptcy Court authorized the Debtors to remit to lessors of the Debtors' oil and gas leases and potentially other interest owners (the "Royalty Interest Owners") their share of the pre-petition oil and gas production from the Debtors' producing wells located on the respective leases (the "Royalties"), including overriding royalty owners. (Royalty Order at 2) Specifically, the appeal challenges payments made to Royalty Interest Owners to the extent that the Royalties owed constitute an unsecured claim and the payment is made outside the context of a plan of reorganization. This appeal further challenges the Bankruptcy Court's finding that granting such relief was appropriate under Rule

---

[2] Because the record on appeal is not consecutively numbered, the Debtors will cite to the items in the record by title.

6003(b) of the Federal Rules of Bankruptcy Procedure, which limits the orders that may be entered within the first 20 days after a bankruptcy petition is filed.  Finally, this appeal challenges whether the Bankruptcy Court relied upon admissible evidence to support its conclusion that the Debtors were entitled to relief.  Given that the Bankruptcy Court's decision was well reasoned and is fully supported by both the law and uncontroverted admissible evidence, the Bankruptcy Court's Royalty Order should be affirmed.

**B.    Course of Proceedings, Disposition Below, and Statement of Facts**

The Debtors commenced these cases by each filing a voluntary petition under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") on May 17 and 18, 2009 (the "Petition Date").  (*See Motion for Authority to Pay or Honor Prepetition and Postpetition Royalty Obligations and Other Obligations Under Oil & Gas Leases* (the "Royalty Motion") ¶ 2).  Since the Petition Date, the Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to § 1107(a) of the Bankruptcy Code.  (Royalty Motion ¶ 3).

TXCO is a mid-sized, full-cycle, publicly traded, U.S.-based, oil and gas exploration and production company employing approximately 60 employees, with a diversified exploitation, development, and exploration project inventory.  (*Unsworn Declaration under Penalty of Perjury of Albert S. Conly, Chief Restructuring Officer of TXCO Resources Inc., in Support of First Day Motions* (the "Conly Declaration") ¶ 7).[3]  The Debtors are headquartered in San

---

[3] The Conly Declaration was filed in support of the relief requested in the Royalty Motion and incorporated therein by reference and was admitted at the hearing held on May 20, 2009 as Debtors' Exhibit 1.  (Royalty Motion ¶ 6; Sec. Day Tr. 11:14-17:15).  Both parties are relying upon the Conly Declaration in the briefing before this Court. Inasmuch as the Conly Declaration was incorporated by reference in the Royalty Motion and not attached to the Royalty Motion, however, it is unclear whether a copy of the Conly Declaration was transmitted to this Court. Accordingly, the Debtors are including a copy of the Conly Declaration, without its exhibit, in their Appendix for the Court's convenience.

Antonio and also maintain an office in Houston. (*Id.*). Each of the Debtors is engaged in one or more aspects of the acquisition, development, exploration, and exploitation of oil and gas properties in the United States. (*Id.* ¶ 8).

The Debtors have more than 720,000 net acres under lease (1.3 million gross acres), and focus operations in the core area of the Maverick Basin in South Texas, as well as the additional strategic areas in the Fort Trinidad Field in the East Texas Basin, the Marfa Basin in West Texas, the Midcontinent area of western Oklahoma, and the Gulf of Mexico – with operations both onshore and in the shallow Gulf waters. (*Id.* ¶ 9).

Prior to the Petition Date, the Debtors' intent was to maintain their interests in mineral lease acreage and undeveloped mineral interests and to develop a multi-year drilling inventory. (*Id.* ¶ 10). The implementation of advanced technologies, such as 3-D seismic and horizontal drilling, is integral to this strategy. (*Id.*). Both acting as operator and participating in non-operated wells, the Debtors' business strategy was growth-oriented – with the goal to discover, develop, and/or acquire more reserves on an annual basis than are produced. (*Id.*). On a gross basis, during 2008 the Debtors participated in 96 wells, including new drilling of 73 wells and the re-entry of 23 existing wells, acting as operator on 57 of the 73 new wells (78%). (*Id.* ¶ 12).

The Maverick Basin of Southwest Texas is the Debtors' core focus area – an area with more than 20 productive geological zones and multiple resource play potential. (*Id.* ¶ 13). The Debtors own oil and gas leases and have all or a portion of the working interest in approximately 1 million acres that overlie the Eagle Ford Shale Formation ("Eagle Ford"), which is a relatively shallow gas-prone shale resource play. (*Id.*). In addition, the Debtors are farmees under a farm-in agreement with Anadarko pursuant to which the Debtors have completed the first phase, and must complete the second phase of the project to earn the additional interests contemplated by

the agreement. (*Id*.). Overall, in 2008, the Debtors participated in 4 wells targeting the Eagle Ford. (*Id*.). Additionally, with a 50% working interest, the Debtors are farmees under a farm-in agreement with EnCana Oil and Gas (USA), Inc., pursuant to which the Debtors have completed the first phase, and must complete the second phase of the project to earn the additional interests contemplated by the agreement in the Pearsall Shale Formation ("Pearsall"), an over-pressurized natural gas shale play underlying 819,000 gross acres of the Debtors' Maverick Basin deep rights holdings. (*Id*.). Overall, in 2008, the Debtors participated in a total of 6 wells targeting the Pearsall. (*Id*.). The 95,250 acre Comanche Ranch Lease ("Comanche") and the adjacent Cage Ranch Lease ("Cage") are sites for significant development of oil resources from the Glen Rose Formation ("Glen Rose") – a water drive reservoir, meaning that oil is driven naturally into the wellbore by rising oil-water contact. (*Id*.). The Debtors own the majority working interest in the Comanche, and 100% of the working interest in the Cage. (*Id*.). In addition to the initial test well, the Debtors and their operating partner drilled 9 new wells and 4 re-entries targeting Glen Rose oil during 2008 on the Comanche, and drilled or re-entered 17 Glen Rose oil wells on the Cage, up 121% from wells drilled on the Cage in 2007. (*Id*.). The Debtors have completed a total of 32 horizontal wells targeting Glen Rose natural gas under an agreement with AROC-Texas, Inc. by which the Debtors drill and AROC-Texas, Inc. operates the wells. (*Id*.). The Georgetown Formation ("Georgetown") is a fractured formation producing both oil and gas and was the target formation of six new wells and six re-entries in 2008. (*Id*.). Through February 2009, either alone or as part of a project with Millenium E&P Resource Fund I, LLC, pursuant to which the Debtors have a carried working interest, the Debtors have participated in three Georgetown wells. (*Id*.). The San Miguel Formation ("San Miguel") is targeted through the Debtors' acquisition of the Pena Creek oil field, on which it conducts waterflood operations.

(*Id*.).  The Debtors participate in 94 producing wells, 94 waterflood wells and 28 shut-in wells. (*Id*.).  New operations in the San Miguel include the drilling of infill wells (drilled between existing wells) and additional wells not in the waterflood zone, and additional pilot projects targeting the San Miguel Oil Sands, that have been suspended pending a rise in oil prices.  (*Id*.). Between 2007 and 2008 six wells were spudded targeting the Austin Chalk Formation ("Austin Chalk").  (*Id*.).

The Debtors have also acquired assets in the East Texas Fort Trinidad area from Output Exploration, L.L.C., which strategically are primarily prospective for targeting the Glen Rose, Buda, Austin Chalk, Eagle Ford, Woodbine and Bossier Formations.  (*Id*. ¶ 14).  The Debtors participated in 5 wells in Fort Trinidad in 2008.  (*Id*.).

Additionally, the Debtors acquired leasehold interests targeting the Barnett and Woodford Shale formations as well as the Navaculite and Ellenberger formations in the Marfa Basin, located approximately 200 miles northwest of their Maverick Basin leases.  (*Id*. ¶ 15). These formations are potentially excellent sources of natural gas, but require expensive horizontal drilling and hydraulic fracturing techniques to efficiently extract the gas reserves. (*Id*.).  As the 50% working interest owner in 140,000 gross acres, the Debtors have conducted some operations.  (*Id*.).  This asset is primarily prospective.  (*Id*.).

The Debtors have also participated in 3 wells in Oklahoma and in the shallow waters off of Louisiana's Gulf Coast, pursuant to their acquisition of assets from Output Exploration, LLC in April of 2007.  (*Id*. ¶ 16).  In addition, the Debtors own 4,400 gross acres in the Williston Basin and current operations have been targeted at the Red River Formation.  (*Id*.).

The ability to lease and to maintain leases is the lifeblood of an oil and gas exploration and production company, such as the Debtors', as it forms the foundation for all operations and

revenue streams. (*Id*. ¶ 27). Lease acquisition and maintenance are of utmost importance because without such ability there is no exploration, no drilling, no development, no possibility for production and no revenue generation from the subsequent sale of that production. (*Id*.).

