IN THE

# United States District Court

FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

### Civil Action No. SA-09-CA-569-FB

_____

IN RE:
TXCO RESOURCES INC.


WEATHERFORD INTERNATIONAL, INC.

*Appellant*


— V. —


TXCO RESOURCES INC., ET AL.

*Appellees.*


APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS, SAN ANTONIO DIVISION


## APPENDIX OF APPELLEES


Deborah D. Williamson
Leslie Sara Hyman
Thomas Rice
COX SMITH MATTHEWS INCORPORATED
112 E. Pecan St., Suite 1800
San Antonio, Texas 78205
(210) 554-5500
(210) 226-8395 (Fax)

*Attorneys for Appellees*

*Unsworn Declaration under
Penalty of Perjury of Albert S. Conly,
Chief Restructuring Officer of
TXCO Resources Inc.,
in Support of First Day Motions*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **In re:** | § | **CHAPTER 11 CASE** |
| | § | |
| **TXCO RESOURCES INC.,** *et al.,* | § | **CASE NO. 09-51807** |
| | § | |
| **Debtors.** | § | **Joint Administration Pending** |

## UNSWORN DECLARATION UNDER PENALTY OF PERJURY OF ALBERT S. CONLY, CHIEF RESTRUCTURING OFFICER OF TXCO RESOURCES INC., IN SUPPORT OF FIRST DAY MOTIONS

1.      I am Albert S. Conly of TXCO Resources Inc. ("TXCO"), one of the above-captioned debtors.  On March 23, 2009, I was retained by TXCO to serve as their Chief Restructuring Officer ("CRO"), a position that I currently hold.  I am a Senior Managing Director of FTI Consulting, Inc.

2.      In my capacity as Chief Restructuring Officer of TXCO, I am familiar with the day-to-day operations, business affairs, and books and records of TXCO Resources Inc. ("TXCO"), Eagle Pass Well Service, L.L.C. ("Eagle Pass"), TXCO Drilling Corp. ("Drilling"), Charro Energy Inc. ("Charro"), Texas Tar Sands Inc. ("Tar Sands"), TXCO Energy Corp. ("Energy"), Output Acquisition Corp. ("Output"), OPEX Energy, L.L.C. ("OPEX"), PPL Operating, Inc. ("PPL"), Maverick Gas Marketing, Ltd. ("Maverick Gas"), and Maverick-Dimmit Pipeline, Ltd. ("Maverick-Dimmit") (collectively, the "Debtors").[1]

3.      To minimize the immediate adverse effects on the Debtors of filing for Chapter 11 protection and to enhance the Debtors' prospects of a successful reorganization, the Debtors are filing a number of motions requesting various types of "first day" relief (collectively,

---

[1] For the sake of simplicity, the term "Debtors" will be used without regard to a particular debtor entity throughout this Motion where such use would not render an inaccuracy.  Where further clarification is necessary, the name of the individual entity or entities will be used.

the "First Day Motions"). I am familiar with the contents of each First Day Motion (including the exhibits and other attachments thereto), and I believe that the relief sought in each First Day Motion: (i) is necessary to enable the Debtors to operate in Chapter 11 with minimum disruption or loss of productivity or value; (ii) is critical to the Debtors' achievement of a successful reorganization; and (iii) best serves the Debtors' estates and the interests of the Debtors' creditors.

4.      I submit this affidavit (the "Affidavit") in support of the First Day Motions.[2] Except as otherwise indicated, all statements set forth in this affidavit are based upon: (i) my personal knowledge, (ii) documents and other information prepared or collected by other members of the Debtors' management, their employees, or their professionals, (iii) my review of relevant documents, and/or (iv) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein based upon my personal knowledge, review of documents, or opinion. I am authorized to submit this Affidavit on behalf of the Debtors.

5.      Part I of this Unsworn Declaration describes the Debtors' businesses, capital structure, and the circumstances surrounding the commencement of these Chapter 11 cases. Part II sets forth the relevant facts in support of each First Day Motion.

## PART I

## OVERVIEW OF THE DEBTORS' BUSINESS OPERATIONS

**A.      Background**

6.      The Debtors commenced these cases by each filing a voluntary petition on May 17, 2009 (the "Petition Date"). The Debtors have continued in the possession of their property

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

2562975v.1

and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or an examiner in these cases, and no official committee has yet been appointed by the U.S. Trustee.

**B.**    **Description of the Debtors**

7.    TXCO is a mid-sized, full-cycle, publicly traded, U.S.-based, oil and gas exploration and production company with a diversified exploitation, development and exploration project inventory, and employing approximately 60 employees. Previously known as The Exploration Company of Delaware, Inc., TXCO's stock trades on NASDAQ's Global Select Market under the ticker symbol "TXCO." TXCO is headquartered in San Antonio, Texas, and also maintains an office in Houston, Texas. Eagle Pass Well Service, L.L.C., TXCO Drilling Corp., Charro Energy Inc., Texas Tar Sands, Inc., TXCO Energy Corp. and Output Acquisition Corp. (formerly known as Output Exploration LLC) are wholly-owned subsidiaries of TXCO. OPEX Energy, LLC is a wholly owned subsidiary of Output Acquisition Corp. PPL is a wholly-owned subsidiary of TXCO and is the General Partner of Maverick Gas and Maverick-Dimmit. TXCO is the limited partner in Maverick Gas and Maverick-Dimmit. PPL, Maverick Gas and Maverick-Dimmit operated a pipeline which was sold and these entities are now essentially dormant.

8.    Each of the Debtors is engaged in one or more aspects of the acquisition, development, exploration and exploitation of oil and gas properties in the United States.

9.    The Debtors have more than 720,000 net acres under lease (1.3 million gross acres), and focus operations in the core area of the Maverick Basin in South Texas, as well as the additional strategic areas of the Fort Trinidad Field in the East Texas Basin, the Marfa Basin in

2562975v.1

West Texas, the Midcontinent area of western Oklahoma, and the Gulf of Mexico – with operations both onshore and in the shallow Gulf waters.

**C.    Overview of the Debtors' Business**

10.    Prior to the Petition Date, the Debtors' intent was to maintain its interests in mineral lease acreage and undeveloped mineral interests and develop a multi-year drilling inventory.  The implementation of advanced technologies, such as 3-D seismic and horizontal drilling, is integral to this strategy.  Acting both as operator and participating in non-operated wells, the Debtors' business strategy was growth-oriented – with the goal to discover, develop and/or acquire more reserves on an annual basis than are produced.

11.    Debtors' Proved Oil and Natural Gas Reserves were 55.3 billion cubic feet ("Bcf") and 10.7 million barrels of oil ("mmBbls") as of March 31, 2008.  The 2009 Value of Estimated Future Reserves (PV-10) for 2009 is $268 million based upon DeGolyer and MacNaughton and William Cobb & Associates reports using Nymex 3-year strip prices. Operating Revenues for 2008 were approximately $143,736,000.00, with oil sales of 1,132,000 Bbls and 2,422,000 thousand cubic feet ("mcf") of gas.  Gross Revenues for the three (3) months ending March 31, 2009 were approximately $15,632,000 with sales of approximately 2,580 Bbls and 517.2 thousand mcf cubic feet of gas.  The estimated value for undeveloped acreage is dependent on (a) the identity of the specific acreage, and (b) the market for such acreage.  There are no quantities of oil or natural gas subject to long-term supply or similar agreements with foreign government authorities.

12.    On a gross basis, Debtors participated in 96 wells, including new drilling of 73 wells and the re-entry of 23 existing wells during 2008, acting as operator on 57 of the 73 new wells (78%).

13.  <u>Maverick Basin Plays</u>:  The Maverick Basin of Southwest Texas is the Debtors'
core focus area – an area with more than 20 productive geological zones and multiple resource
play potential.  The Debtors own oil and gas leases and have all or a portion of the working
interest in approximately 1 million acres that overlie the Eagle Ford Shale Formation ("Eagle
Ford"), which is a relatively shallow gas-prone shale resource play.  In addition, the Debtors are
farmees under a farm-in agreement with Anadarko pursuant to which Debtors have completed
the first phase, and must complete the second phase of the project to earn the additional interests
contemplated by the agreement.  Overall, in 2008, Debtors participated in 4 wells targeting the
Eagle Ford.  Additionally, with a 50% working interest, the Debtors are also farmees under a
farm-in agreement with EnCana Oil and Gas (USA), Inc. ("EnCana"), pursuant to which Debtors
have completed the first phase, and must complete the second phase of the project to earn the
additional interests contemplated by the agreement in the Pearsall Shale Formation ("Pearsall"),
an over-pressurized natural gas shale play underlying 819,000 gross acres of Debtors' Maverick
Basin deep rights holdings.  Overall, in 2008, Debtors participated in a total of 6 wells targeting
the Pearsall.  The 95,250 acre Comanche Ranch Lease ("Comanche") and the adjacent Cage
Ranch Lease ("Cage") are sites for significant development of oil resources from the Glen Rose
Formation ("Glen Rose") – a water drive reservoir, meaning that oil is driven naturally into the
wellbore by rising oil-water contact.  TXCO owns the majority working interest in the
Comanche, and 100% of the working interest in the Cage.  In addition to the initial test well,
Debtors and their operating partner drilled 9 new wells and 4 re-entries targeting Glen Rose oil
during 2008 on the Comanche, and drilled or re-entered 17 Glen Rose oil wells on the Cage, up
121% from wells drilled on the Cage in 2007.  Debtors have completed a total of 32 horizontal
wells targeting Glen Rose natural gas under an agreement with AROC-Texas, Inc. by which

2562975v.1

Debtors drill and AROC-Texas, Inc. operates the wells. The Georgetown Formation ("Georgetown") is a fractured formation producing both oil and gas and was the target formation of six new wells and six re-entries in 2008. Through February 2009, either alone or as part of a joint venture with Millenium E&P Resource Fund I, LLC, pursuant to which Debtors have a carried working interest, Debtors have participated in an additional 3 Georgetown wells. The San Miguel Formation ("San Miguel") is targeted through the Debtors acquisition of the Pena Creek oil field on which it conducts waterflood operations. Debtors participate in 94 producing wells, 94 waterflood wells and 28 shut-in wells. New operations in the San Miguel include the drilling of infill wells (drilled between existing wells) and additional wells not in the waterflood zone, and additional pilot projects targeting the San Miguel Oil Sands, that have been suspended pending a rise in oil prices. Between 2007 and 2008 six wells were spudded targeting the Austin Chalk Formation ("Austin Chalk").

14.     Fort Trinidad:  Debtors acquired assets in the East Texas Fort Trinidad area from Output Exploration, L.L.C., which strategically are primarily prospective for targeting the Glen Rose, Buda, Austin Chalk, Eagle Ford, Woodbine and Bossier Formations. Debtors participated in 5 wells in Fort Trinidad in 2008.

15.     Marfa Basin:  Debtors' acquired leasehold interests targeting the Barnett and Woodford Shale formations as well as the Navaculite and Ellenberger formations in the Marfa Basin, located approximately 200 miles northwest of their Maverick Basin leases. These formations are potentially excellent sources of natural gas, but require expensive horizontal drilling and hydraulic fracturing techniques to efficiently extract the gas reserves. As the 50% working interest owner in 140,000 gross acres, Debtors have conducted some operations. This asset is primarily prospective.