Although each oil and gas lease is unique according to the individual terms contained therein, there are certain commonalities among oil and gas leases relating to rights and obligations of the oil and gas lessee, operator, or working interest owner ("lessee") or operator vis-à-vis the owner of the mineral estate ("lessor"). (*Id*. ¶ 28). In addition, certain rights and obligations between lessor and lessee are dictated by statute even when not specifically dictated by a lease agreement. Generally speaking, a lease has a fixed primary term and the potentiality of infinite duration as long as oil or gas is produced from the lands covered by the lease. (*Id*.). The lease typically calls for the payment of upfront consideration (known as a "bonus"), payment for the right, but not the obligation, to drill during the primary term ("delay rentals"), royalty payments representing a fraction of production or shut-in payments for those wells that have been drilled and are capable of producing, but have been shut-in for a certain reason (such as lack of a pipeline), in exchange for the right to explore for and produce minerals. (*Id*.). In some cases, the lessor negotiates for the lessee to have the *obligation* to drill a certain number of wells continuously over a period of time (known as a "continuous drilling obligation"). (*Id*.). In other cases, the lessee or operator has entered into a contractual arrangement such as a joint operating or joint exploration agreement with other working interest owners that requires a certain number of wells to be drilled, either as a contractual covenant or as consideration for earning acreage. (*Id*.). It is often the case that the timing under such a contractual arrangement between or among working interest owners is tied to the underlying lease commitments. (*Id*.).

Should a lessee fail to meet its obligations under the lease or a contractual arrangement, as described above, there are two potential results.  (*Id.* ¶ 29).  The first is liability for contract damages, as occurs when a lessee or operator breaches a covenant (for example, under a standard lease, failure to properly pay royalties is a breach of covenant).  (*Id.*).  The second result, however, is the termination of a lease or forfeiture of certain acreage thereunder that is not held by a well (known as "non-HBP acreage"), as a result of a breach of a lease *condition*.  (*Id.*). Failure to pay or to properly pay delay rentals or shut-in royalties, failure to meet continuous drilling commitments, and in some cases, failure to pay royalties, may be breaches of conditions that would result in the partial or complete termination of a lease.  (*Id.*).  A lessee's failure to meet continuous drilling commitments usually results in the forfeiture of all leased acreage not immediately surrounding already drilled wells.  (*Id.*).

The Debtors currently have 720,000 net and 1.3 million gross acres under lease.  (*Id.* ¶ 31).  Such leasehold assets comprise a large component of the valuation of the Bankruptcy Estates.  (*Id.*).  As of the Petition date, the Debtors stood to lose 284,846 net acres (all of which is crucial acreage located in the Debtors' strategic core area of the Maverick Basin) due to a failure to pay delay rentals, bonus payments for lease extensions, ratifications and renewals, and the inability to outlay the necessary expenditures for the drilling or re-entry of wells, as required by continuous drilling commitments of various leases and contractual arrangements with other working interest owners.  (*Id.*).  This would have gravely jeopardized the value of the Bankruptcy Estate by resulting in the loss of approximately 40% of the Debtors' acreage and potentially 65% to 93% of the Debtors' strategic acreage positions, including unearned acreage. (*Id.*).

Prepetition, the Debtors maintained a Cash Management System that included 11 Accounts at Guaranty Bank. (*Id.* ¶ 60). At Guaranty Bank, the "TXCO Revenue Clearing Account" received revenues and funds that were then transferred into two accounts, the "TXCO Revenue Distribution Account," which was segregated for the purpose of holding and paying royalties, and the "TXCO Concentration Account," which was the primary operating account. (*Id.* ¶¶ 60-61).

Royalties were paid from the TXCO Revenue Distribution Account. (*Id.* ¶ 61). Royalty checks were due to be distributed the week before the Petition Date so the Debtors sought approval from the Bankruptcy Court to issue the royalty checks. (*Id.*). The Debtors proposed to keep the Revenue Distribution Account open to allow checks to clear. (*Id.*). Postpetition royalties will be paid out of new Frost Debtor-In-Possession Accounts. (*Id.*).

As of the Petition Date, the Debtors also maintained four accounts at Amegy Bank of Texas. (*Id.* ¶ 63). The "Output Royalty" and "OPEX Royalty" accounts at Amegy Bank were used to pay royalty obligations and the Debtors proposed to keep such Accounts open post-petition to allow royalty checks issued prepetition to clear with postpetition royalty checks issued after May 31, 2009 to be issued out of new Debtor-In-Possession Accounts at Frost. (*Id.*).

For royalty and working interest owners, revenue is received from production via wire transfers, ACH, or checks, and then transferred into appropriate segregated Royalty Accounts. (*Id.* ¶ 68). The amounts are then booked and applied to well levels to calculate amounts owed to each royalty or working interest owner. (*Id.*). Joint interest billings ("JIBs") are then run on or about the 10th of each month. (*Id.*). Royalty and working interest payments are run on or about the 15th of each month. (*Id.*). After revenue amounts are generated, the Debtors' Controller receives and reviews the recommended payments report. (*Id.*). After review by the Controller,

including a determination whether there are any obligations that should be set off, final approval of the recommended payments is issued. (*Id.*). The recommended payments list is then sent to the Debtors' office manager for check printing. (*Id.*). After printing, checks are signed and reviewed, after which the Debtors' computer program records these payments. (*Id.*).

In connection with the Debtors' oil and gas assets, the Debtors are obligated, pursuant to their oil and gas leases and related operating agreements, to remit the Royalties to the Royalty Interest Owners. (*Id.* ¶ 111). As of the Petition Date, the Debtors estimated that they owed approximately $2 million to the Royalty Interest Owners for current royalty obligations.[4] (*Id.*). Of that, $1,065,367 was owed for the Royalties attributable to oil and gas revenues received by the Debtors in the month prior to the Petition Date. (*Id.*).

Non-payment of Royalties could jeopardize oil and gas leases. (*Id.* ¶ 112). In addition, there are certain statutory penalties for failure to pay Royalties. Lastly, purchasers of production may be reluctant to timely deliver oil and gas receipts to the Debtors if Royalty Interest Owners are not paid. (*Id.*). Payments to the Royalty Interest Owners are paid in arrears and should be paid promptly. (*Id.*). Accordingly, on May 18, 2009, the Debtors filed the Royalty Motion requesting that the Bankruptcy Court enter an order authorizing the Debtors to deliver in the ordinary course of business the funds owed to Royalty Interest Owners, which included amounts owed both prepetition and postpetition. (Royalty Motion ¶ 7). The statutory predicates for the relief requested in the Royalty Motion were § 105(a) and § 363 of the Bankruptcy Code. (Royalty Motion ¶ 5). In addition to the statutory predicates for the relief, the Debtors asserted

---

[4] Debtors' books and records reflect both "current" and certain "aged" royalty obligations. Funds for current royalties are segregated for payment and paid in the ordinary course. The "aged" royalties (which royalties' obligations related to historical situations such as where Debtors have been unable to locate the address for the royalty owner or have been otherwise unable to deliver payment) are simply listed as liabilities on Debtors financial records. Debtors sought no relief with respect to those aged royalty obligations.

that the Royalties were held in a segregated account, which was subject to the equitable interest of the Royalty Interest Owners and not property of the Bankruptcy Estates. (Royalty Motion ¶¶ 15 & 21).

The Debtors are also the operators for a number of the oil and gas wells in which they hold an interest, many under joint operating agreements with other parties. (Conly Declaration ¶ 113). As a part of insuring that these wells continue operating, the Debtors are incurring numerous current lease operating expenses ("LOEs"). (*Id.*). Many of the invoices for these LOEs will cover both prepetition and postpetition expenses. (*Id.*). Given the number of such invoices, and the Debtors' now limited accounting staff, separating the prepetition portions from the postpetition portions of each individual invoice will be impractical or even impossible for the Debtors to timely accomplish. (*Id.*).

Where the Debtors hold non-operating working interests in wells under various joint operating agreements ("JOAs"), the Debtors receive payments representing their share of production revenues. (*Id.* ¶ 114). The Debtors then reimburse the operator for their share of the production costs through the payment of JIBs. (*Id.*). The failure to timely pay JIBs may provide grounds for the operator to assert contractual or statutory lien rights against the Debtors' interest in the well. (*Id.*).

If the Debtors had not paid the prepetition JIB, JOA and LOE obligations, the Debtors' operations would have been severely impacted and production could have completely ceased for certain wells. (*Id.* ¶ 115). These occurrences would have directly, immediately and negatively impacted the Debtors' creditors and other parties in interest. (*Id.*).

The Debtors' ongoing operations depend, to a significant degree, on their relationship with the parties to whom LOE, JOA, and JIB obligations are owed. (*Id.* ¶ 116). If these

relationships are harmed, either through the non-payment of obligations as they become due, or through the perceived difficulties of dealing with chapter 11 debtors, the Debtors will likely encounter particularized controversies with each entity, unnecessary costs and distractions and corresponding harm to their businesses with the possible loss of the Debtors' going concern value. (*Id.*). Given the competitive nature of the Debtors' businesses, strict lease provisions, and statutory requirements, the counterparties to LOEs and JIBs may not have the same dependence upon the Debtors. (*Id.*).