6

16.    <u>Other Areas</u>:  Debtors have participated in 3 wells in Oklahoma and in the shallow waters off of Louisiana's Gulf Coast, pursuant to its acquisition of assets from Output Exploration, LLC in April of 2007.  In addition, Debtors own 4,400 gross acres in the Williston Basin and current operations have been targeted at the Red River Formation.

## D.    **TXCO's Liabilities**

17.    TXCO's estimated liabilities as of the Petition Date (exclusive of accrued and unpaid interest, any asset retirement obligations and other accrued liabilities), are as follows:

| Creditor | Approx. Amount |
|---|---|
| Prepetition Revolver | $50 million |
| Prepetition Term Loan | $100 million |
| Convertible Preferred Stock | $97 million |
| Accounts and Notes Payable | $80 million |
| **TOTAL:** | **$327 million** |

## E.    **The Debtors' Relationship with Their Secured Creditors**

18.    TXCO is the borrower under the Senior Credit Agreement and the Term Loan Agreement and OPEX Energy, L.L.C., Output Acquisition Corp., TXCO Energy Corp. and Texas Tar Sands, Inc. are guarantors of the Senior Credit Agreement and the Term Loan Agreement.

**Bank Credit Facilities**

19.    In connection with its acquisition of Output Exploration LLC in April 2007, TXCO replaced its credit facility with Guaranty Bank with two new facilities with the Bank of Montreal, as agent ("BMO" or "Agent").  Both of these facilities were amended and restated or amended in July 2007, as described below.  As disclosed in the Form 8-K filed with the SEC on February 27, 2009, TXCO is in violation of the current ratio covenant under these agreements.

a.    <u>Senior Credit Agreement</u> – At December 31, 2008, the Debtors had a $125 million senior revolving credit facility (the "Senior Credit Agreement," "SCA" or "Revolver")

with the Bank of Montreal as agent for BMO; Amegy Bank, National Organization; Guaranty Bank; Allied Irish Banks, P.L.C.; Natixis; Western National Bank; and Standard Bank Plc (the "Senior Credit Lenders"). The Senior Credit Agreement was entered into in April 2007, amended in July 2007, and expires in April 2011. At December 31, 2008, the borrowing base was $55 million, $50 million was outstanding at a weighted average interest rate of 4.0% and the unused borrowing base was $5 million. The Senior Credit Agreement is secured by a first-priority security interest in certain of the assets of TXCO, Tar Sands, Energy, Output and OPEX, including proved oil and natural gas reserves and in the equity interests of certain subsidiaries. In addition, TXCO's obligations under the Senior Credit Agreement are guaranteed by Tar Sands, Energy, Output and OPEX. As of March 13, 2009, the balance outstanding under the Senior Credit Agreement was $50.0 million, with a weighted average non-default interest rate of 4.00%, using the base rate option. Loans under the Senior Credit Agreement are subject to floating rates of interest based on (1) the total amount outstanding under the Senior Credit Agreement in relation to the borrowing base and (2) whether the loan is a LIBOR loan or a base rate loan. LIBOR loans bear interest at the LIBOR rate (for the applicable 1-, 2-, 3- or 6-month maturity chosen by TXCO) plus the applicable margin and base rate, bear interest at the base rate plus the applicable margin. The applicable margin varies with the ration of total outstanding to the borrowing base. For base rate loans it ranges from zero to 100 basis points and for LIBOR rate loans it ranges from 150 to 250 basis points. The Senior Credit Agreement allows the Senior Credit Lenders to increase the interest rate by 200 basis points at any time an event of default exists under the Senior Credit Agreement. Borrowings under the Senior Credit Agreement may be repaid and reborrowed from time to time without penalty.

      b.     <u>Term Loan Agreement</u> – At December 31, 2008, the Debtors had a $100 million, five-year term loan facility (as amended, restated, supplemented or otherwise modified from time to time the "Term Loan Agreement" or "TLA") with Bank of Montreal as agent for BMO, Regiment Capital, Carlson Capital, Standard Bank Plc, CIT Group, AIB Debt Management United, and Amegy Bank, National Organization, and assignees and/or affiliates thereof (the "Term Loan Lenders") with a non-default interest rate of 5.9375%. The Term Loan Agreement is secured by a second-priority security interest in certain assets of TXCO, Tar Sands, Energy, Output and OPEX, including proved oil and natural gas reserves and in the equity interest of certain subsidiaries. Loans under the Term Loan Agreement are subject to floating rates of interest equal to, at TXCO's option, the LIBOR rate plus 4.50% or the base rate plus 3.50%. The "LIBOR rate" and the base rate are calculated in the same manner as under the Senior Credit Agreement. The Term Loan Agreement allows the Term Loan Lenders to increase the interest rate by 200 basis points at any time a payment event of default exists under the Term Loan Agreement. Borrowings under the Term Loan Agreement may be prepaid (but not reborrowed). However, no prepayments are permitted if the ratio of the total amount outstanding under the Senior Credit Agreement to the borrowing base thereunder exceeds 75% or if any event of default exists under the Senior Credit Agreement.

**F.**    <u>**Events Leading up to the Chapter 11 Filings**</u>

      20.     During 2008, the Company engaged in its largest capital expenditure program in its history. The costs incurred in the development and purchase of oil and natural gas properties increased from $117 million in 2007 to $182 million in 2008. After the drilling program was initiated, costs to drill escalated throughout the summer followed by an unprecedented commodity price collapse. There was a 51.3% decrease in oil and gas revenue between the first

three (3) months of 2009 when compared to the same period in 2008.[3]  As a result of the time lag between the incurrance of the increased drilling costs and the resulting increase in revenues from new production, and deteriorating economic conditions, Debtors experienced severe cash flow constraints.  Debtors experienced substantial difficulties in meeting short-term cash needs, particularly in relation to vendor commitments.  Extreme volatility in energy prices and a deteriorating global economy created great difficulties in the capital markets and greatly hindered the Debtors' ability to raise debt and/or equity capital.  The Debtors examined alternatives to improve liquidity and cash resources, including seeking additional short and long-term capital through bank borrowings, the issuance of debt instruments, the sale of common stock and preferred stock, the sale of non-strategic assets, joint-venture financing, and restructuring of existing obligations.  The inability to improve liquidity and cash resources caused material adverse business consequences.  The Debtors went into covenant default under the Senior Credit Agreement First Lien Facility and the Term Loan Agreement Second Lien Facility.  Due to a variety of factors, including the drastic fall in the price of crude oil in the last calendar quarter of 2008, the stress on the Debtors' cash flow increased.  The Debtors and the Prepetition Secured Lenders began addressing a forbearance agreement beginning in March 2009 which, unfortunately, could not be consummated.

21.     On April 21, 2009, Bank of Montreal ("BMO" or "Agent") provided the Debtors with (i) notice of acceleration of the amounts due under the Senior Credit Agreement, which had an outstanding balance (not including any accrued and unpaid interest) of approximately $50

---

[3] Operational Data

| for the periods ending March 31 | Three Months | | |
|---|---|---|---|
| | 2009 | 2008 | % Change |
| Oil – average daily sales (bopd) | 2,866 | 2,717 | + 5.5 |
| Natural gas – average daily sales (mcfc) | 5,747 | 7,306 | – 21.3 |
| Combined average daily sales (mboed) | 3,824 | 3,935 | – 2.8 |
| Combined average daily sales (mmcfed) | 22,944 | 23,608 | – 2.8 |

10

2562975v.1

million as of March 31, 2009, and (ii) notice of acceleration of the amounts due under the Term Loan Agreement of approximately $100 million as of March 31, 2009 (together, the "Notices of Acceleration"). The Notices of Acceleration notified the Debtors of the acceleration of and demand for immediate payment of the entire amount of the funds that the Debtors owe to the Term Loan Lenders and the Senior Credit Agreement Lenders under the Term Loan Agreement and the Senior Credit Agreement, including all interest accrued and unpaid thereon. The Notices of Acceleration also notified the Debtors that the commitment of each Senior Credit Agreement Lender and Term Loan Agreement Lender to make loans or participate in issuances of letters of credit was terminated. Prior to the Notices of Acceleration, the Agent also demanded interest at the default rate. On information and belief, prior to the Petition Date there was no payment default on the SCA and the only payment default on the TLA was a failure to pay default interest demanded by the Agent shortly before the Petition Date.

22. Also as a result of the liquidity issues, Debtors began receiving demands for payment and notices of lien filings from its vendors. As of May 15, 2009, in excess of $14 million in liens had been filed and over $37 million in demands for payment had been received.

23. The Debtors determined that they could no longer operate outside of Chapter 11 and commenced these cases on the Petition Date.

## PART II

## FIRST DAY MOTIONS

**A.** **Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 364 and 507 and Federal Rules of Bankruptcy Procedure 2002, 4001 and 9014 (I) Authorizing the Debtors to Incur Postpetition Senior Secured Superpriority Indebtedness; (II) Authorizing Use of Cash Collateral; (III) Granting Security Interests and Superpriority Claims; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; and (VI) Scheduling a Final Hearing on the Motion**

24.      By the *Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 364 and 507 and Federal Rules of Bankruptcy Procedure 2002, 4001 and 9014 (I) Authorizing the Debtors to Incur Postpetition Senior Secured Superpriority Indebtedness; (II) Authorizing Use of Cash Collateral; (III) Granting Security Interests and Superpriority Claims; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; and (VI) Scheduling a Final Hearing on the Motion* (the "DIP Motion"), the Debtors seek authorization to enter into a postpetition lending agreement (the "DIP Loan" or "DIP Financing") and use of Cash Collateral.

25.      The Debtors have determined that it is necessary to use cash collateral and to obtain postpetition financing for the Debtors to operate their business in Chapter 11 and for the Debtors' successful reorganization.  In addition to day-to-day operations, certain expenditures related to leasehold maintenance must be undertaken to protect the value of the Bankruptcy Estate.  Post-petition financing will also allow the Debtors to provide assurances to service providers, vendors, suppliers, customers and employees.

26.      The postpetition financing is required to preserve and to prevent deterioration of the value of the Bankruptcy Estate, through lease maintenance and protection of valuable reserves.  To accomplish these goals, the Debtors must pay delay rentals, make bonus payments for lease extensions, ratifications and renewals, pay shut-in royalties and outlay expenditures for

12

drilling certain wells required under continuous development commitments. All of these actions are necessary under the terms of various leases and/or farmout agreements to maintain them in full force and effect and/or to meet continuous drilling commitments under the leases or under various joint operating or joint exploration agreements. The proposed DIP Facility will be used to accomplish these goals. Without the use of the DIP Facility, the Debtors will be unable to maintain much less improve their assets. The proposed DIP Facility is necessary to provide working capital for the Debtors to continue their operations. Cash collateral alone is insufficient to pay even the normal operating expenses after the proposed adequate protection payments are made to the Revolver Lenders. The Debtors believe that the proposed DIP Facility will be viewed favorably by the Debtors' employees, minimize disruption to the Debtors' businesses and ongoing operations and obtaining interim relief will avoid immediate and irreparable harm to the Debtors, their creditors, their business, their employees and their assets.