In the instances where the Debtors hold a non-operating working interest in leases or wells, the JOAs often grant the operator a contractual lien upon the Debtors' interest in the lease or well that may include (a) all equipment installed on the lease; (b) all hydrocarbons or other minerals severed and extracted from or attributable to the lease; (c) all accounts and proceeds of sale, contract rights, and general intangibles arising in connection with the sale; (d) fixtures; and (e) any and all accessions, additions and attachments thereto and the proceeds and products therefrom. (*Id.* ¶ 117). The lien sometimes purports to secure the payment of all charges, fees, court costs, and other directly related collection costs. (*Id.*). If the Debtors do not pay charges when due, the operator may also attempt to assert additional rights to collect from the purchaser of the Debtors' hydrocarbon production until the amount owed has been paid. (*Id.*).

As such, the Debtors' failure to timely pay JIBs owing would likely lead to instances of attempted setoff or recoupment. (*Id.* ¶ 118). The Debtors expect to pay, and should have the funds available to pay, Royalties, LOEs and JIBs in the ordinary course of business <u>postpetition</u>. (*Id.*). The Debtors thus requested in the Royalty Motion authority to pay all invoices for LOEs received after the Petition Date where they deem it impractical to differentiate between prepetition and postpetition costs. (*Id.*). The Debtors also sought to pay all LOEs and JIBs that

could include both prepetition and postpetition amounts, in the ordinary course of business to avoid the potential shut down of the Debtors' operations or the incurrence of contractual or statutory liens in favor of non-debtor operators.  (Royalty Motion ¶ 11-12).

Weatherford responded to the Royalty Motion in its *Omnibus Objection of Weatherford International to First Day Motions* (the "Objection"), wherein Weatherford argued that the Bankruptcy Court should deny the relief requested in the Royalty Motion.  (Objection ¶ 11).  In this Objection, filed prior to the hearing, Weatherford asserted that the Debtors had not demonstrated proof of immediate and irreparable harm in order to be entitled to relief under Bankruptcy Rule 6003(b).  (*Id*. ¶ 12).  Weatherford further argued that the Royalty Motion was prejudicial to its interest because Weatherford would not be receiving any of the payments contemplated in the Royalty Motion.  (*Id*. ¶ 13).  Finally, Weatherford asserted that such payments were prohibited in the Fifth Circuit.  (*Id*. ¶ 14).

On May 19, 2009, the Bankruptcy Court held a hearing to consider the Royalty Motion and several other motions that had been filed by the Debtors.  (May 19, 2009 Transcript of First Day Hearings ("First Day Tr.") at 1).  Weatherford was represented by counsel at that hearing, who actively participated in the proceedings.  (First Day Tr. 4).

The first person to testify on behalf of the Debtors was Mr. Gary Grinsfelder, the President of TXCO.  (First Day Tr. 185).  Mr. Grinsfelder initially testified about the business operations of TXCO and the fact that a significant part of the Debtors' assets was the substantial acreage retained by the Debtors under various oil and gas leases.  (First Day Tr. 187:14 - 189:6).  He explained that the Debtors had been operating in the Maverick Basin for over 20 years and had developed significant business relationships with the land owners in that area.  (First Day Tr. 195:12 – 196:2).  The uncontroverted evidence was that the Debtors dealt with large landholders

13

in the Maverick Basin, which could potentially have both positive and negative consequences to the Debtors. (First Day Tr. 196:3–19).

After a discussion of the Debtors' drilling operations, Mr. Grinsfelder testified about certain drilling obligations that were required under a specific lease -- the Paloma Lease. (First Day Tr. 22:15–24). This testimony elicited the first objection from Weatherford's counsel, as highlighted by Weatherford on page 8 of its brief, regarding whether Mr. Grinsfelder could testify about the drilling obligations under the Paloma lease. (Appellant's Brief at 8-9 (citing First Day Tr. 220:12 – 221:16)). The Bankruptcy Court indicated that Mr. Grinsfelder could testify about his knowledge of the subject. (First Day Tr. 221:18-19 ("THE COURT: He can give his information, best available information. Go ahead.")).

Shortly thereafter, Mr. Grinsfelder testified about his understanding of the drilling requirements under the Paloma lease, which elicited the only other objection by Weatherford's counsel. (First Day Tr. 222:9–25). The Bankruptcy Court overruled this second objection, again allowing the witness to testify about his understanding of the Debtors' drilling obligations. (First Day Tr. 223:1-6). As acknowledged in the Appellant's Brief, there were no further "best evidence" objections raised by Weatherford.

Mr. Grinsfelder went on to testify about the necessity of paying the Royalties and LOEs. (First Day Tr. 246:8 – 254:3). Mr. Grinsfelder acknowledged that some of the Debtors' leases had expired; however, he also testified about his understanding that many of those landholders were willing to consider renewal of the leases based on the long-term business relationship with the Debtors. (First Day Tr. 246:8–23). He explained how the failure to make royalty payments would damage the Debtors' important business relationships, which could lead to the Debtors' business operations being compromised. (First Day Tr. 248:6 – 249:13). Mr. Grinsfelder's

14

testimony was that harm to business operations could also come from the Debtors' failure to pay the LOEs. (First Day Tr. 249:14 – 250:14).[5] Mr. Grinsfelder also described the business risks from competitors faced by the Debtors in the immediate future. (First Day Tr. 247:2–20). He explained that the Debtors face increased competition to obtain and retain acreage. (First Day Tr. 257:9–22). On cross-examination, Mr. Grinsfelder expounded on the potential harms to the Debtors' business relationships should the Debtors fail to pay the Royalties. (First Day Tr. 255:14 – 258:3).

On the second day of the hearing, the Bankruptcy Court heard from Mr. Conly, a senior managing director with FTI Consulting and the Chief Restructuring Officer for the Debtors whose declaration was already before the Bankruptcy Court. (May 20, 2009 Transcript of First Day Hearings ("Sec. Day Tr.") at 9:13 – 10:12). Mr. Conly testified that he had a vast range of experience in the oil and gas industry. (Sec. Day Tr. 10:18 - 11:7). Like Mr. Grinsfelder, Mr. Conly described the harm to the Debtors' business relationships should the Debtors fail to pay the Royalties. (Sec. Day Tr. 49:2 – 50:11). For example, Mr. Conly confirmed that the failure to make royalty payments could lead to the loss of leases. (Sec. Day Tr. 49:7-10). Mr. Conly explained that failure to pay the Royalties could also harm the Debtors' relationship with the purchasers of the oil and gas produced by the Debtors. (Sec. Day Tr. 49:17-50:11 ("A couple of cases, we've had purchasers withhold payment because of their concerns about actions by the royalty owners, that -- that they're actually holding, at least for a temporary period of time, the royalty owners' money -- money, and then submitting that to the operator for distribution, and

---

[5] Towards the conclusion of Mr. Grinsfelder's testimony, a final "best evidence" objection was raised by Mr. Scott Rose, counsel to the Bank of Montreal. (First Day Tr. 252:8 – 253:19). The objection was related to the Debtors' ability to obtain postpetition funding, not to the terms of the leases and is not the subject of this appeal. (First Day Tr. 250:15 – 252:12).

that they have, out of an abundance of caution, perhaps, withheld payment until they have a court order protecting them.")).  Mr. Conly also discussed the immediate need for the relief requested by the Debtors in the motions before the Bankruptcy Court, including the relief sought in the Royalty Motion.  (Sec. Day Tr. 56:25 – 58:23).

Mr. Conly was also cross-examined by Weatherford's counsel on the relief requested in the Royalty Motion.  (Sec. Day Tr. 99:1 – 100:22).  In connection with Mr. Conly's concern that leases could terminate due to the failure to make royalty payments, Mr. Conly confirmed that he had never seen a TXCO lease that did not contain automatic termination language and that leases generally do include that language.  (Sec. Day Tr. 99:11-17).  Mr. Conly also explained that if the Royalties were not paid, parties working with the Debtors in connection with continuous drilling obligations could refuse to continue to work with the Debtors. (Sec. Day Tr. 100:2-18).

On cross-examination by counsel to Halliburton Energy Service, Mr. Conly explained how the accounting for the Royalties was handled.  (Sec. Day Tr. 120:14 – 126:11).  Regarding the account at Guaranty Bank, Mr. Conly testified that the Debtors maintained a separate account to hold the Royalties, such that the money to pay the Royalties would not come from the Debtors' general funds.  (Sec. Day Tr. 120:24 – 122:5).  Additionally, Mr. Conly illustrated when the payments would be made to the Royalty Interest Owners.  (Sec. Day Tr. 122:6 – 126:11).

Mr. Conly was also asked about the potential harm to the Debtors from the failure to make royalty payments and payments for the amounts owed under the JIBs.  (Sec. Day Tr. 126:12 – 128:22).  He confirmed that it was the Debtors' belief that leases could be lost based on the failure to make royalty payments.  (Sec. Day Tr. 127:2-10).  Furthermore, Mr. Conly agreed

with Halliburton's counsel that "we can all agree that there is inconvenience and sometimes real problems if we don't pay our royalty owners." (Sec. Day Tr. 127:2-8).

At the end of Mr. Conly's testimony, he again confirmed that leases could contain termination provisions. (Sec. Day Tr. 159:16-23). No party objected to Mr. Conly's testimony about the payment of Royalties, or amounts owed by the Debtors for JIBs under the "best evidence" rule. Weatherford did not attempt to introduce any controverting evidence.