27.    The ability to lease and to maintain leases is the lifeblood of an oil and gas exploration and production company, such as the Debtors, as it forms the foundation for all operations and revenue streams. Lease acquisition and maintenance are of utmost importance because without such ability there is no exploration, no drilling, no development, no possibility for production and no revenue generation from the subsequent sale of that production.

28.    Although each oil and gas lease is unique according to the individual terms contained therein, there are certain commonalities among oil and gas leases relating to rights and obligations of the oil and gas lessee or operator vis-à-vis the owner of the mineral estate ("lessor"). Generally speaking, a lease has a fixed primary term and the potentiality of infinite duration as long as oil or gas is produced from the lands covered by the lease. The lease typically calls for the payment of upfront consideration (known as a "bonus"), payment for the

right, but not the obligation, to drill during the primary term ("delay rentals"), royalty payments representing a fraction of production or shut-in payments for those wells that have been drilled and are capable of producing, but have been shut-in for a certain reason (such as lack of a pipeline), in exchange for the right to explore for and produce minerals. In some cases, the lessor negotiates for the lessee to have the *obligation* to drill a certain number of wells continuously over a period of time. In other cases, the lessee or operator has entered into a contractual arrangement such as a joint operating or joint exploration agreement with other working interest owners that requires a certain number of wells to be drilled, either as a contractual covenant or as consideration for earning acreage. It is often the case that the timing under such a contractual arrangement between or among working interest owners is tied to the underlying lease commitments.

29. Should a lessee or operator fail to meet its obligations under the lease or a contractual arrangement, as described above, there are two potential results. The first is liability for contract damages, as occurs when a lessee or operator breaches a covenant (in most cases, failure to properly pay royalties, for example, is a breach of covenant). The second result, however, is the termination of a lease or forfeiture of certain acreage thereunder, as a result of a breach of a lease *condition*. Failure to pay or to properly pay delay rentals, shut-in royalties and failure to meet continuous drilling commitments are breaches of conditions that result in the partial or complete termination of a lease. A lessee's or operator's failure to meet continuous drilling commitments usually results in the forfeiture of all leased acreage not immediately surrounding already drilled wells.

30. Though leasehold acreage is the basis for valuing an oil and gas exploration and production company, the value of the resource reserves is most often used and the best indicator

14

of value. Reserves are those quantities of hydrocarbons anticipated to be commercially recoverable by application of development projects to known accumulations from a given date forward under defined conditions. Reserves must further satisfy four criteria: they must be discovered, recoverable, commercial and remaining (as of the evaluation date) based on the development project(s) applied. Reserves are further categorized in accordance with the level of certainty associated with the estimates – proved being the most valuable – and may be sub-classified based on project maturity and/or characterized by development and production status. From the categorization of proved reserves, the pretax future net income, discounted at 10% and commonly known as PV-10, is used as measure of present value.

31. As stated above, Debtors currently have 720,000 net and 1.3 million gross acres under lease. Such leasehold assets comprise a large component of the valuation of the Bankruptcy Estates. Absent the ability to secure postpetition financing, the Debtors stand to lose 284,846 net acres (all of which is crucial acreage located in Debtors' strategic core area of the Maverick Basin) due to a failure to pay delay rentals, bonus payments for lease extensions, ratifications and renewals, and the inability to outlay the necessary expenditures for the drilling or re-entry of wells, as required by continuous drilling commitments of various leases and contractual arrangements with other working interest owners. This would gravely jeopardize the value of the Bankruptcy Estate by resulting in the loss of approximately 40% of the Debtors' acreage and potentially 65% to 93% of Debtors' strategic acreage positions, which includes unearned acreage.

32. The Debtors value their proven and producing leases between $100,000,000 and $300,000,000. Additionally, the Debtors value their unproven and nonproducing lease assets at between $100,000,000 and $400,000,000. The Revolver Lenders' claim is approximately

15

$50,000,000. Therefore, even under the most conservative estimate, the Revolver Lenders enjoy an equity cushion in excess of 100%. Even assuming the DIP Facility is fully advanced and relying solely on the conservative value of the proven and producing lease assets, the equity cushion would be at least 35%.

33. The Interim Budget itemizes the sources and uses of cash and provides a weekly projection of cash receipts and expenditures. The Interim Budget includes categories of business expenses that are reasonable and necessary and that must be paid in order to continue the Debtors' businesses and maintain leases until such time as a final hearing on the Motion can be held.

34. The Debtors believe that the value of the Prepetition Collateral substantially exceeds the sum total of the indebtedness to the Revolver Lenders and the resulting equity cushion will protect the Revolver Lenders against any decrease in the value of their interests in the Prepetition Collateral for the duration of the requested use of their Cash Collateral.

35. Pursuant to the DIP Motion, by which the Debtors seek, *inter alia*, authority to use Cash Collateral subject to the conditions specified in the Cash Collateral Motion.

36. During the four (4) weeks ending June 12, 2009, the Debtors will receive approximately $3,300,000[4] in oil and gas receipts net of Royalty and ORRI Payments. From those amounts, Debtors propose to comply with section 11.4(b) of the Amended and Restated Credit Agreement dated April 2, 2007 and to pay the Agent all "documented out-of-pocket costs and expenses (including attorney's costs)" incurred by the Agent which the Agent had previously estimated at $900,000. Debtors also propose to pay Agent approximately $340,000 in non-

---

[4] There may be properties owned by one or more of the Debtors which are not subject to a valid or otherwise enforceable lien in favor of the Pre-Petition Lenders. While the Debtors believe that more than seventy (70%) of their proved producing property is subject to a valid and senior lien in favor of the Pre-Petition Lenders, nothing herein is intended to constitute an admission that all or any portion of the oil and gas receipts constitute the cash collateral of the Pre-Petition Lenders.

default interest for the benefit of the Revolver Lenders. Severance taxes are estimated at $55,000. The Debtors also estimate that during the same four-week period, they will receive approximately $100,000 in joint interest billings. Debtors propose to pay $1,500,000 in post-petition lease operating expenses, which are necessary in order to continue to receive oil and gas receipts. Of the approximately $3,400,000 in net revenues projected to be received by the Debtors over the next four (4) weeks, approximately $2,795,000 will be paid to the Agent or used to maintain the oil and gas revenues which arguably constitute cash collateral. Employment expenses are estimated to be approximately $550,000 over the same four-week period. Absent the DIP Financing, the Debtors will have little, if any, margin for variance even as to normal Operating Expenses.

37. The Debtors require immediate use of Cash Collateral, including cash proceeds, to continue the operation of their businesses. Without such funds, the Debtors will not be able to pay costs and expenses, including, but not limited to, wages, salaries, rent, general and administrative operating expenses, lease operating expenses and maintenance costs, that arise in the administration of these Cases and in the ordinary course of the Debtors' businesses. During the term of the DIP Financing, no portion of the cash collateral will be used for Capex which generally includes drilling, lease acquisition and renewal expenses and delay rentals. Thus, cash collateral will not be used to fund what is colloquially referred to as a "drill out" plan and no leases, wells or such property acquired by the Estates of the Debtors after the commencement of the cases as a result of Capex expenditures will be subject to the liens of the Revolver Lenders. Such property will be subject to the liens of the Term Lenders only if the Term Lenders suffer a diminution in value of their interests in the Pre-Petition Collateral as a result of use of cash collateral or the DIP Financing.

38.     Absent the ability to use Cash Collateral, the Debtors will be forced to try and find a source of additional loans or shut down all of their operations abruptly, which will negatively impact the value of their assets and eliminate any prospect distributions to unsecured creditors. The Debtors further believe that an abrupt shutdown will result in a severe and dramatic loss of collateral value, causing the Term Lenders to receive a drastically reduced value for the collateral securing the indebtedness under the prepetition credit agreements.

39.     The Debtors request interim authorization to use Cash Collateral as set forth in the Interim Budget (attached hereto as Exhibit "A") until a final order granting further use of cash collateral can be entered. The Debtors are without sufficient funds, other than DIP Financing and Cash Collateral, to operate until a final hearing on this Motion can be held. The Debtors' inability to timely pay the costs and expenses set forth herein will result in immediate and irreparable harm to their assets.

40.     On an interim basis, the Debtors request that this Court authorize the Debtors to borrow and use up to $12,500,000. The Debtors must have the interim relief requested in order to operate their business. The Debtors must incur approximately $10,500,000 in Capex and related Seismic payments during the four-week period ending June 12, 2009 in order to maintain leases.

41.     The Debtors believe that the proposed DIP Facility represents the best financing option to advance the Debtors' reorganization efforts. The DIP Facility was negotiated at arm's length. In the weeks leading up to the Petition Date, the Debtors undertook substantive negotiations with four (4) potential debtor-in-possession financing lenders, including the Agent. Although the Debtors attempted to reach favorable term sheets with each potential lender, they were unable to develop agreements comparable to the proposed DIP Facility in the time

18

available. For example, the DIP Facility proposed by the Agent did not provide the Debtors with the working capital needed to satisfy lease expenses and renew and preserve leases as necessary to maintain the Debtors' assets. The DIP Facility proposed by Agent also required Debtors to waive any objection to the extent or validity of the Pre-Petition Liens. The proposed DIP facilities from two (2) other third-party lenders, while also significantly larger than that proposed by the Agent, could not be finalized by the Petition Date. All four (4) proposals, including that of the Agent, required that the liens securing the DIP Financing be senior to all statutory liens and the liens of the Existing Lenders.

42. Three (3) members of the Term Loan Lenders group holding $70,000,000 in debt have consented to the use of Cash Collateral. The Revolver Lenders have not consented to the use of Cash Collateral.

43. The Debtors propose to provide adequate protection to the prepetition lenders as follows:

a. The Revolver Lenders will receive interest at the nondefault rate under the prepetition loan documents as well as their fees and expenses.

b. The Term Lenders will receive replacement liens.

c. The Revolver Lenders and Term Lenders will both receive superpriority liens to the extent such lender is able to demonstrate a diminution in value.

## B. Debtors' Motion for Order Directing Joint Administration of Bankruptcy Cases

44. By the *Debtors' Motion for Order Directing Joint Administration of Bankruptcy Cases,* the Debtors seek entry of an order directing the joint administration of their Chapter 11 cases and the consolidation thereof for procedural purposes only. Joint administration of these Chapter 11 cases (a) is warranted because the Debtors' financial affairs and business operations

are closely related, (b) will ease the administrative burden on the Court and the parties, and (c) protects creditors of different estates against potential conflicts of interest.

45.     The Debtors anticipate that numerous notices, applications, motions, other pleadings, hearings, and orders in these cases will affect all of the Debtors.  The failure to administer these cases jointly would result in numerous duplicative pleadings filed and served upon separate service lists.

46.     Such duplication of substantially identical documents would be extremely wasteful and would unnecessarily overburden the Clerk of this Court (the "Clerk") with the volume of paper.

47.     Joint administration will permit the Clerk to use a single general docket for the Debtors' cases and to combine notices to creditors and other parties in interest of the Debtors' respective estates.  Joint administration will also protect parties in interest by ensuring that such parties in interest in each of the Debtors' respective Chapter 11 cases will be apprised of the various matters before the Court in all of these cases.