In addition to taking evidence, the Bankruptcy Court heard oral argument on the Royalty Motion. (Sec. Day Tr. 249:16 – 272:13). Counsel for Halliburton Energy Services argued that the Bankruptcy Court should not authorize the Debtors to pay all Royalties on the third day after the Petition Date, instead seeking a review of the lease agreements to determine which leases contained termination provisions. (Sec. Day Tr. 250:24 – 256:9).[6] Halliburton's counsel recognized the need for the Bankruptcy Court to make a decision quickly however (Sec. Day Tr. 254:1-5), and acknowledged that "[i]t may be the best thing to pay them all." (Sec. Day Tr. 253:14-15). Additionally, there was recognition by counsel for Halliburton that there was a possibility that the Royalty Interest Owners could have obtained a lien on the proceeds from production under the Texas Business & Commerce Code. (Sec. Day Tr. 253:7-10 ("There is an argument -- I don't want to mislead anybody. There is an argument in Texas, under 9.343 of the Texas Uniform Commercial Code, that a royalty owner might have a statutory lien.")).

Weatherford's counsel argued, as Weatherford does on appeal, that the timing of the Royalty Motion was inappropriate under Bankruptcy Rule 6003. (Sec. Day Tr. 256:11-18).

---

[6] Halliburton filed a separate Notice of Appeal of the Royalty Order that recites the exact same issues to be considered by the Court in this appeal. It is assumed that the arguments asserted by both counsel for Weatherford and counsel for Halliburton were considered by the Bankruptcy Court in reaching its decision to grant the Royalty Motion and thus both are relevant to this appeal.

Additionally, Weatherford's counsel argued that the Debtors had presented no evidence of harm, specifically asserting that the Debtors had not presented a single lease containing termination language.  (Sec. Day Tr. 261:21 - 262:1).  In connection with this argument, Weatherford's counsel tacitly acknowledged that the Debtors could obtain the requested relief if they demonstrated such relief was necessary.  (Sec. Day Tr. 256:16-18, 262:2-9).

In closing, the Debtors' counsel addressed the case law applicable to authorization of payment of prepetition debts prior to confirmation of a plan and walked the Bankruptcy Court through application of that caselaw to the facts elicited at the hearing.  The Debtors' counsel demonstrated that the uncontroverted evidence from Mr. Grinsfelder and Mr. Conly established that the Debtors were entitled to authorization to pay the Royalties.  (Sec. Day Tr. 258:8 – 259:11).  The Debtors' counsel also reminded the Bankruptcy Court that Mr. Grinsfelder and Mr. Conly had demonstrated that the Debtors could suffer an immediate and irreparable injury either from the termination of leases or through the loss of or harm to critical business relationships.  (Sec. Day Tr. 257:22 – 259:22).  The closing argument also demonstrated the need for payment of the Debtors' JIBs.  (Sec. Day Tr. 260:7-17).  Finally, the Debtors' counsel argued that at least one court has stated that royalty payments could be subject to an implied bailment and thus, the Royalties may not even be property of the bankruptcy estate.  (Sec. Day Tr. 260:24 – 261:12).

The Bankruptcy Court then ruled from the bench.  (Sec. Day Tr. 269:12 – 272:13).  The Bankruptcy Court recognized the threatened harm to the Debtors' business relationships and specifically found that failing to pay the Royalty Interest Owners would cause the Debtors irreparable harm.  (Sec. Day Tr. 269:25 – 270:13).  The Bankruptcy Court thus authorized the Debtors to pay the Royalties in the ordinary course of business.  (Sec. Day Tr. 270:1-5).  This oral ruling was followed on May 22, 2009, by a written order authorizing the Debtors to pay the

Royalties to the Royalty Interest Owners in the ordinary course of business and authorizing the Debtors to satisfy any outstanding payment obligations, both pre- and post-petition, under existing JIBs.  (Royalty Order at 2).  The Royalty Order also states that the requested relief was appropriate under Bankruptcy Rule 6003.  (*Id.* at 1).

### III.  Authority and Argument

#### A.      Summary of Argument

Weatherford lacks standing to appeal the Royalty Order because it is not a party aggrieved by that order.  The appeal also lacks merit because the Bankruptcy Court did not err when it entered the Royalty Order.  It is well recognized by the lower courts in the Fifth Circuit that a bankruptcy court has authority to authorize payment of pre-petition debts under the doctrine of necessity.  The Bankruptcy Court properly applied the prevailing doctrine of necessity standards to the facts of this case in authorizing the Debtors to pay the Royalties.  The Bankruptcy Court's decision that the threat of immediate and irreparable harm satisfied the standards of Bankruptcy Rule 6003(b) was not clearly erroneous and, in the alternative, was, at best, harmless error as Weatherford has neither shown nor even argued that it was prejudiced by entry of the Royalty Order within the first 20 days following the Petition Date.  Finally, Weatherford's "best evidence" argument fails because (1) Weatherford failed to object on that basis to the evidence about which it now complains and (2) any error was harmless inasmuch as the Bankruptcy Court's decision was based on sufficient evidence, even setting aside the objected-to evidence relating to the Paloma Lease.

#### B.      Weatherford Lacks Standing to Appeal the Royalty Order

As a threshold matter, Weatherford lacks standing to appeal the Royalty Order. Bankruptcy courts, as courts authorized under Article I, rather than Article III, of the United

19

States Constitution are not bound by the traditional Article III rules of judicial standing. *Rohm &*

*Hass Texas, Inc. v. Ortiz Bros. Insulation, Inc*., 32 F.3d 205, 210 n.18 (5th Cir. 1994). Instead,

the requirements of judicial standing in bankruptcy cases and proceedings are derived from the

former Bankruptcy Act of 1898, which stated that "[a] person aggrieved by an order of a referee .

. . may file with the referee a petition for review . . . ." 11 U.S.C. § 67(c) (1976) (*repealed*

1978). Although Congress did not include this provision when the Bankruptcy Code was

overhauled in 1978, a body of common law developed that continues to apply this standard.

*Rohm & Haas,* 32 F.3d at 210 n.18*; Gibbs & Bruns LLP v. Coho Energy, Inc. (In re Coho*

*Energy, Inc.)*, 395 F.3d 198, 202 (5th Cir. 2004).

The "person aggrieved" standard is more exacting than the test for traditional

constitutional standing. *In re Coho Energy,* 395 F.3d at 202. The policy behind such an

exacting standard is to prevent unreasonable delay caused by protracted litigation, serving the

interests of neither the bankrupt's estate nor its creditors. *In re El San Juan Hotel*, 809 F.2d 151,

154 (1st Cir. 1987). The bankruptcy setting faces a greater risk of such protracted litigation

because of its "myriad of parties" – directly and indirectly involved or affected by each order and

decision of the bankruptcy court. *Id.* Therefore, the "person aggrieved" standard demands a

higher causal nexus between act and injury and a proper appellant's rights or interests must be

"directly and adversely affected pecuniarily" by the order of the bankruptcy court. *In re Coho*

*Energy*, 395 F.3d at 202; *In re San Juan Hotel*, 809 F.2d at 154.

Thus, to have standing, an appellant must <u>first</u> show a real and immediate injury or threat

of injury in fact, which may not be "conjectural or hypothetical." *Rohm*, 32 F.3d at 208-10.

Such injury or threat of injury requires that the appellant have its own financial stake in the order

appealed from, such that the order "diminishes [its] property, increases [its] burdens or impairs

[its] rights." *Harker v. Troutman* (*In re: Troutman Enters., Inc.*), 286 F.3d 359, 364 (6th Cir. 2002). When the order appealed from involves use of the debtors' funds, an appellant making claim on those funds "must show a realistic likelihood of injury" by virtue of the deprivation of those funds in order to have standing. *In re Coho Energy,* 395 F.3d at 203.

Weatherford does not have a direct pecuniary interest in the funds being paid to the Royalty Interest Owners. Nor has it shown a "realistic likelihood of injury." Weatherford has asserted only that its "injury" is based on its being "a creditor who is owed $8.3 million on a pre-petition basis and was not a recipient of [the royalty] payments." (Appellant's Brief at 2). Weatherford's not being a recipient of the royalty payments is insufficient to show any harm to it, let alone the "immediate and irreparable" harm necessary to sustain standing. Weatherford has made no showing that payment of the Royalties will in any way affect the ultimate payment to Weatherford.[7] It thus lacks standing to appeal the Royalty Order. *See In re Coho Energy,* 395 F.3d at 203 (holding that a "remote possibility" that funds paid to others might have otherwise gone to the purported appellant "does not constitute injury under *Rohm's* 'person aggrieved' test").

Moreover, Weatherford does not actually have a claim to the specific funds used to pay the Royalties. The Royalties are the royalty owner's share of the proceeds of oil and gas production. Weatherford asserts it is a secured creditor and has "filed to perfect its statutory liens." (Appellant's Brief at 5).[8] No objection has yet been filed to Weatherford's claim. As a secured mineral lien claimant, Weatherford has no claim to the proceeds of production and

---

[7] In this regard, the Debtors agree with Weatherford's claim that once the Debtors confirm a plan of reorganization, the relief sought in this appeal would be moot. (Appellant's Brief at ii).