48.     The rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of these cases inasmuch as the relief sought is purely procedural and is in no way intended to affect substantive rights.

49.     Each creditor and party in interest will maintain whatever rights it has against the particular estate in which it allegedly has a claim or right.  Indeed, the rights of all creditors will be enhanced by the reduction in costs resulting from joint administration.  The Court will also be relieved of the burden of entering duplicative orders and keeping duplicative files.  Supervision of the administrative aspects of these Chapter 11 cases by the Office of the United States Trustee will also be simplified.

C.    **Motion for Order Granting Additional Time to File Schedules and Statements**

50.    By the *Debtors' Motion for Order Granting Additional Time to File Schedules and Statements,* the Debtors seek an extension of the time allotted under the Federal Rules of Bankruptcy Procedures for filing their schedules of assets and liabilities (the "Schedules") and statement of financial affairs (the "Statements").

51.    The Debtors have approximately 1,200 creditors and numerous other parties-in-interest and operate their business from various locations. Given the size and complexity of the Debtors' business, staffing limitations, and the fact that certain prepetition invoices have not yet been received and/or entered into the Debtors' financial systems, the Debtors have not had the opportunity to gather the necessary information to prepare and file their respective Schedules and Statements.

52.    Further, the efforts of the Debtors' employees during the initial postpetition period are critical, and the Debtors must devote their time and attention to business operations during the first critical weeks of these Cases in order to maximize the value of their estates.

53.    I currently anticipate that a period ending forty-five (45) days after the date of the bankruptcy filing will be sufficient for the Debtors to file their bankruptcy Schedules and Statements.

D.    **Motion for Entry of Order Authorizing (A) Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks and (B) Continued Use of Existing Cash Management System**

54.    By the Debtors' *Motion for Entry of Order Authorizing (A) Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks and (B) Continued Use of Existing Cash Management System* (the "Cash Management Motion"), the Debtors seek an order (a) authorizing the maintenance of their existing bank accounts and the continued use of existing

business forms and checks and (b) authorizing the continued use of the existing cash management system.

55.     Prior to the commencement of these Cases, in the ordinary course of business, the Debtors maintained a cash management system (the "Cash Management System"). This Cash Management System is a substantially integrated and centralized cash management system consisting of various collection, deposit, controlled disbursement and checking accounts (collectively, the "Accounts"). The Debtors' Accounts are located at Guaranty Bank, Amegy Bank of Texas, Western National Bank, Frost National Bank ("Frost") and Bank of North Dakota (collectively, the "Banks"). Amegy Bank of Texas and Frost National Bank are authorized depositories in the Western District of Texas.

56.     The Debtors believe that the continuation of certain of the Accounts is essential to a smooth transition into Chapter 11. The Debtors also require the ability to close unnecessary Accounts and open new Accounts (at authorized depositories) as needed and treat such new Accounts for all purposes as Accounts of the Debtors in their capacity as debtors-in-possession. A delay in this regard would be extremely detrimental to the Debtors.

57.     By preserving business continuity and avoiding the operational and administrative paralysis that would accompany the closing of all Accounts and the re-establishment of new ones, the relief requested herein is in the best interests of the Debtors' estates and all parties-in-interest.

58.     Authorization for the Debtors to use all correspondence, business forms (including, but not limited to, letterhead, purchase orders and invoices) and checks existing immediately prior to the Petition Date will minimize expenses to the estates. Requiring the Debtors to change their business stock could, *inter alia*, delay payment for postpetition goods

and services. Such delay would cause additional damage to the Debtors' operations at this
critical juncture. The Debtors estimate that the receipt of new check stock will take no longer
than two weeks.

59. Given the size of these Cases, parties doing business with the Debtors will
undoubtedly be aware of the Debtors' status as Chapter 11 debtors-in-possession. Changing
correspondence and business forms would be unnecessary and burdensome to the Debtors'
estates and disruptive to the Debtors' ongoing business operations.

60. The Debtors require continued use of certain aspects of their Cash Management
System so that they may continue the uninterrupted operation of their businesses and be assured
an orderly transition into Chapter 11. Attached to the Cash Management Motion as Exhibit A is
a schematic showing the various Accounts which comprise the Debtors' cash management
system. Prepetition, Debtors[5] maintained eleven (11) Accounts at Guaranty Bank. At Guaranty
Bank, the TXCO Revenue Clearing Account received revenues and funds were then transferred
from this account to the TXCO Revenue Distribution Account to make royalty payments and to
the TXCO Concentration Account which was the primary operating account. From the TXCO
Concentration Account, funds were transferred to the TXCO Operating, Texas Tar Sands and
Charro Energy Accounts, which were zero balance Accounts, to make certain disbursements.
Disbursements were also made directly out of the TXCO Concentration Account.

61. Postpetition, with the exception of the TXCO Revenue Clearing Account and the
TXCO Revenue Distribution Account, Debtors anticipate closing the other Guaranty Accounts
shortly after the Petition Date and opening new Accounts at Frost with essentially the same cash
management structure. Debtors anticipate closing the Guaranty Bank Accounts within

---

[5] PPL, Maverick Gas and Maverick-Dimmit conducted operations related to a pipeline which was sold. These
entities are, essentially, dormant and their accounts will be closed.

approximately two (2) weeks of the Petition Date, with the exception of the TXCO Revenue Clearing Account and TXCO Revenue Distribution Account. The TXCO Revenue Clearing Account is the Debtors' account where the revenue from the sale of Debtors oil and gas production is deposited, much of that on an automatic clearing house or wire transfer basis. Closing this account after the Debtors' bankruptcy filings would be extremely detrimental to operations as it will likely take a lengthy period of time to notify all of the necessary parties to begin depositing payments to Debtors in any new Revenue Clearing Account. Debtors anticipate maintaining their Accounts at Guaranty Bank and continuing to use them in the normal course of business until new Accounts can be established at Frost, which, again, Debtors anticipate occurring within approximately two (2) weeks of the Debtors bankruptcy filings. However, Debtors propose to maintain the TXCO Revenue Clearing Account throughout the term of Debtors' bankruptcy Cases or until all necessary parties have begun to deposit Debtors' revenues in the new Revenue Clearing Account established at Frost. While the TXCO Revenue Clearing Account is open during Debtors' Cases, Debtors will receive deposits in that account and periodically transfer such funds to the appropriate new Debtor-In-Possession Accounts established at Frost where disbursements will be made. Debtor will maintain appropriate records regarding the deposits and transfers and make that information available upon request to the United States Trustee. The TXCO Revenue Distribution Account is used to pay royalties. Royalty checks were due to be distributed the week before the filing of Debtors' cases and Debtors are seeking court approval to issue the royalty checks. Debtors propose to keep this account open to allow checks to clear. Post-petition royalties will be paid out of the new Frost Debtor-In-Possession Accounts. Debtors have filed a separate motion requesting Court authority to make royalty payments, both pre and post-petition. It should be noted that the Debtors had

funds in the TXCO Concentration and TXCO Revenue Clearing Accounts swept on a daily basis to certain investment Accounts to earn a higher rate of interest. Those investment sweeps were discontinued prepetition.

62. With respect to the TXCO Drilling and Eagle Pass Well Service Accounts at Guaranty Bank, these Accounts are standalone operating Accounts. Debtors anticipate that they will be closed and likewise reestablished at Frost within two (2) weeks. Pending closure, any disbursements via check will have the checks notated with "Debtor-In-Possession" and the bankruptcy case number.

63. The Debtors currently maintain four (4) Accounts at Amegy Bank of Texas. Amegy Bank is an authorized depository in the Western District of Texas. There are two (2) general operating Accounts, the Output Operating Account and the OPEX Operating Account. Debtors propose to maintain those Accounts and request authority to continue to use such Accounts in the ordinary course of business. Debtors plan to, postpetition, stamp or otherwise notate that the checks are Debtor-In-Possession checks with the bankruptcy case number on any checks issued out of the Output Operating or OPEX Operating Accounts. The Output Royalty and OPEX Royalty Accounts at Amegy Bank are used to pay royalty obligations and Debtors propose to keep such Accounts open post-petition simply to allow royalty checks issued pre-petition to clear with post-petition royalty checks issued after May 31, 2009 to be issued out of new Debtor-In-Possession Accounts at Frost.

64. The Debtors' sole account at Western National Bank is the TXCO Drilling account, which is a standalone operating account. Debtors propose to maintain the TXCO Drilling Account until Debtors are able to open a new TXCO Drilling Account at Frost. Debtors

then plan to close the existing TXCO Drilling Account at Western National Bank which is not an approved depository in the Western District of Texas.

65.     The Debtors' maintain three (3) Accounts at Frost National Bank.  The TXCO Operating account was dormant until March 2009.  The Revenue Clearing account and Prepaid Drilling account were both opened in April 2009.  The Debtors also maintain a certificate of Deposit in the amount of $125,000 for Liberty Mutual Insurance at Frost National Bank.  Frost National Bank is an approved depository for the Western District of Texas.  Currently, Debtors are not issuing any checks out of the existing Accounts at Frost National Bank but to the extent that checks are obtained for use with any of the Frost National Bank Accounts, Debtors intend to have them bear the appropriate "Debtor-In-Possession" and bankruptcy case number notations.

66.     Finally, the Debtors maintain one (1) certificate of deposit in the amount of $50,000 at Bank of North Dakota for North Dakota production.  Debtors maintain the certificate of deposit at the Bank of North Dakota for regulatory reasons.  Debtors anticipate that the certificate of deposit will be maintained throughout the pendency of Debtors' bankruptcy Cases.  Debtors do not anticipate opening any additional Accounts at the Bank of North Dakota nor issuing any disbursements out of the Bank of North Dakota.

67.     The Debtors receive invoices either electronically or in paper format.  The invoices are then entered into the Debtors' accounting program and are sent to a senior accountant once each day.  Once the invoices are verified by the senior accountant, a voucher is created and approved for payment by a senior accountant.  After a weekly cash projection, invoices are marked for payment in the week they are due generating weekly recommended payments reports.  The Debtors' controller then reviews the list of recommended payments each week, with final approval of the weekly payments then made.  The recommended payments list

is then sent to the Debtors' office manager for check printing or initiation by a senior financial analyst of a wire transfer. After printing, checks are signed and reviewed prior to mailing. Once the check or wire payment is sent, the Debtors' computer program records the payment against the relevant invoice.

68.     For royalty and working interest owners, revenue is received through the month as wire transfer, ACH or checks in the Revenue Clearing Accounts and then deposited into appropriate segregated Royalty Accounts. The amounts are then booked and applied to well levels to calculate amounts owed to each royalty or working interest owner. Joint interest billings are then run on or about the 10th of each month. Royalty and working interest payments are run on or about the 15th of each month. After revenue amounts are generated, the Debtors' Controller receives and reviews the recommended payments report each month. After review by the Controller, including a determination whether there are any obligations which should be setoff, final approval of the recommended payments is issued. The recommended payments list is then sent to the Debtors' office manager for check printing. After printing, checks are signed and reviewed prior to mailing. Once the check or wire payment is sent, the Debtors' computer program records these payments.