[8] The Debtors do not waive any right to challenge the extent or validity of Weatherford's mineral lien claim.

therefore no claim to the royalty owners' share of those proceeds.[9]  *See, e.g., Onyx Refining Co v. Evans Prod. Corp.,* 182 F. Supp. 253, 257 (N.D. Tex. 1959) (holding that a statutory lien on an oil and gas lease does not attach to oil and gas after severance, or its proceeds); *In re Hess,* 61 B.R. 977 (Bankr. N.D. Tex. 1986) (same); *Wilkins v. Fecht*, 356 S.W.2d 855 (Tex. Civ. App.-San Antonio 1962, writ ref'd) (same).  Additionally, to the extent the funds in the Debtors' segregated royalty accounts were insufficient to pay the Royalties, the Debtors used the proceeds from the Debtors' postpetition loan to cover the difference, Weatherford does not and cannot have any interest in advances made pursuant to this loan.  Because Weatherford has no claim to the funds at issue, the Bankruptcy Court's order allowing the Debtors to use those funds to pay pre-petition royalties does not and could not diminish Weatherford's property, increase its burden, or impair its rights.  *See, e.g., Rohm*, 32 F.3d at 209 (holding that when an appellant does not have a claim to funds at issue in a lawsuit, any interest asserted necessarily must be indirect and too remote to satisfy even Article III standing).  Having no claim to the funds, and having failed to show a realistic likelihood of injury, Weatherford does not have standing to appeal.  The appeal should thus be dismissed for lack of standing.[10]

## C.    The Bankruptcy Court Can Authorize Payment of Prepetition Debt under § 105(a) and § 363 of the Bankruptcy Code

Turning to the substance of this appeal, Weatherford relies upon *In re Kmart Corp.*, 359 F.3d 866 (7th Cir. 2004), and *In re Oxford Management*, 4 F.3d 1329 (5th Cir. 1993), for the

---

[9] Two appeals by other parties are pending before this Court on the issue of whether a mechanics' and materialmans' lien attaches to the proceeds from production; however, Weatherford did not appeal that decision.

[10] Indeed, the Debtors' payment of pre-petition royalties <u>benefits</u> Weatherford by maintaining or increasing the value of the Estate through lease maintenance, the continuation of positive relationships with crucial lessors and the preservation of the Debtor's goodwill and reputation as a company with which landowners are comfortable conducting business.  It is failing to make the Royalty Payments that could compromise the Debtors' ability to maintain their business.  (First Day Tr. 248:6 – 249:13).

proposition that 11 U.S.C. § 105 does not provide the Bankruptcy Court the power to permit payment of the Royalties.  (Appellant's Brief at 14-18).  In making this argument, Weatherford ignores the true basis for the Debtors' request for relief in the Royalty Motion, which relied upon both § 105(a) and § 363 of the Bankruptcy Code.  (Royalty Motion ¶5).  The Royalty Order likewise invokes § 363 by authorizing the Debtors to undertake the delivery of the Royalties "in the ordinary course of business."  (Royalty Order at 2).[11]

Section 363(c)(1) of the Bankruptcy Code provides that "[i]f the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  A bankruptcy court may also grant relief under § 363(b)(1), which allows a debtor to use, sell, or lease property of the estate, after notice and a hearing, outside the ordinary course of business.  11 U.S.C. § 363(b)(1).  Indeed, in the very case Weatherford relies upon for the proposition that § 105 does not permit the relief in the Royalty Order, the Seventh Circuit recognized that § 105 in conjunction with § 363(b)(1) may provide authority for paying the prepetition claims of creditors that are "critical" to the success of the business.  *In re Kmart*, 359 F.3d at 872 ("Yet what these [decisions of the Supreme Court] principally say is that priorities do not change unless a statute supports that step; and if § 363(b)(1) is such a statute, then there is no insuperable problem.").

---

[11] The Bankruptcy Court also stated on the record that the Debtors should be authorized to pay the Royalty Interest Owners in the ordinary course of business.  (Sec. Day Tr. 270:1-5).

23

The Fifth and Seventh Circuit cases Weatherford cites stand only for the proposition that § 105(a) does not <u>in and of itself</u> authorize the payment of prepetition claims of unsecured creditors outside a plan of reorganization.  In the case of *In re Kmart*, the debtors sought to pay all "critical vendors" as determined in the debtors' discretion.  *In re Kmart*, 359 F.3d at 868-69. The debtors sought this authority only under § 105(a).  *Id.* at 869.  The Seventh Circuit found that the bankruptcy court did not consider sufficient pertinent evidence in making its decision. *Id.* at 868.  The Court of Appeals, as mentioned above, did discuss whether relief could be granted under § 363(b)(1), but did not reach that issue because the bankruptcy court's decision could not have supported relief based upon that section.  *Id*. at 872 ("We need not decide whether § 363(b)(1) could support payment of some pre-petition debts, because this order was unsound no matter how one reads § 363(b)(1).").  *Kmart* thus did not, as Weatherford suggests, completely preclude the payment of prepetition claims to unsecured creditors outside of a plan. Indeed, the court of appeals' discussion of § 363(b)(1) in *In re Kmart* was employed by the bankruptcy court in *In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15 (Bankr. M.D. Fla. 2005), to authorize the payment of prepetition claims of critical vendors.  Instead, the Seventh Circuit held only that § 105(a) cannot be the sole authority for granting such relief.  *In re Kmart,* 359 F.3d at 872-74 (concluding that "satisfaction of a pre-petition debt in order to keep 'critical' supplies flowing" might be a proper use of the bankruptcy court's power under § 363).

Weatherford also relies upon *In re Oxford Management*, 4 F.3d 1329 (5th Cir. 1993), in which the bankruptcy court ordered the payment of prepetition claims of an unsecured creditor over the objection of the debtor.  *Id.* at 1333.  On appeal, the appellees could not cite a specific provision of the Bankruptcy Code to support the relief granted by the bankruptcy court.  *Id*. at

1334.  The Fifth Circuit found that the bankruptcy court was in error when it relied on its equitable powers under § 105(a) to command the payment.  *Id.*

This case is not analogous to *In re Oxford Management* for two reasons: (a) the Debtors proposed the requested relief and (b) the relief is requested under both § 105(a) and § 363.  There is no dispute with the Fifth Circuit's conclusion that property should not be forcibly removed from the estate in order to satisfy the claims of unsecured creditors outside of a plan, which would clearly harm a debtor's ability to reorganize.  However, the current case does not present such a scenario, as the Debtors seek to pay the Royalty Interest Owners and JIBs in order to <u>avoid</u> any harm to the estates.  Additionally, the Debtors are not simply seeking relief under § 105(a); instead, the Debtors request that the Court authorize the payments under both § 105 and § 363 together.

Neither *In re Oxford Management* nor *In re Kmart* precluded a bankruptcy court acting under § 363 from authorizing a debtor in an appropriate case to pay the prepetition claims of unsecured creditors outside of a plan.[12]  Thus even assuming that Weatherford is correct that a bankruptcy court cannot rely solely on § 105(a) in authorizing payment of the prepetition claims of unsecured creditors outside of a plan, Weatherford has not shown that the bankruptcy court erred in issuing the Royalty Order.

The Debtors rely upon § 105(a) and § 363 for the requested relief.  The Court of Appeals in *In re Kmart* opined that a debtor might be able to obtain relief under § 363(b)(1) if it could show that creditors not receiving the payment will be as well off after the proposed payment and that supposedly critical vendors would have refused to deliver goods to the debtor.  *Id.* at 873.  In

---

[12] Nor did those two courts "reject the 'doctrine of necessity'" as Weatherford argues.  (Appellant's Brief at 16).  Instead, the courts rejected the idea that a bankruptcy court could authorize payments deemed by a debtor to be necessary without grounding that authorization in the powers granted to bankruptcy courts in the Bankruptcy Code.

this case, the Debtors demonstrated that they met the three prong test established in *In re CoServ, LLC*, 273 B.R. 487 (Bankr. N.D. Tex. 2002), which is substantially similar to the test suggested in *In re Kmart*.

Weatherford attempts to disparage the *CoServ* opinion in several ways.    First, Weatherford suggests that the *CoServ* court relied for authority only on § 105, which would arguably place it in opposition to *In re Oxford Management* and *In re Kmart*.  (Appellant's Brief at 17).   In so doing, Weatherford misrepresents the *CoServ* opinion, in which the bankruptcy court, recognizing the Fifth Circuit's ruling in *In re Oxford Management,* did <u>not</u> rely just on § 105 and held that:

> To get from section 105(a) to the Doctrine of Necessity, the Court must find a bridge that makes application to the Doctrine of Necessity "necessary or appropriate to carry out the provisions of" the Bankruptcy Code (11 U.S.C. § 105(a)). The Court believes such a bridge exists in the debtor in possession's role as the equivalent of a trustee.