69.     For Debtors' payroll, ADP withdraws amounts to cover the Debtors' payroll on the Wednesday prior to the payroll, and then issues checks or makes direct deposits of the payroll amounts into each Employee's individual account on the Friday of payroll. Payroll is processed every two weeks.

70.     ADP withdraws payroll funds from each of the following Accounts:

| Bank | Account Name | Payroll Account at ADP |
| --- | --- | --- |
| Guaranty | TXCO Concentration | TXCO Resources Inc. Payroll |
| Guaranty | Charro Energy | Charro Energy Inc. Payroll |
| Amegy Bank of Texas | Output Operating Account | Output Acquisition Corp. and |

27

| | | OPEX Energy, LLC Payroll |
|---|---|---|
| Western National Bank | TXCO Drilling | TXCO Drilling Corp. Payroll |

71.     The Debtors submit that the practices described in the Cash Management Motion directly and indirectly help maintain and preserve the value of their businesses.  The Debtors' operations and asset values depend on the continuation of these cash management practices. Otherwise, the Debtors might not be able to trace their receipts and disbursements or efficiently manage their liquid assets.  As a result: (a) the Debtors would not be able to timely meet postpetition obligations; (b) interest on the Debtors' funds would be lost; and (c) payroll for employees would be disrupted. Accordingly, absent the relief sought in the Cash Management Motion, the Debtors' businesses could be disrupted and their asset values irreparably harmed.

**E.      Motion for Order (I) Authorizing Debtors to Pay (A) Certain Prepetition Employee Obligations and Benefits and (B) Prepetition Withholding Obligations and (II) Directing All Banks to Honor Certain Related Prepetition Transfers**

72.     The Debtors have filed their *Motion for Order (I) Authorizing Debtors to Pay (A) Certain Prepetition Employee Obligations and Benefits and (B) Prepetition Withholding Obligations and (II) Directing All Banks to Honor Certain Related Prepetition Transfers* (the "Wage Motion").

73.     Prior to the Petition Date, the Debtors reduced their staff by 27 employees.  The Debtors' workforce includes both hourly and salaried employees (collectively, the "Employees").  The majority of "field" employees are paid hourly.  The Employees will suffer undue hardship and, in many instances, serious financial difficulties without the relief requested herein.  Without the requested relief, the Debtors' stability would be undermined at the outset of these Cases.  Any delay in paying prepetition Employee obligations would seriously harm the Debtors' relationship with its Employees and could irreparably impair Employee morale at the very time the dedication, confidence, and cooperation of the Employees is most critical.  The

Debtors face the imminent risk that operations may be severely impaired if they are not immediately granted authority to make the payments described in the Wage Motion.

74.     As of the Petition Date, TXCO Resources Inc. employed approximately fifty-five (55) Employees.  Output Acquisition Corp. employed approximately four (4) Employees. Charro Energy Inc. employed approximately one (1) Employee.

75.     The Employees are compensated on a bi-weekly basis.  The next payroll is scheduled to be paid May 29, 2009, and will cover the time period from May 12, 2009 through May 25, 2009.  The average biweekly payroll amounts for each of the Debtors are detailed below:

| Debtor: | Total Payroll: | Portion of Total Payroll for Taxes: |
| --- | --- | --- |
| TXCO | $188,936.27 | $28,907.25 |
| Output | $18,150.13 | $2,776.97 |
| Charro | $5,288.46 | $809.13 |

76.     Assuming all payroll checks issued post-petition have cleared, all of the Employee payroll obligations which accrued prior to the Petition Date are individually below the statutory amount afforded priority in 11 U.S.C. § 507(a)(4).[6]

77.     The Debtors also represent that there will be sufficient cash available to pay all prepetition Employee obligations to the extent described herein if the requested use of cash collateral and post-petition financing is approved, as such amounts become due in the ordinary course of their business.

78.     The Debtors also utilize the services of certain independent contractors.  The Debtors also seek to satisfy pre-petition obligations related to the independent contractors.  The amounts paid to these independent contractors (including agency fees) are approximately $111,300 per month.

---

[6] To the extent requested by the Court, Office of the United States Trustee or any appointed Committee, the Debtors will provide a list of Employees and the amounts owed to them on account of wages or salary earned prepetition.

79.     In the ordinary course of the Debtors' business, the Debtors reimburse Employees for certain business-related expenses.   The expenses are ordinary course expenses that the Debtors' Employees incur in performing their job functions.   It is essential to the continued operation of the Debtors' businesses that they are permitted to continue reimbursing Employees for such business-related expenses.   There are nominal amounts of unreimbursed business expenses as of the Petition Date.   Historically, the Debtors reimburse Employees (in aggregate) approximately $1,350 per week for business expenses.  The Debtors' prepetition policy has been to require Employees to submit expense reports, including receipts, within five (5) days of the end of the month in which the expenses occurred, or the reimbursement may be denied. Therefore, there may be reimbursement requests, for prepetition expenses, that have not yet been provided by Employees to the Debtors.  The Debtors seek authority to reimburse Employees for all business expenses in the ordinary course of business, including those incurred prior to the Petition Date.

80.     The Debtors' full time Employees are eligible for coverage under health, dental, long term disability and life insurance (the "Health Benefits Plan").  The Health Benefits Plan is paid in full by the Debtors, except for a portion of the Employee dental insurance, which is paid by individual Employees.   Full time Employees become eligible to participate in the Health Benefits Plan ninety (90) days after beginning employment.   Employees of the Debtors contribute to coverage for any dependents.

81.     The Debtors' obligations related to the Health Benefits Plan are paid monthly. The most recent payment, on account of the Health Benefits Plan, was made on May 4, 2009 and covered the period from May 1, 2009 through May 31, 2009.  The next payment will be due June

2562975v.1

1, 2009, and will cover the period from June 1, 2009 through June 30, 2009.  The Debtors will owe $51,615.06 on account of the Health Benefits Plan on June 1, 2009.

82.     The Debtors provide vacation and sick leave benefits to eligible full-time Employees.  The Employees accrue five days of paid sick leave per year to be used for illness of the Employee or an immediate family member.  Eligible Employees are allowed to carry over unused sick leave days from year to year up to a maximum balance of twenty (20) days.  Unused sick leave balances, in excess of twenty (20) days are forfeited.  Accrued unused sick leave is not paid out upon an Employee's termination of employment.

83.     Employees earn vacation time based on years of service with the Debtors. Employees who have been employed between one and five years earn two weeks annual vacation time. Employees with between five and fifteen years of service with the Debtors earn three weeks of annual vacation time.  Employees with more then fifteen years of service with the Debtors earn four weeks of vacation time annually.  Unused vacation time generally can not be carried over in subsequent years.

84.     Additionally, the Debtors may be granted up to a maximum of three (3) full days of paid personal time per calendar year.  Personal time is not accrued, nor can unused time be carried from year to year.  Unused personal time is not paid out upon an employee's termination of employment.  Employees must request authorization from their supervisor to take such personal time.

85.     The Debtors anticipate that many of their Employees will utilize any accrued sick, vacation or personal time in the ordinary course of business without resulting in any material cash flow requirements beyond the Debtors' normal payroll obligations.

86.     Debtors provide workers' compensation benefits to Employees (the "Workers' Compensation Benefits").   The Debtors' workers compensation coverage is through Texas Mutual Insurance Company.   The Debtors' monthly premium is approximately $19,391.   The Debtors' payments to Texas Mutual Insurance Company are due on the fifteenth of each month for the previous month's coverage.

87.     As of the Petition Date, there was only one workers' compensation claim pending against the Debtors.

88.     In the Wage Motion, the Debtors seek authorization to pay all Employee federal and state withholding and payroll-related taxes and obligations relating to prepetition periods including, but not limited to, all withholding taxes, Social Security taxes, unemployment taxes, Medicare taxes, Court ordered payments, and garnishments, as well as all other withholdings such as contributions to savings, retirement or pension plans, and insurance contributions, if any (collectively, the "Prepetition Withholding Obligations").

89.     The Debtors routinely withhold from Employee paychecks the Prepetition Withholding Obligations, including, without limitation, amounts deducted for child support and creditor garnishment that the Debtors are required to transmit to third parties.   The Debtors believe that such withheld funds, to the extent that they remain in Debtors' possession, likely constitute moneys held in trust and, therefore, are not property of the Debtors' bankruptcy estates.

90.     Typically, the Debtors pay Employees' wages and salaries through an agreement with ADP.   Funds are transmitted to ADP on the Wednesday prior to the date of making the wages and salary payments.   ADP then pays Employees via checks or direct deposits drawn on an ADP account on Friday.

32

91.     The Employees are essential to the continued operation of the Debtors' business and successful reorganization, and the Employees' morale directly affects their effectiveness and productivity.  Consequently, it is critical that the Debtors continue, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date.  If the checks issued and electronic fund transfers requested in payment of any of the Employee obligations have been or are dishonored, or if such obligations are not timely paid postpetition, the Employees will suffer extreme personal hardship and may be unable to pay their daily living expenses.  These circumstances undoubtedly will adversely affect their performance and similarly impact the Debtors' reorganization effort to the detriment of all parties in interest.

92.     The Debtors' workforce is owed, on account of prepetition Employee obligations, amounts that are, individually, less than the cap given priority by section 507(a)(4) and (5) of the Bankruptcy Code.  First and foremost, these Employees are critical to the Debtors' continued operations, especially in the early stages of these chapter 11 Cases.  The morale and work ethic of the Debtors' Employees are paramount to maintaining the current value of the Debtors' estates.

93.     In order to retain Employees, and to maintain morale, the Debtors must have authority to pay or otherwise satisfy all prepetition Employee obligations and benefits and Prepetition Withholding Obligations.

94.     The relief requested in the Wage Motion is necessary to the Debtors' successful reorganization.  The Employees are vital to the continued operation of the Debtors' business and to their successful reorganization.

2562975v.1

**F.** **Motion for Entry of Order (I) Prohibiting Utilities from Altering, Refusing or Discontinuing Services on Account of Prepetition Invoices and (II) Authorizing and Approving of Procedures for Providing Adequate Assurance of Postpetition Payments**

95.     The Debtors have filed *Motion for Entry of Order (I) Prohibiting Utilities from Altering, Refusing or Discontinuing Services on Account of Prepetition Invoices and (II) Authorizing and Approving of Procedures for Providing Adequate Assurance of Postpetition Payments* (the "Utilities Motion").  In connection with the operation of their businesses, the Debtors currently utilize electricity, telephone services, trash maintenance and similar services ("Utility Services") through numerous accounts with various utility companies (collectively, the "Utility Companies").  The Debtors' main utility needs are to service their offices and oil and gas wells and other facilities.

96.     The Debtors propose to provide each of the Utility Companies, as additional adequate assurance of payment, a cash deposit in an amount equal to the last bill for utility service provided by each Utility Company prior to the Petition Date (the "Utility Deposits").  A list of the names and addresses of the Utility Companies and proposed Utility Deposits is attached to the Utilities Motion as Exhibit A.

97.     Uninterrupted utility service is essential to the Debtors' ability to operate and maintain its operations.  Therefore, it is necessary for the Debtors to receive the relief requested in the Utilities Motion to avoid immediate and irreparable harm.