*In re CoServ,* 273 B.R. at 497.   Thus, the *CoServ* court actually based relief upon § 105 in conjunction with 11 U.S.C. § 1107, which provides that a debtor is considered to have a fiduciary duty to the bankruptcy estate, to determine that payments of prepetition amounts owed to unsecured creditors should be approved when necessary to preserve the value of the estate.   *Id.* at 496-97.   Likewise, the Debtors here relied upon § 105 in conjunction with another section of the Bankruptcy Code.

Weatherford further mischaracterizes the state of the law on this issue by citing two cases for the proposition that the opinion in *In re CoServ* has not been "widely embraced" by other

courts. (Appellant's Brief at 17). Neither case stands for that proposition.[13] In the case of *In re Scotia Dev., LLC,* Case No. 07-20027, 2007 Bankr. LEXIS 3262 (Bankr. S.D. Tex Sept. 21, 2007), which Weatherford describes as "refusing to apply *CoServ* to claims by former employees," the bankruptcy court actually set forth the *CoServ* factors with approval, holding only that that the relief requested by the debtors before it did not satisfy those factors. In *In re CEI Roofing, Inc.,* 315 B.R. 50 (Bankr. N.D. Tex. 2004), the bankruptcy court held that it "*agrees* with the court in *CoServ"* that under proper circumstances a bankruptcy court may authorize payment of prepetition debts in reliance on § 105(a) together with "another provision of the Code that at least impliedly authorizes such payments." *In re CEI Roofing,* 315 B.R. at 59 (emphasis added). Thus, the very cases Weatherford relies upon to show that *CoServ* has not been followed both recognize that under appropriate circumstances, a bankruptcy court may authorize payment of prepetition debts prior to confirmation of a plan.

Although Weatherford has attempted to argue that the Bankruptcy Code precludes the payment of prepetition claims of unsecured creditors prior to confirmation of a plan, it does so without citation to binding precedent. Instead, the circuit courts to consider the issue hold only that § 105(a) cannot be the sole authority for the bankruptcy court to grant relief; rather, the bankruptcy court must use its equitable powers under § 105(a) in conjunction with another provision of the Bankruptcy Code. In this case, the Debtors sought relief under both § 105(a) and § 363. The Court should reject the Weatherford's attempt to mischaracterize the law, and

---

[13] To the contrary, numerous courts within the Fifth Circuit have recognized that under appropriate circumstances, prepetition debts should be paid prior to confirmation of a plan. *See, e.g., In re Babcock & Wilcox Co.,* 274 B.R. 230, 256 n.208 (Bankr. E.D. La. 2002); *In re Mirant Corp.,* 296 B.R. 427 (N.D. Tex. 2003); *In re All Trac Transportation, Inc.,* 306 B.R. 859 (Bankr. N.D. Tex. 2004); *In re American Plumbing & Mechanical, Inc.*, 323 B.R. 442, 459 (Bankr. W.D. Tex. 2005).

conclude instead that the Bankruptcy Court could, as a matter of law, authorize the payment of the Royalties and JIBs.

**D.      The Debtors Demonstrated the Propriety of Authorizing Payment of these Prepetition Debts Prior to Confirmation**

The leading case in the Fifth Circuit on the propriety of paying prepetition debts prior to confirmation, *In re CoServ,* set forth three factors that must be satisfied prior to authorizing the payment of prepetition debts of unsecured creditors outside of a confirmed plan of reorganization:

> The debtor must show three elements are present. First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*In re CoServ*, 273 B.R. at 498.  Weatherford argues on appeal that even if the *CoServ* test is an appropriate one, the Debtors did not meet it.  (Appellant's Brief at 18-21).  In so doing, Weatherford improperly focuses on only one element of the harm demonstrated at the hearing on the Royalty Motion – the potential termination of leases.  Contrary to Weatherford's argument, the evidence before the Bankruptcy Court did establish the suggested elements.

Regarding the first element, Weatherford argues only that "[t]here is nothing critical about dealing with a royalty owner since a royalty owner provides nothing to a debtor . . . [and] is not providing anything 'critical' to the reorganization."  (Appellant's Brief at 19). Weatherford thereby demonstrates a fundamental misunderstanding of the uncontroverted evidence regarding Debtors' business and the role of royalty owners.  Royalty interests are real property interests in land.  *See Thompson v. Thompson*, 236 S.W.2d 779, 783-84 (Tex. 1951);

*Sheffield v. Hogg*, 77 S.W.2d 1021, 1023-24 (Tex. 1934), *rehr'g denied,* 80 S.W.2d 741 (Tex. 1935); *Consol. Gas & Equip. Co. of Am. v. Thompson*, 405 S.W.2d 333, 336 (Tex. 1966); *Kelly Oil v. Svetlik*, 975 S.W.2d 762, 764 (Tex. App.--Corpus Christi 1998, *pet. denied).* The evidence before the Bankruptcy Court established that the Royalties would be paid to the landowners that controlled the land upon which the Debtors' oil and gas leases were located. (First Day Tr. 248:6-249:13; Sec. Day Tr. 49:2-50:2).

      The ability to lease and to maintain leases is the lifeblood of an oil and gas exploration and production company as it forms the foundation for all operations and revenue streams. (Conly Declaration ¶ 27). Lease acquisition and maintenance are of utmost importance because without such ability there is no exploration, no drilling, no development, no possibility for production, and no revenue generation from the subsequent sale of that production. (*Id.*). Mr. Grinsfelder specifically testified that if the Debtors failed to pay the Royalties, the landowners could refuse to renew expired leases with the Debtors. (First Day Tr. 249:1-2 ("If we're not paying royalty, then our ability to [renew expired leases] is probably severely compromised, I would guess.")). He further stated that landowners would not work cooperatively with the Debtors to carry out drilling operations on the leases that the Debtors currently own. (First Day Tr. 249:6-13 ("Any current leases that we have from any of the landowners that we're not paying royalty on or anybody nearby that we're not paying royalty on, I would -- I would think that they would not be willing to work with us on whatever matter we need to work with, surface issues, to -- to drill wells, or whatever. I think our ability to perform in the basin just -- just as an operator would be compromised.")).

      Mr. Conly also explained that failure to pay the Royalties could harm the Debtors' relationship with the purchasers of the oil and gas produced by the Debtors. (Sec. Day Tr. 49:17-

50:11 ("A couple of cases, we've had purchasers withhold payment because of their concerns about actions by the royalty owners, that -- that they're actually holding, at least for a temporary period of time, the royalty owners' money -- money, and then submitting that to the operator for distribution, and that they have, out of an abundance of caution, perhaps, withheld payment until they have a court order protecting them.")).  These business concerns were in addition to the concern that the Debtors could lose leases based on termination provisions that exist in the leases for failure to timely make royalty payments.  (Sec. Day Tr. 49:7-10 ("Well, typically, an oil and gas company must pay royalties on a current basis.  If it fails to pay royalties in accordance with the lease agreement, you could lose the lease.")).

As demonstrated by the argument of Halliburton's counsel, the proceeds from production may also be subject to a lien in favor of the Royalty Interest Owners under the Texas version of the Uniform Commercial Code.   (Sec. Day Tr. 253:7-10 ("There is an argument -- I don't want to mislead anybody.  There is an argument in Texas, under 9.343 of the Texas Uniform Commercial Code, that a royalty owner might have a statutory lien.")).

The Debtors also met the second *CoServ* element by establishing the potential harm that could come from the loss of the business relationship between the Debtors and the landowners. When the Debtors acquire a lease, they obtain a full panoply of rights related to the real property upon which the lease is granted.  Every piece of real property is considered unique.  *Greater Houston Bank v. Conte,* 641 S.W.2d 407, 410 (Tex. App.--Houston [14th Dist.] 1982, no writ). Thus, to the extent the Debtors are unable to renew leases, extend leases, obtain surface provisions or any of the other rights associated with the leases, based on animosity caused by the failure to pay the Royalties, the Debtors will have lost a valuable business opportunity.

Mr. Grinsfelder established that the Debtors have long-standing relationships with the large landowners in the Maverick Basin. (First Day Tr. 195:14-196:2). These relationships have created an advantage for the Debtors. (First Day Tr. 196:13-15 ("The large leases and the large lease block is a -- is a value creator for the company, for sure.")). This value can be also be quickly lost if the business relationship is destroyed. (First Day Tr. 196:16-19 ("Because they're so large, you lose a lot of acreage if you don't have the lease.")). The Debtors established through Mr. Grinsfelder that a recent transaction involving acreage next to the Debtors was completed for $250 per acre, which Mr. Grinsfelder testified was within a range of comparable value for the Debtors acreage. (First Day Tr. 227:20-228:21). Based on a value of $250 per acre, if the Debtors preserved a mere 12,000 acres, the payment of Royalties would be a breakeven transaction.

Even in the absence of lease language dictating the time and manner of royalty payments, Texas law establishes default rules for payment of proceeds of production. For first production, Texas law requires that a payor (the party undertaking to distribute oil and gas proceeds) distribute the proceeds due the royalty owner on or before 120 days after the end of the month during which the first production is sold. TEX. NAT. RES. CODE § 91.402. Subsequent payments must be made either according to the lease or no later than (1) for oil, 60 days after the end of the month during which oil is sold or (2) for gas, 90 days after the end of the month during which gas is sold. *Id.* Payments may be withheld only for certain circumstances, such as a title issues. *Id.* Should payment not be made according to these rules, interest accrues beginning at the expiration of the applicable time limits. *Id.* § 91.403. As a further penalty for failure to timely pay royalties, the law provides for a civil cause of action for the royalty owner. *Id.* § 91.404. The royalty owner must give notice of its intent to file suit, after which time the payor has 30

days to either pay or respond with a reasonable cause for nonpayment.  *Id*.  A successful plaintiff

is entitled to attorneys' fees and $200 or actual damages, whichever is greater.  *Id*. § 91.406.