**G.** **Motion for Entry of Order Limiting Notice and Establishing Notice Procedures**

98.     By their *Motion for Entry of Order Limiting Notice and Establishing Notice Procedures* ("Limit Notice Motion"), the Debtors wish to limit notice sent to creditors and other parties in interest.

99.     Service of papers by electronic mail or by the Court's ECF system where applicable will substantially reduce costs to the estate for photocopying and postage.

100.    The mailing of notices of all pleadings and other documents in these Cases to all creditors and parties-in-interest, and the mailing of notices of all pleadings and other documents to insured depository institutions in contested matters and adversary proceedings via certified mail, would be both impractical and impose an administrative and economic burden upon the Debtors' estates.

101.    Limiting service as called for in the Limit Notice Motion will make the administration of these Cases more efficient and cost-effective.  Furthermore, because all creditors and other parties in interest will have the right to request notice of all proceedings in these Cases and to be included on the Limited Service List at any time, the notice procedures requested in the motion will not prejudice the rights of any creditor or other party in interest. The motion is in the best interest of the Debtors' estates and creditors because it will limit administrative costs and will not prejudice the rights of any creditor or party-in-interest.

**H.      Application for Approval of the Employment of Cox Smith Matthews Incorporated as Attorneys for the Debtors**

102.    The Debtors have filed an *Application for Approval of the Employment of Cox Smith Matthews Incorporated as Attorneys for the Debtors* (the "Cox Smith Application").  By the Cox Smith Application, the Debtors seek to employ and retain Cox Smith Matthews Incorporated ("Cox Smith") as their counsel, as of the Petition Date, in connection with various matters, including the Debtors' commencement and prosecution of their Chapter 11 Cases.

103.    The employment of Cox Smith, as specified in the Cox Smith Application, is appropriate and necessary to enable the Debtors to execute faithfully their duties as Debtors and Debtors-in-Possession.  Cox Smith has stated its desire and willingness to act as counsel in the

Cases and render the necessary professional services as attorneys for the Debtors. The Debtors have selected Cox Smith to provide them representation in the Cases because their expertise with bankruptcy cases of similar size and scope is well known.

104.  Interim approval of the Cox Smith Application is necessary to avoid immediate and irreparable damage to the Debtors. If counsel's employment has not been approved, there may be some reluctance on the part of third parties who need to negotiate with the Debtors' counsel. Counsel must argue motions that relate to the Debtors' ability to pay employees for wages that were accrued pre-petition. Counsel will be involved in negotiations with the Bank of Montreal in connection with postpetition financing. The Debtors' counsel will also be involved in discussions with utilities essential to Debtors' operations. Interim approval provides counsel with authority and legitimacy, which may be questioned if not approved as counsel. Furthermore, lack of approval on an interim basis may impact whether an attorney-client relationship exists.

I.  **Application for Approval of the Employment of Fulbright & Jaworski L.L.P. as Special Counsel for the Debtors**

105.  The Debtors have filed an *Application for Approval of the Employment of Fulbright & Jaworski L.L.P. as Special Counsel for the Debtors* (the "Fulbright Application"). By the Fulbright Application, the Debtors seek to employ and retain Fulbright & Jaworski L.L.P. ("Fulbright") as their special counsel, as of the Petition Date, in connection with various matters, enumerated in detail in the Fulbright Application.

106.  The employment of Fulbright as special counsel in connection with these Cases is necessary and in the in the best interest of the estate. Fulbright currently represents the Debtors as their general corporate and securities counsel. More specifically, Fulbright is currently representing the Debtors with respect to all filings under and compliance with federal securities

36

laws, as well as certain general corporate matters, including its compliance with its debt agreements. Such experience has resulted in Fulbright's unique knowledge of the Debtors' business and related legal issues. The professional services that Fulbright will render are necessary in that the Debtors will need postpetition financing and corporate transactions work in connection with the reorganization, the Debtors will continue to need legal counsel to assist and advise with respect to securities laws, and, to the extent that CSM cannot undertake an issue, a substitute counsel to step in and handle such issues if Fulbright is able to do so.

107. The Debtors believe Fulbright is both well qualified and uniquely able to act as the Debtors' special counsel. The Debtors have selected Fulbright as its special counsel to save the significant cost and time that would be required for new counsel to become familiar with, and educated about, the types of matters Fulbright has handled for the Debtors in the past. Moreover, the functions to be performed by Fulbright will not be duplicative of the work performed by CSM, but rather will ensure the most economic and effective means for the Debtors to be represented herein.

108. The Debtors are unaware of any circumstances where Fulbright was adverse to the Debtors.

109. Interim approval of the Fulbright Application is necessary to avoid immediate and irreparable damage to the Debtors. If counsel's employment has not been approved, there may be some reluctance on the part of third parties who need to negotiate with the Debtors' counsel. Counsel will be involved in negotiations with Debtors' pre-petition lenders and Debtor-In-Possession financing lenders in connection with postpetition financing. Fulbright will also assist immediately after the filing with certain Securities and Exchange Commission filings and issues. Interim approval provides counsel with unquestionable authority and legitimacy, to address these

important matters. Furthermore, lack of approval on an interim basis could impact aspects of the attorney-client relationship.

**J.**     **Debtors' Motion for Authority to Pay or Honor Prepetition and Postpetition Royalty Obligations**

110.     The Debtors have filed the *Motion for Authority to Pay or Honor Prepetition and Post-Petition Royalty Obligations* ("Royalty Interests Motion").

111.     In connection with the Debtors' oil and gas assets, the Debtors are obligated, pursuant to their oil and gas leases and related operating agreements, to remit to the lessors of the oil and gas leases and potentially other parties, including without limitation, owners of working interests (the "Royalty Interest Owners") their share of the production from the producing wells located on the respective leases, free of expenses of production (the "Royalties") and to the owners of the overriding royalty interests (the "ORRI Owners") the overriding royalties (the "ORRI"). As of the Petition Date, the Debtors estimate that they owe $2 million to the Royalty Interest Owners and ORRI Owners for current royalty obligations.[7] The Debtors' payments to Royalty Interest Owners and ORRI Owners were approximately $1,146,000 for the month prior to the Petition Date and will be $1,065,367 for the Royalties attributable to oil and gas revenues received by the Debtors in the month prior to the Petition Date.

112.     Non-payment of Royalties and ORRIs could jeopardize some oil and gas leases. Also, purchasers of production may be reluctant to timely pay to Debtors oil and gas receipts if Royalty Interest Owners and ORRI Owners are not paid. Payments to the Royalty Interest Owners and ORRI Owners are in paid arrears and should be paid promptly.

---

[7] Debtors' books and records reflect both "current" and certain "aged" royalty obligations. Funds for current royalties are segregated for payment and paid in the ordinary course. The "aged" royalties (which royalties' obligations related to historical situations such as where Debtors have no address for the royalty owner, etc.) are simply listed as liabilities on financial records of the Debtors. Debtors are seeking no relief via the Royalty Interests Motion with respect to those obligations.

113.    The Debtors are also the operators for a number of the oil and gas wells in which the Debtors hold an interest, many under joint operating agreements with other parties.  As a part of insuring that these wells continue operating, the Debtors are incurring numerous current lease operating expenses (the "LOEs").  Debtors request authority to pay all LOEs invoices received after the Petition Date where they deem it impractical to differentiate between prepetition and postpetition costs.  Many of the invoices for these LOEs will cover both prepetition and postpetition expenses.  Given the number of such invoices, and the Debtors now limited accounting staff, separating the prepetition portions from the postpetition portions of each individual invoice will be impractical or even impossible for the Debtors' to timely accomplish.

114.    Where the Debtors hold non-operating working interests in wells under various joint operating agreements ("JOAs"), the Debtors receive payments representing their share of production revenues.  The Debtors then reimburse the operator for their share of the production costs through the payment of joint-interest billings ("JIBs").  The failure to timely pay JIBs may provide grounds for the operator to assert contractual or statutory lien rights against the Debtors' interest in the well.

115.    If the Debtors stop paying JIB, JOA and LOE obligations as they become due, the Debtors operations will be severely impacted and production may completely cease for certain wells.  These occurrences would directly, immediately and negatively impact the Debtors' creditors and other parties in interest.

116.    The Debtors ongoing operations depend, to a significant degree, on its relationship with the parties to whom LOE, JOA and JIB obligations are owed.  If these relationships are harmed, either through the non-payment of obligations as they become due, or through the perceived difficulties of dealing with chapter 11 debtors, the Debtors will likely

encounter particularized controversies with each entity, unnecessary costs and distractions and corresponding harm to their businesses with the possible loss of the Debtors' going concern value. Given the competitive nature of the Debtors' businesses, the strict lease provisions, and statutes, the counterparties to LOEs and JIBs may not have the same dependence upon the Debtors.

117. In the instances where the Debtors hold a non-operating working interest in their leases, the JOAs often grant the operator a contractual lien upon the Debtors' interest in the lease that may include (a) all equipment installed on the lease; (b) all hydrocarbons or other minerals severed and extracted from or attributable to the lease; (c) all accounts and proceeds of sale, contract rights, and general intangibles arising in connection with the sale; (d) fixtures; and (e) any and all accessions, additions and attachments thereto and the proceeds and products therefrom. The lien sometimes purports to secure the payment of all charges, fees, court costs, and other directly related collection costs. If the Debtors do not pay charges when due, the operator may also attempt to assert additional rights to collect from the purchaser of the Debtors' hydrocarbon production until the amount owed has been paid.

118. As such, the Debtors' failure to timely pay JIBs owing is likely to lead to instance of attempted setoff or recoupment. The Debtors expect to pay, and should have the funds available to pay, Royalty payments, ORRI payments, LOEs and JIBs in the ordinary course of business postpetition.

## K. Application for Approval of the Employment of FTI Consulting, Inc. as Chief Restructuring Officer and Financial Advisors for the Debtors

119. The Debtors have filed an *Application for Approval of the Employment of FTI Consulting, Inc. as Chief Restructuring Officer and Financial Advisors for the Debtors* ("FTI Application"). By the FTI Application, the Debtors seek court approval of the continuation of a

pre-existing agreement between FTI and the TXCO, under which FTI has provided the services of Albert S. Conly as Chief Restructuring Officer ("CRO"), and served as financial advisors to the Debtors.

120. FTI and TXCO entered into an agreement (the "Agreement") on March 24, 2009, under which FTI agreed to provide TXCO with the services described above. A copy of that agreement is attached to the FTI Application as Exhibit B. It is necessary that the Debtors receive the services described in the FTI Application. FTI has stated its desire and willingness to act as CRO and financial advisors in the Cases and render the necessary professional services for the Debtors. The Debtors have selected FTI to act as the CRO and financial advisors in the Cases because their expertise with bankruptcy cases of similar size and scope is well known.

121. The continuance of FTI's services is necessary for the Debtors to avoid immediate and irreparable harm. The CRO and FTI are involved in negotiations in connection with the use of post-petition financing and related Budgets. Interim approval of FTI's continued engagement will provide FTI and the CRO a cloak of authority and legitimacy which may be questioned if such approval is not given.