Weatherford's completely ignores the harm to these business relationships established by

the evidence.  Instead, focusing solely on the potential loss of leases, Weatherford suggests that

the protections provided by the automatic stay under 11 U.S.C. § 362 are sufficient to

demonstrate that the Debtors are not likely to suffer harm.  (Appellant's Brief at 19-21)  This

approach, however, would place the Debtors at significant risk.    To begin with, the

uncontroverted evidence is that the Debtors are concerned that their leases could be quickly

terminated based on the failure to pay the Royalties.    (Sec. Day Tr. 126:23-127:8).

Weatherford's myopic approach also ignores the fact that the Royalty Interest Owners who may

be prohibited by the automatic stay from terminating leases are the same parties that the Debtors

must work with in connection with renewing leases, extending leases, or obtaining new leases or

in connection with surface rights issues.  (First Day Tr. 248:6-249:13).  Given Weatherford's

suggestion that the Debtors could pay the prepetition claims of the Royalty Interest Owners if a

motion for relief from stay is filed, which is the relief the Debtors currently have under the

Royalty Order, the Debtors would prefer to avoid risking the irreparable harm to or loss of these

significant business relationships by forcing the Royalty Interest Owners to make motions for

relief from stay.  The long-term harm to these business relationships significantly outweighs the

short-term value of the royalty payments currently authorized by the Bankruptcy Court.

The Debtors also satisfied the third *CoServ* element.  Weatherford argues that since the

Royalty Interest Owners are prohibited from terminating the leases based on the automatic stay,

the Debtors have an alternative legal remedy to deal with the Royalty Interest Owners'

prepetition claims.  Again, the uncontroverted evidence demonstrates that the Debtors could risk

losing significant business relationships based on the failure to pay the Royalties. Forcing the Royalty Interest Owners to litigate with the Debtors over relief from the automatic stay only increases the risk of loss for these critical business relationships.

Furthermore, Weatherford insinuates that if the Bankruptcy Court decides that a specific lease contains a termination provision, the Debtors could be provided an opportunity to "cure" a default by paying the Royalty Interest Owner at some later undefined date. Under § 108(b), the time period for a debtor to undertake an act under an agreement, including curing a default, may be extended to the later of any time period set forth in the agreement or 60 days after the petition date. 11 U.S.C. § 108(b). To the extent that § 108(b) is applicable, the Debtors may have had a limited opportunity to deliver the outstanding Royalties in an attempt to cure any potential defaults under their oil and gas leases within the first 60 days of the Bankruptcy Case under § 108(b) of the Bankruptcy Code; however, that time period would now have expired. Thus, to the extent that § 108(b) is applicable, the Debtors had no legal or practical alternative for dealing with the Royalty Interest Owners.

The evidence before the Bankruptcy Court clearly demonstrated that the Debtors could suffer irreparable harm absent the relief requested in the Royalty Motion and the Bankruptcy Court's finding of such risk of irreparable harm was not clearly erroneous. The Court should affirm the Bankruptcy Court's decision to authorize the Debtors to pay the prepetition amounts owed for the Royalties and the JIBs.

**E.    In the Alternative, the Royalty Order Should be Affirmed Because Royalties held in the Debtors' Segregated Bank Account Are not Property of the Estate**

Even if the Court concludes that the Royalty Order cannot be affirmed on the basis of the doctrine of necessity, it should be affirmed on an alternative ground argued below but not

reached by the Bankruptcy Court. Section 541(d) of the Bankruptcy Code provides that property in which the debtor holds only legal title and not an equitable interest becomes property of the estate only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold. 11 U.S.C. § 541(d). "Where Debtor merely holds bare legal title to property as agent or bailee for another, Debtor's bare legal title is of no value to the estate, and Debtor should convey the property to its rightful owner." *In re MCZ, Inc.*, 82 B.R. 40, 42 (Bankr. S.D. Tex. 1987).

In the case of in *In re MCZ*, the debtor was an operator of certain oil and gas wells and the plaintiffs were working interest owners entitled to royalty payments. *In re MCZ*, 82 B.R. at 41. The debtor stopped making royalty payments and placed the funds in an account. *Id.* After the debtor filed for bankruptcy, the plaintiffs sought to recover the funds from the account. *Id.* at 41-42. At the hearing before the bankruptcy court, the primary issue was whether the funds were property of the estate. *Id.* at 42. The court recognized that the funds were property of the estate "subject to the Court's power to recognize the equitable interest of the third-party royalty owners for whose benefit the funds were escrowed." *Id.* The debtors testified that the estate may have had some limited interest in the funds, the working interest owners were the ones entitled to the majority of the funds. *Id.* The bankruptcy court found that the debtors had mere legal title and that the funds should be delivered to the plaintiffs. *Id.* *Compare In re Antweil*, 154 B.R. 982 (Bankr. D.N.M. 1993)(court held that payments made to royalty interest owners were preferential transfers predicated on finding that debtor had an interest in the payments based on debtor's commingling of funds in general operating account).

The facts in the case are analogous to *In re MCZ*. Prepetition, in accordance with their long-standing practice, the Debtors placed substantially all of the amounts owed to the Royalty

34

Interest Owners in segregated bank accounts that are used solely to pay the Royalties. (Conly Declaration ¶ 60 ("At Guaranty Bank, the TXCO Revenue Clearing Account received revenues and funds were then transferred from this account to the TXCO Revenue Distribution Account to make royalty payments and to the TXCO Concentration Account which was the primary operating account.); ¶ 61("The TXCO Revenue Distribution Account is used to pay royalties."); ¶ 63("The Output Royalty and OPEX Royalty Accounts at Amegy Bank are used to pay royalty obligations and Debtors propose to keep such Accounts open post-petition simply to allow royalty checks issued prepetition to clear with postpetition royalty checks issued after May 31, 2009 to be issued out of new Debtor-In-Possession Accounts at Frost.")). Mr. Conly also explained that for royalty and working interest owners, revenue is received through the month as wire transfer, ACH or checks in the Revenue Clearing Accounts and then deposited into appropriate segregated Royalty Accounts. (*Id.* ¶ 68). The amounts are then booked and applied to well levels to calculate amounts owed to each royalty or working interest owner. (*Id.*). JIBs are then run on or about the 10th of each month. (*Id.*). Royalty and working interest payments are run on or about the 15th of each month. (*Id.*). After revenue amounts are generated, the Debtors' Controller receives and reviews the recommended payments report each month. (*Id.*). After review by the Controller, including a determination whether there are any obligations which should be setoff, final approval of the recommended payments is issued. (*Id.*). The recommended payments list is then sent to the Debtors' office manager for check printing. (*Id.*). After printing, checks are signed and reviewed prior to mailing. (*Id.*). Once the check or wire payment is sent, the Debtors' computer program records these payments. (*Id.*). Mr. Conly also testified on cross-examination by counsel to Halliburton Energy Service, about the accounting for the Royalty payments. (Sec. Day Tr. 120:14 – 126:11). In connection with the Debtors'

account at Guaranty Bank, Mr. Conly explained that the Debtors maintained a separate account to hold the Royalties, such that the money to pay the Royalties would not come from the general funds of the Debtors.  (Sec. Day Tr. 120:24 – 122:5).  Additionally, Mr. Conly illustrated when the payments would be made to the Royalty Interest Owners.  (Sec. Day Tr. 122:6 – 126:11).  Thus, it is clear from the evidence that the Debtors intended the funds in the various Royalty accounts to be held for the benefit of the Royalty Interest Owners.

As the Debtors asserted in the Royalty Motion, the funds held in the various Royalty accounts were not property of the estate and thus the Debtors should be authorized to pay such amounts to the Royalty Interest Owners.  (Royalty Motion ¶ 21).  At most the Debtors hold bare legal title to the Royalty amounts based on the funds being placed in an account controlled by the Debtors.  Given that the Debtors do not have any equitable interest in the funds held in the Royalty accounts, if necessary, the Court may affirm the Bankruptcy Court's decision to deliver all amounts held in the Royalty accounts to the Royalty Interest Owners on this alternate ground.

**F.    The Bankruptcy Court Properly Relied Upon Admissible Evidence in Granting the Royalty Motion**

Weatherford next argues that the Bankruptcy Court based its decision upon inadmissible evidence.  (Appellant's Brief at 21-24).  Specifically, Weatherford asserts that (a) a proper objection was made under Rule 1002 of the Federal Rules of Evidence to the testimony of Mr. Grinsfelder and Mr. Conly in regards to whether the leases contained language indicating the lease would automatically terminate if the Royalties remained unpaid; (b) the Bankruptcy Court improperly admitted such testimony; and (c) the Bankruptcy Court improperly relied on such testimony in granting the Royalty Motion.  The transcript of the hearing, however, demonstrates that each of Weatherford's assertions are false.