**L.    Motion for an Order (i) Authorizing the Debtors to Pay Certain Prepetition Taxes and Regulatory Fees in the Ordinary Course of Business and (ii) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto**

122. The Debtors have filed the *Motion for Order (i) Authorizing the Debtors to Pay Certain Prepetition Taxes and Regulatory Fees in the Ordinary Course of Business and (ii) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto* (the "Tax Motion"). The Tax Motion requests authority to pay, in the Debtors' sole discretion, sales and use taxes (the "Sales and Use Taxes"), property taxes (the "Property Taxes"), federal, state, and local severance and production taxes (the "Production Taxes"),

franchise and/or income taxes (the "Franchise/Income Taxes"), and other taxes (together with the Sales and Use Taxes, Property Taxes, Production Taxes, and Franchise Taxes, the "Taxes") and/or fees ("Fees") owed or accrued prepetition to the taxing and governmental regulatory authorities (the "Taxing and Regulatory Authorities"). Debtors have agreed that on an interim basis, pending a final hearing on the motion, the Debtors will seek approval to pay only Production Taxes and Sales and Use Taxes.

123.    In the ordinary course of business, and as part of their operations, the Debtors incur, or collect, various Taxes, including Sales and Use Taxes, Property Taxes, Production Taxes, Franchise Taxes and other taxes and Fees. Before the Petition Date, the Debtors generally paid all undisputed Taxes in a timely fashion.

124.    Certain Taxing and Regulatory Authorities require the Debtors to collect from their customers, and/or for the Debtors to pay as a customer, Sales and Use Taxes that are based on a percentage of sales prices. In most cases, the Sales and Use Taxes are paid in arrears once collected. It is difficult for the Debtors to estimate the amount of Sales and Use Taxes owed as of the Petition Date, as such taxes are taken into account in the numerous invoices either generated by or paid by the Debtors.

125.    Property Taxes are assessed and become payable in the ordinary course of business and are calculated based on a statutorily-mandated percentage of property value (for both real and personal property). Generally, Property Taxes are due annually, and the timing of payment of Property Taxes varies from jurisdiction to jurisdiction. As of the Petition Date, the Debtors estimate that no Property Tax amounts are due and owing to the Taxing and Regulatory Authorities as all current Property Taxes have been assessed and paid prior to the Petition Date. However, there may be a *de minimis* amount of Property Taxes that are disputed or have not yet

been assessed; therefore, certain Property Taxes may be billed during the pendency of these Cases.

126.     Various Taxing and Regulatory Authorities also assess Production Taxes based on the Debtors' extraction of oil and gas, usually as a percentage of revenues.  Production Taxes are essentially akin to a sales tax in form and effect.  Each state has different rules, guidelines and procedures related to the assessment of the Production Taxes, and each assess taxes at a different percentage rate.  Because the payment of Production Taxes is directly related to the Debtors' ability to continue the extraction and sale of oil and gas, payment of the Production Taxes is critical to the Debtors' continued operations.  Severance taxes are estimated to be $54,352 for the four-week period ending June 12, 2009.

127.     In addition, the Debtors have Franchise Tax obligations they must pay to various state authorities in jurisdictions where the Debtors operate or are authorized to do business.  The Franchise Taxes are assessed annually and are necessary to remain in good standing.  The Debtors request authority upon final hearing, in an abundance of caution, to continue to pay the Franchise Tax obligations if and when they become due and payable during the pendency of these Cases.

128.     Certain of the Taxes or Fees collected by the Debtors from third parties are held in trust for the benefit of the Taxing and Regulatory Authorities.  Thus, as to accrued Taxes and Fees of the Debtors that were unpaid as of the Petition Date, the Debtors' officers and directors could be subjected to lawsuits during the pendency of these Cases.  Such lawsuits would prove extremely distracting for the Debtors and the named officers and directors, whose immediate and full-time attention is required for the Debtors' reorganization.  It is in the best interest of the

Debtors' estates to eliminate the possibility of such time-consuming and potentially damaging distractions.

129.    Debtors submit that the payment of the Taxes and Fees is necessary to avoid potential administrative difficulties.    Without such payments, the Taxing and Regulatory Authorities may file liens, conduct audits and bring motions to lift the automatic stay.    Debtors believe that the payment of the Taxes and Fees will help to avoid such actions.

## M.    Motion for Order Establishing Procedures for Interim Compensation and Reimbursement of Professionals

130.    The Debtors have filed the *Motion for Order Establishing Procedures for Interim Compensation and Reimbursement of Professionals* (the "Compensation Motion").    In short, the Compensation Motion seeks the Court's approval of procedures for paying the Debtors' professionals on a monthly basis at eighty percent (80%) of fees incurred during the period covered by the Monthly Statement and one-hundred percent (100%) of expenses incurred for the month.    These payments shall be subject to this Court's subsequent approval pursuant to section 331 of the Bankruptcy Code as part of the normal interim-fee application and the local rules of this Court.

131.    Implementation of the procedures outlined in the Compensation Motion will allow parties in interest in the case to closely monitor the costs of administration of the case, and the Debtors will be able to monitor professional expenses on a monthly basis, maintain level cash flows and implement efficient cash management procedures, while receiving the professional services that are necessary to achieve a successful restructuring of the Debtors.

**N.**     <u>**Motion For Approval of Payments on Insurance Premium Financing Agreements**</u>

132.     The Debtors their *Motion for Approval of Payments on Insurance Premium Financing Agreements* ("PFA Motion"), by which Debtors seek approval of the continuation of payments under the terms of an insurance premium financing agreement.

133.     On or about June 6, 2008, TXCO Resources Inc. entered into a *Premium Finance Agreement, Security Agreement, Disclosure Statement and Limited Power of Attorney* (the "First Agreement") with Flatiron Capital ("Flatiron"). A true and correct copy of the First Agreement is attached to the PFA Motion as Exhibit A. The First Agreement provides for 11 monthly payments of $17,271.70, each due to Flatiron by the 15th of each month. The Debtors made the most recent payment to Flatiron on April 3, 2009.

134.     On or about November 2, 2008, TXCO Resources Inc. entered into a *Premium Finance Agreement, Security Agreement, Disclosure Statement and Limited Power of Attorney* (the "Second Agreement," together with the First Agreement the "Agreements") with Flatiron. A true and correct copy of the Second Agreement is attached to the PFA Motion as Exhibit B. The Second Agreement provides for 11 monthly payments of $47,896.57, each due to Flatiron by the 1st of each month. The Debtors made the most recent payment to the Lender on April 23, 2009.

135.     Under the Agreements, Flatiron is granted a security interest in all of the related insurance policies, unearned premiums, return premiums, dividend payments and loss payments. Should the Debtors fail to make payments under the Agreements, cancellation of the Policies by Flatiron is a considerable risk. A default under the Agreements risks unacceptable gaps in insurance coverage, carrying with it loss of the Debtors' going concern value. The Agreements with Flatiron are already in place, and, in the Debtors' business judgment, any possible savings from refinancing and renegotiating such a replacement for the Agreements will be likely

2562975v.1

outweighed by the transaction costs of such a process. Further, the cancellation of insurance coverage will cause the Debtors immediate and irreparable harm.

**O.     Application for Approval of the Employment of Administar Services Group LLC, as Claims, Balloting, Noticing and Administrative Agent for the Debtors**

136.    By the *Application for Approval of the Employment of Administar Services Group LLC, as Claims, Balloting, Noticing and Administrative Agent for the Debtors* (the "Administar Application"), Debtors seek to employ Administar Services Group LLC ("Administar") as claims, balloting, noticing and administrative agent for the Debtors.

137.    The creditor matrix in the Debtors' cases includes over 1,275 parties to whom certain notices must be sent exclusive of equity holders. Such a large number of creditors and parties in interest will undoubtedly impose heavy administrative and other burdens on the Court and the Office of the Clerk of the Court. The Debtors will also need assistance in managing and addressing the myriad of administrative issues that will likely arise in this case. In addition, in connection with any plan of reorganization proposed by the Debtors, the Debtors have determined that they will require the services of Administar to act as solicitation agent with respect to, *inter alia*, the mailing of a disclosure statement, the plan and related ballots, and maintaining and tallying ballots in connection with the voting on such plan. To relieve and assist with these burdens, the Debtors request the appointment of the Administar as claims, balloting, noticing and administrative agent in these Chapter 11 Cases.

138.    Administar is one of the country's leading Chapter 11 administrators with expertise in noticing, claims processing, claims reconciliation, and distribution and ballot tabulation. Administar has acted as claims and noticing agent in hundreds of bankruptcy cases and is well qualified to provide the Debtors with experienced services as claims, noticing, balloting, and administrative agent in connection with these Chapter 11 Cases.

139.    The Debtors and its advisors solicited proposals from four (4) different administrators and received responses from three (3).   After undergoing this analysis, the Debtors concluded that Administar was the best choice for the claims and noticing agent in these Cases.  The Debtors believe that the Services Agreement contemplates compensation at a level that is reasonable and appropriate for services of this nature, and is consistent with the compensation arrangement charged by Administar in other cases in which it has been retained to perform similar services.  The Debtors need to employ a claims agent with proven competence and believe that Administar so qualifies.  In light of Administar's experience and the efficient and cost-effective methods that it has developed, the Debtors' estates and creditors will clearly benefit from the appointment of Administar as the claims and noticing agent in these Chapter 11 Cases.

140.    Pursuant to Rule 2002(a)(1) of the Federal Rules of Bankruptcy Procedure, twenty days notice is required for the meeting of creditors.   The Debtors believe that the assistance of Administar as noticing agent is necessary to comply with this, and other, noticing requirements in these Cases, making the approval of the Application necessary to avoid immediate an irreparable harm to the Debtor's estate.

141.    Debtors are unaware of any circumstances where Administar was adverse to the Debtors, except as described in the Administar Motion and the attached declaration.   The Debtors have been informed that neither Administar, nor any of its professional personnel, have any relationship with the Debtors that would impair Administar's ability to serve as claims and noticing agent.

## P. Application for Approval of the Employment of DeGolyer and MacNaughton as Engineers and Consultants for the Debtors

142.    By the *Application for Approval of the Employment of DeGolyer and MacNaughton as Engineers and Consultants for the Debtors* (the "D&M Application") the Debtors seek to employ and retain DeGolyer and MacNaughton ("D&M") to provide petroleum engineering and consulting services, as of the Petition Date.  In the ordinary course of business, the Debtors have employed D&M to provide various petroleum engineering services and consulting services, including the preparation of annual appraisal reports of the Debtors' various energy producing properties.  D&M has produced annual appraisal reports for the Debtors for the years 2004 through 2008.  The employment of D&M is appropriate and necessary to enable the Debtors to execute faithfully their duties as Debtors and Debtors-in-Possession.  The Debtors propose to hire D&M to provide petroleum engineering and consulting services to the Debtors as necessary, including the preparation of annual appraisal reports, for the Debtors to maximize the value of their assets on behalf of creditors and parties in interest.  Further, the Debtors and their other professionals may consult with D&M concerning valuation issues early in the case, making the Court's approval of the D&M Application necessary to avoid immediate and irreparable harm.

143.    It is necessary that the Debtors employ the foregoing professional services.  D&M has stated its desire and willingness to act as petroleum engineers and consultants in the Cases and render the necessary professional services for the Debtors.