As to whether Weatherford properly preserved an objection to the complained-of testimony about royalty payments, the record is clear that each of the objections cited in the Appellant's Brief related not to whether the Debtors' leases contain automatic termination provisions, but to whether the Debtors had an obligation to drill wells under the leases being discussed.  (*See* First Day Tr. 220:15-221:16, 222:20-223:6, 251:14-253:19).   Weatherford highlighted this fact for the Court on page 8 of its brief where it demonstrated that its objection was to a drilling requirement in connection with the Paloma lease.  Weatherford did not object to any of the testimony by Mr. Grinsfelder or Mr. Conly relating to the necessity to make the Royalty payments.  (See First Day Tr. 248:6-250:14; Sec. Day Tr. 49:2-50:11, 99:1-100:22, 120:14-128:22).  In fact, there were no "best evidence" objections at all during Mr. Conly's testimony.  Weatherford thus did not preserve the right to complain that the Bankruptcy Court improperly admitted the testimony of Mr. Grinsfelder and Mr. Conly relating to the necessity for payment of the Royalties and JIBs.  This argument is thus waived and the admission of the testimony of Mr. Grinsfelder and Mr. Conly may be reviewed only for plain error.  *C.P. Interests, Inc. v. California Pools, Inc.,* 238 F.3d 690, 701 (5th Cir. 2001).  Plain error is an error that affects substantial rights and may be corrected on appeal only if it seriously affects "'the fairness, integrity, or public reputation of judicial proceedings.'"  *Rodriguez v. Riddell Sports, Inc.,* 242 F.3d 567, 579 (5th Cir. 2001) (quoting *United States v. Calverley,* 37 F.3d 160, 164 (5th Cir. 1994) (en banc)).

Weatherford has made no such showing.  Even assuming for the sake of argument that the Debtors' leases are the "best evidence" of the terms of the leases, in admitting the testimony of Mr. Grinsfelder and Mr. Conly regarding the leases the Bankruptcy Court at most committed harmless error.  Weatherford specifically argues (incorrectly) that its objection was to the

admission of testimony regarding whether the leases provide for termination based on the failure to timely deliver the royalty. While there was some testimony by Mr. Grinsfelder and Mr. Conly that the Debtors could have some leases containing such termination provisions, the majority of the uncontroverted testimony by Mr. Grinsfelder and Mr. Conly on the issue of royalty payments focused on the irreparable harm to the Debtors' essential business relationship with the landowners under its oil and gas leases. (First Day Tr. 248:6-250:14; Sec. Day Tr. 49:2-16). Mr. Conly also testified that the relationship with the party purchasing the Debtors' production could be affected by the failure to make royalty payments, causing additional harm to the Debtors. (Sec. Day Tr. 49:17-50:11). Even counsel to Halliburton, a creditor opposed to the Royalty Motion, recognized that the preservation of the Debtors leases outweighed any potential downside related to payment of the Royalties. (Sec. Day Tr. 255:9-17 ("If it is a lease that is valuable and important to the Debtor, and we want to keep it, and we need that lessor landowner to be happy so that we can maintain that valuable asset, then absolutely. That's a case where you don't like to do it, but you are happy to pay the royalty. After all, royalty is a relatively small percentage of money that has -- has come to the Debtor. So, I mean, we can't owe royalty unless we've made a lot of money.")).

In its determination that the Debtors would suffer irreparable harm absent the Royalty Order, the Bankruptcy Court focused not on the possibility of lease termination but on the harm to the Debtors' business relationships:

> But I think that we do need to pay the royalty owners. And there may not be a legal equitable ownership by the royalty owners, but I think that the flow of business is just going to be so much smoother if we keep the royalty owners paid in the ordinary course of business. I think it would cause irreparable harm to the Debtor not to pay them, because there could be possible termination actions, certainly adverse effects with lessees, farm-out arrangements, et cetera, if royalty owners aren't paid. And it certainly doesn't help the Debtor going out soliciting

new properties, either.  So, I mean, if they're not -- if they're not paying their
royalty owners, that gets around in the industry.

(Sec. Day Tr. 269:25-270:13).  Thus, the Bankruptcy Court did not commit reversible error in

regards to its determination that Mr. Grinsfelder and Mr. Conly could testify about whether the

Debtors' leases generally contained a clause authorizing the automatic termination of the lease

upon failure to make timely royalty payments.  Nor did the Bankruptcy Court commit reversible

error in granting the relief requested in the Royalty Motion.

**G.     The Bankruptcy Court Properly Determined that the Debtors Would Suffer
         Immediate and Irreparable Harm as Required by Rule 6003(b)**

Finally, Weatherford argues that the Bankruptcy Court's finding of irreparable harm was

improper, and thus that Rule 6003(b) precluded the relief granted.  (Appellant's Brief at 24-25).

Rule 6003(b) provides that within the first 20 days after the filing of a petition, a bankruptcy

court may not grant a motion to pay a claim that arose before the filing of the petition "[e]xcept

to the extent that relief is necessary to avoid immediate and irreparable harm."  Because the

*CoServ* factors discussed above likewise require a demonstration of probable harm absent the

requested relief, should the Court determine that the Bankruptcy Court's Royalty Order was

proper, entry of the Royalty Order within the first 20 days after the Petition Date would likewise

be proper.

The uncontroverted evidence before the Bankruptcy Court established the significant,

irreparable harm that the Debtors would suffer to their essential business relationships from the

failure to timely pay the Royalties.  Additionally, counsel to Halliburton confirmed the need for

the Bankruptcy Court to act as soon as possible to avoid irreparable harm to the Debtors.  (Sec.

Day Tr. 254:1-5 ("MR. CAMPBELL:  No.  I mean, what I contemplate is making that decision

very quickly.  If there is royalty that needs to be paid, it needs to be paid soon, but it doesn't need to be paid on day three.")).

As Weatherford argues in its brief, Rule 6003(b) was enacted to "'alleviate some of the time pressures present at the start of a case so that full and close consideration can be given to matters that may have a fundamental impact on the case.'"  (Appellant's Brief at 25 (quoting Notes of Rule 6003 Advisory Committee)).  The Bankruptcy Court held a two-day hearing on the Debtors' first day motions, including the Royalty Motion.  Weatherford was represented by counsel at that hearing.  Weatherford argues that "there was no time for anybody to give this important matter close consideration" but fails to even guess as to what different "consideration" might have occurred after 20 days had passed.  Nor does Weatherford argue, let alone establish, that a hearing on the 21st day after the Petition Date would have resulted in a different outcome.

Weatherford has not demonstrated that the Bankruptcy Court erred in finding that the Debtors would suffer irreparable harm to their essential business relationships if the Royalties were not timely paid to the Royalty Interest Owners.  Weatherford's Rule 6003 argument thus is without merit.

### IV.  Conclusion

This appeal should be dismissed for lack of standing because Weatherford is not a party aggrieved by the Royalty Order.  In the alternative, the Royalty Order should be affirmed. Bankruptcy courts have authority to authorize payment of pre-petition debts under the doctrine of necessity when relying on their authority under § 105 in conjunction with another section of the Bankruptcy Code.  Neither *In re Kmart* nor *In re Oxford Management* holds otherwise.  The Bankruptcy Court properly applied the doctrine of necessity to the facts of this case in authorizing the Debtors to pay the Royalties.

Having properly determined that "it would cause irreparable harm to the Debtor not to pay [the Royalties," because there could be possible termination actions, certainly adverse effects with lessees, farm-out arrangements, et cetera, if royalty owners aren't paid,"[14] the Bankruptcy Court's decision that the this threatened immediate and irreparable harm satisfied the standards of Bankruptcy Rule 6003(b) was not clearly erroneous.  Finally, Weatherford failed to object on the ground of "best evidence" to any evidence regarding lease termination provisions and, even setting aside that evidence, the Bankruptcy Court's decision was based on sufficient evidence. Accordingly, Weatherford's "best evidence" argument is not grounds for reversal of the Royalty Order, which should be affirmed.

Respectfully submitted,

COX SMITH MATTHEWS INCORPORATED
112 East Pecan Street, Suite 1800
San Antonio, Texas  78205
(210) 554-5500
(210) 226-8395 - Fax

By:_____*/s/ Deborah D. Williamson*_____
    Deborah D. Williamson
    Texas State Bar No. 21617500
    Leslie Sara Hyman
    Texas State Bar No. 00798274
    Thomas Rice
    Texas State Bar No. 24025613

**ATTORNEYS FOR APPELLEES**

---

[14] Sec. Day Tr. 269:25-270:13.

## CERTIFICATE OF SERVICE

I certify that the Brief of Appellees has been served upon the following via the Court's

CM/ECF system on this 18th day of August, 2009:

      Edward L. Rothberg
      Hugh Massey Ray, III
      Weycer, Kaplan, Palaski & Zuber, PC
      11 Greenway Plaza - Suite 1414
      Houston, TX 77046-1104


                         */s/ Leslie Sara Hyman*
                         Leslie Sara Hyman

2659974.1

42