144.    Debtors are unaware of any circumstances where D&M was adverse to the Debtors.  Debtors and D&M have not identified any connections between the Debtors' creditors or parties in interest and D&M.  To the best of the Debtors' knowledge, the employees of D&M do not have any other connection with or any interest adverse to the Debtors, their creditors, or

any other party in interest, or their respective attorneys and accountants or the United States Trustee or any person employed in the office of the United States Trustee.

145.     Since 2005, D&M and TXCO (then named "The Exploration Company of Delaware") have operated under a letter agreement, attached as Exhibit B (the "Letter Agreement").  Under the Letter Agreement, D&M provides its services to the Debtors on a fee basis, and TXCO releases and indemnifies D&M with respect to certain claims.  The Debtors propose to retain D&M subject to the Letter Agreement, except that the indemnification granted in such Letter Agreement shall only apply to the postpetition conduct and services of D&M.

**Q.     Motion for Order Under 11 U.S.C. §§ 105(a), 362 and 541 Establishing Notification and Hearing Procedures for Trading in Equity Securities**

146.     The Debtors have filed their *Motion for Order Under 11 U.S.C. §§ 105(a), 362 and 541 Establishing Notification and Hearing Procedures for Trading in Equity Securities* ("Trading Motion") in order to be able to preserve the important and valuable tax attributes of the Debtors.  The Debtors net operating losses as of March 31, 2009 are estimated to be as high as $217,000,000.  Protecting and preserving such net operating losses is essential to preserve value of the Debtors and will be important in connection with any plan of reorganization with respect to the Debtors.

147.     The Trading Motion is designed to advise the Debtors of transactions in TXCO stocks which might trigger a change of control which could negatively impact the ability of the Debtors to use these important attributes post-petition.  Without the protection provided in the Trading Motion, the Debtors will have little or no ability to take appropriate action to address any potential stock transactions that might represent a potential change of control.  Unless the Court grants this Trading Motion, the Debtors could be irreparably impacted as a change of

control transaction could occur without the Debtors having the ability to address the consequences of such transactions.

148. Consequently, the Debtors have requested narrowly tailored relief which simply requests parties undertaking significant stock transaction in excess of 1,730,000 shares which number of shares is 4.5% of Debtors outstanding stock, to give Debtors notice of such proposed transaction and allows the Debtors to appropriately respond thereto. Again, Debtors important and significant tax attributes would be severely endangered without this emergency relief.

2562975v.1

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___17___ day of May 2009.

_Albert S. Conly_

Albert S. Conly
Chief Restructuring Officer

## Miscellaneous:

<u>09-51807-rbk TXCO Resources Inc.</u>

Type: bk        Chapter: 11 v          Office: 5 (San Antonio)
Assets: u       Judge: rbk

### U.S. Bankruptcy Court

### Western District of Texas

Notice of Electronic Filing

The following transaction was received from Deborah D. Williamson entered on 5/18/2009 at 2:12 AM CDT and filed on 5/18/2009
**Case Name:**      TXCO Resources Inc.
**Case Number:**    <u>09-51807-rbk</u>
**Document Number:** <u>7</u>

**Docket Text:**
Unsworn Declaration Under Penalty of Perjury of Albert S. Conly, Chief Restructuring Officer of TXCO Resources Inc., in Support of Firt Day Motions filed by Deborah D. Williamson for Debtor TXCO Resources Inc.. (Attachments: # (1) Exhibit A)(Williamson, Deborah)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** C:\Documents and Settings\pwilkes\Desktop\Dec.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=988230274 [Date=5/18/2009] [FileNumber=12442313-0
] [95217a1f7287a9f50fe9bee57bd4d3e21ad3e747329728d64412b28227e38cf2e55
d4a90e8988e05cef2cfd5b50e420a819f96d4d9c3e40baf94146a62bab5f5]]
**Document description:** Exhibit A
**Original filename:** C:\Documents and Settings\pwilkes\Desktop\Ex A Cvr Sheet.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=988230274 [Date=5/18/2009] [FileNumber=12442313-1
] [4d5bd1a8b7f1fe39ee3f8b23fcbe9187eaad512adfbe53f44c9016e012f07ddc3c4
904cb4ed9e31c6a9191a74a6cbd1833f787ccecf82084e11c0d6c90cff6ae]]

**09-51807-rbk Notice will be electronically mailed to:**

Lindsey D. Graham on behalf of Debtor TXCO Resources Inc.
lgraham@coxsmith.com, aseifert@coxsmith.com

United States Trustee - SA12
USTPRegion07.SN.ECF@usdoj.gov

Deborah D. Williamson on behalf of Debtor TXCO Resources Inc.

dwilliamson@coxsmith.com, aseifert@coxsmith.com;pwilkes@coxsmith.com

**09-51807-rbk Notice will not be electronically mailed to:**

Statutes

**11 U.S.C. § 105(a)**

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

## 11 U.S.C. § 108(a) & (b)

**(a)** If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of--

**(1)** the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

**(2)** two years after the order for relief.

**(b)** Except as provided in subsection (a) of this section, if applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor or an individual protected under section 1201 or 1301 of this title may file any pleading, demand, notice, or proof of claim or loss, cure a default, or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of--

**(1)** the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

**(2)** 60 days after the order for relief.

## 11 U.S.C. § 362(a)

**(a)** Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of--

**(1)** the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

**(2)** the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

**(3)** any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

**(4)** any act to create, perfect, or enforce any lien against property of the estate;

**(5)** any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

**(6)** any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

**(7)** the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

**(8)** the commencement or continuation of a proceeding before the United States Tax Court concerning a corporate debtor's tax liability for a taxable period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title.

## 11 U.S.C. § 363

**(a)** In this section, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

**(b)(1)** The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless--

**(A)** such sale or such lease is consistent with such policy; or

**(B)** after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease--

**(i)** giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and

**(ii)** finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

**(2)** If notification is required under subsection (a) of section 7A of the Clayton Act in the case of a transaction under this subsection, then--

**(A)** notwithstanding subsection (a) of such section, the notification required by such subsection to be given by the debtor shall be given by the trustee; and

**(B)** notwithstanding subsection (b) of such section, the required waiting period shall end on the 15th day after the date of the receipt, by the Federal Trade Commission and the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice, of the notification required under such subsection (a), unless such waiting period is extended--

**(i)** pursuant to subsection (e)(2) of such section, in the same manner as such subsection (e)(2) applies to a cash tender offer;

**(ii)** pursuant to subsection (g)(2) of such section; or

**(iii)** by the court after notice and a hearing.

**(c)(1)** If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

**(2)** The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless--

**(A)** each entity that has an interest in such cash collateral consents; or

**(B)** the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

**(3)** Any hearing under paragraph (2)(B) of this subsection may be a preliminary hearing or may be consolidated with a hearing under subsection (e) of this section, but shall be scheduled in accordance with the needs of the debtor. If the hearing under paragraph (2)(B) of this subsection is a preliminary hearing, the court may authorize such use, sale, or lease only if there is a reasonable likelihood that the trustee will prevail at the final hearing under subsection (e) of this section. The court shall act promptly on any request for authorization under paragraph (2)(B) of this subsection.

**(4)** Except as provided in paragraph (2) of this subsection, the trustee shall segregate and account for any cash collateral in the trustee's possession, custody, or control.

**(d)** The trustee may use, sell, or lease property under subsection (b) or (c) of this section only--

**(1)** in accordance with applicable nonbankruptcy law that governs the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust; and

**(2)** to the extent not inconsistent with any relief granted under subsection (c), (d), (e), or (f) of section 362.

**(e)** Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).

**(f)** The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if--

**(1)** applicable nonbankruptcy law permits sale of such property free and clear of such interest;

**(2)** such entity consents;

**(3)** such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

**(4)** such interest is in bona fide dispute; or

**(5)** such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

**(g)** Notwithstanding subsection (f) of this section, the trustee may sell property under subsection (b) or (c) of this section free and clear of any vested or contingent right in the nature of dower or curtesy.

**(h)** Notwithstanding subsection (f) of this section, the trustee may sell both the estate's interest, under subsection (b) or (c) of this section, and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if--

**(1)** partition in kind of such property among the estate and such co-owners is impracticable;

**(2)** sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;

**(3)** the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and

**(4)** such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

**(i)** Before the consummation of a sale of property to which subsection (g) or (h) of this section applies, or of property of the estate that was community property of the debtor and the debtor's spouse immediately before the commencement of the case, the debtor's spouse, or a co-owner of such property, as the case may be, may purchase such property at the price at which such sale is to be consummated.

**(j)** After a sale of property to which subsection (g) or (h) of this section applies, the trustee shall distribute to the debtor's spouse or the co-owners of such property, as the case may be, and to the estate, the proceeds of such sale, less the costs and expenses, not including any compensation of the trustee, of such sale, according to the interests of such spouse or co-owners, and of the estate.

**(k)** At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

(*l*) Subject to the provisions of section 365, the trustee may use, sell, or lease property under subsection (b) or (c) of this section, or a plan under chapter 11, 12, or 13 of this title may provide for the use, sale, or lease of property, notwithstanding any provision in a contract, a lease, or applicable law that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title concerning the debtor, or on the appointment of or the taking possession by a trustee in a case under this title or a custodian, and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property.

(**m**) The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

(**n**) The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount. In addition to any recovery under the preceding sentence, the court may grant judgment for punitive damages in favor of the estate and against any such party that entered into such an agreement in willful disregard of this subsection.

(**o**) Notwithstanding subsection (f), if a person purchases any interest in a consumer credit transaction that is subject to the Truth in Lending Act or any interest in a consumer credit contract (as defined in section 433.1 of title 16 of the Code of Federal Regulations (January 1, 2004), as amended from time to time), and if such interest is purchased through a sale under this section, then such person shall remain subject to all claims and defenses that are related to such consumer credit transaction or such consumer credit contract, to the same extent as such person would be subject to such claims and defenses of the consumer had such interest been purchased at a sale not under this section.

(**p**) In any hearing under this section--

(**1**) the trustee has the burden of proof on the issue of adequate protection; and

(**2**) the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest.

**11 U.S.C. § 541(d)**

**(d)** Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

## 11 U.S.C. § 1107

**(a)** Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter.

**(b)** Notwithstanding section 327(a) of this title, a person is not disqualified for employment under section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case.

Rules

**Federal Rule of Bankruptcy Procedure 6003. Interim and Final Relief Immediately Following the Commencement of the Case--Applications for Employment; Motions for Use, Sale, or Lease of Property; and Motions for Assumption or Assignment of Executory Contracts**

Except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 20 days after the filing of the petition, grant relief regarding the following:

**(a)** an application under Rule 2014;

**(b)** a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition, but not a motion under Rule 4001; and

**(c)** a motion to assume or assign an executory contract or unexpired lease in accordance with § 365.

**CERTIFICATE OF SERVICE**

I certify that the Appendix of Appellees has been served upon the following via the

Court's CM/ECF system on this 18th day of August, 2009:

    Edward L. Rothberg
    Hugh Massey Ray, III
    Weycer, Kaplan, Palaski & Zuber, PC
    11 Greenway Plaza - Suite 1414
    Houston , TX 77046-1104

                _/s/ Leslie Sara Hyman_____
                Leslie Sara Hyman