# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | **APPEAL** |
| **TXCO RESOURCES INC.** | § | Civil Action No. 09-CA-569-FB |
| **DEBTOR** | § |  |

---

|  |  |
|---|---|
| **WEATHERFORD INTERNATIONAL, INC.** | § |
| **APPELLANT** | § |
|  | § |
| **V.** | § |
|  | § |
| **TXCO RESOURCES, INC., et al.** | § |
| **APPELLEES** | § |
|  | § |

---

## BRIEF OF PUTATIVE INTERVENOR

---

James Donnell
Texas Bar No. 05981300
WINSTON & STRAWN, LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 294-6700
Facsimile: (212) 294-4700

Paul D. Moak
Texas Bar No. 00794316
ANDREWS KURTH LLP
Chasless Yancy
Texas State Bar No. 24033481
600 Travis, Suite 4200
Houston, Texas 77002
Telephone: (713) 220-4200
Facsimile:   (713) 220-4285

ATTORNEYS FOR DEBTOR-IN-POSSESSION LENDERS

**CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that the Judge of this Court may evaluate possible disqualification or recusal:

**Appellees**
**TXCO Resources, Inc.,** *et al.*
**Counsel for Appellees:**
> Deborah D. Williamson
> Lindsey D. Graham
> Patrick L. Huffstickler
> Cox Smith Matthews Incorporated
> 112 East Pecan Street, Suite 1800
> San Antonio, TX 78205

**Appellant**
**Weatherford International**
**Counsel for Appellant:**
> Edward L. Rothberg
> Hugh Massey Ray, III
> Weycer, Kaplan, Pulaski & Zuber, PC
> 11 Greenway Plaza, Suite 1400
> Houston, TX 77046

**Putative Intervenor or Amicus Curiae**
**Debtor-in-Possession Lenders[1]**
**Counsel for Debtor-in-Possession Lenders**

| | |
|---|---|
| James Donnell | Paul D. Moak |
| Winston & Strawn, LLP | Chalsess Yancy |
| 200 Park Avenue | Andrews Kurth LLP |
| New York, NY 10166 | 600 Travis, Suite 4200 |
| | Houston, Texas 77002 |

Chalsess Yancy

---

[1]  The Debtor-in-Possession Lenders ("DIP Lenders") include Regiment Capital Special Situations Fund III, L.P., CIT Bank, BD Funding I, LLC and LTD/DLT Longhorn Corp.

ii

## STATEMENT REGARDING ORAL ARGUMENT

Putative Intervenor believes the Court can determine this case exclusively on the briefs, but would present oral argument if the Court desires it.

HOU:2947251.2

## <u>TABLE OF CONTENTS</u>

I. STATEMENT OF ISSUES ........................................................................................... 2

II. STATEMENT OF THE CASE ................................................................................... 2

III. STATEMENT OF THE FACTS ................................................................................ 4

IV. SUMMARY OF ARGUMENT .................................................................................. 9

IV. ARGUMENT ........................................................................................................... 10

   A. The Bankruptcy Court properly exercised its authority to authorize the payment of prepetition claims. ................................................................................................ 10

      1. *Kmart Corp.* and *Oxford Management* do not Preclude the Payments Authorized by the Royalty Order. ................................................................................................ 11

      2. Case Law in the Fifth Circuit Permits Payment Under the Royalty Order. ................ 13

      3. Application of Case Law to the Royalty Order ......................................................... 17

   B. Evidence at Trial was Properly Admitted ...................................................................... 20

   C. The Bankruptcy Court Satisfied Rule 6003(b) .............................................................. 22

V. CONCLUSION ......................................................................................................... 23

## TABLE OF AUTHORITIES

*In re CEI Roofing, Inc.*, 315 B.R. 50 (Bankr. N.D. Tex. 2004)......................................12

*Chiasson v. J. Louis Matherne and Associate (In re Oxford Mgmt, Inc.)*, 4 F.3d 1329
    (5th Cir. 1993)........................................................................9, 11, 12, 13, 16

*In re Coserv, L.L.C.*, 273 B.R. 487 (Bankr. N.D. Tex. 2002)......................13, 14, 17, 18

*In re Eagle-Picher Industrial Inc.*, 124 B.R. 1021 (Bankr. S.D. Ohio 1991).................11

*In re Equalnet Commc'ns Corp.*, 258 B.R. 368 (Bankr. S.D. Tex. 2000) ...............13, 15

*In re Gulf Air, Inc.*, 112 B.R. 152 (Bankr. W.D. La. 1989)...........................................10

*Internal Revenue Service v. Stern (In re Stern)*, 204 F.3d 1117 (5th Cir. 1999) ...........12

*In re Ionosphere Clubs*, 98 B.R. 174 (Bankr. S.D.N.Y. 1989).......................................10

*Johnson v. Ford Motor Company*, 988 F.2d 573 (5th Cir. 1993)............................20, 21

*Jones v. Benefit Trust Life Insurance Co.*, 800 F.2d 1397 (5th Cir. 1986)....................20

*In re Just for Feet, Inc.*, 242 B.R. 821 (D. Del. 1999).................................................10

*Kiva Kitchen & Bath Inc. v. Capital Distributing, Inc.*, 319 Fed. Appx. 316, No.
08-20303 (5th Cir. April 2, 2009)...............................................................................21

*In re Kmart Corp.*, 359 F.3d 866 (7th Cir. 2004) ...........................................11, 12, 23

*In re Lehigh & New Eng. Railway Co.*, 657 F.2d 570 (3d Cir. 1981) ...........................10

*In re Mirant Corp.*, 296 B.R. 427 (Bankr. N.D. Tex. 2003)...................................13, 15

*In re Mobilift Equip. of Fla., Inc.*, 415 F.2d 841 (5th Cir. 1969)..................................21

*In re Quality Interiors, Inc.*, 127 B.R. 391 (Bankr. N.D. Ohio 1991) ...........................10

*In re Tri-Union Development Corp.*, 253 B.R. 808 (Bankr. S.D. Tex. 2000) ...........13, 16

*United States v. Duffy*, 454 F.2d 809 (5th Cir. 1972) ..................................................20

*U.S. v. Ponder*, 475 F.2d 37 (5th Cir. 1973)..............................................................20

*U.S. v Sutherland*, 656 F.2d 1181 (5th Cir. 1981) ................................................21, 22

v

*In re Wehrenberg, Inc.*, 260 B.R. 468 (Bankr. E.D. Mo. 2001) .................................................11

## FEDERAL STATUTES

11 U.S.C. § 105.................................................................................................................10

11 U.S.C. § 363.................................................................................................................12

11 U.S.C. § 1107...............................................................................................................12

Fed. R. Bankr. 6003 ..............................................................................2, 9, 19, 20, 22, 23

Fed. R. Evid. 103 ..............................................................................................................21

Fed. R. Evid. 1002 ............................................................................................................20

## STATE STATUTES

Tex. Bus. & Com. Code §9.319.........................................................................................16

Tex. Bus. & Com. Code §9.343.........................................................................................16

HOU:2947251.2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | **APPEAL** |
| | § | |
| **TXCO RESOURCES INC.** | § | Civil Action No. 09-CA-569-FB |
| **DEBTOR** | § | |

| | | |
|---|---|---|
| **WEATHERFORD INTERNATIONAL, INC.** | § | |
| **APPELLANT** | § | |
| | § | |
| **V.** | § | |
| | § | |
| **TXCO RESOURCES, INC., et al.** | § | |
| **APPELLEES** | § | |
| | § | |

**FINAL ORDER APPEALED FROM**
**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

**BRIEF OF PUTATIVE INTERVENOR**

**TO THE HONORABLE FRED BIERY, UNITED STATES DISTRICT JUDGE:**

# I.  STATEMENT OF ISSUES

1.      Whether a bankruptcy court may authorize the payment of prepetition claims prior to confirmation of a Chapter 11 Plan.  If so, did the Bankruptcy Court properly exercise its authority?

2.      Whether the Bankruptcy Court's decision is supported by the evidentiary record?

3.      Whether the Bankruptcy Court complied with Bankruptcy Rule 6003(b) by authorizing payment of prepetition claims before the passage of 20 days from the date the Chapter 11 petition was filed?

# II.  STATEMENT OF THE CASE

4.      TXCO Resources, Inc. ("TXCO") and certain of its affiliates[2] (the "Debtors") operate oil and gas wells and sell the production, distributing the proceeds to royalty and working interest owners when applicable.  TXCO is a mid-sized, fully-cycle, publicly-traded, U.S.-based oil and gas exploration and production company.  Each of the Debtors is engaged in aspects of the acquisition, development, exploration and exploitation of oil and gas properties in the United States.  *See* Unsworn Declaration Under Penalty of Perjury of Albert S. Conly, Chief Restructuring Officer of TXCO Resources Inc., in Support of First Day Motions[3] (the "Conly Declaration") [Docket No. 7].[4]

---

[2]   Along with TXCO Resources, Inc., the following related entities are jointly administered in the bankruptcy cases:  Charro Energy, Inc.; Maverick Gas Marketing, Ltd; OPEX Energy, LLC; TXCO Drilling Corp.; Eagle Pass Well Service, LLC; Output Acquisition Corp.; TXCO Energy Corp.; Texas Tar Sands, Inc.; Maverick-Dimmit Pipeline, Ltd.; and PPL Operating, Inc.

[3]   The Conly Declaration was admitted as an exhibit by the Bankruptcy Court at the hearing on May 20, 2009.  *See* Transcript of May 20, 2009 Hearing, at 17.

[4]   Unless stated otherwise, documents referenced with a Docket Number shall be documents filed in *In re TXCO Resources, Inc., et al.*, Case No 09-51807 in the United States Bankruptcy Court for the Western District of Texas.

2

5.     The Debtors filed their voluntary petitions seeking Chapter 11 bankruptcy protection on May 17, 2009 (the "Petition Date") in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division (the "Bankruptcy Court"). Along with their petitions, the Debtors filed a number of "first-day" motions requesting various relief. Included in these motions was the Debtors' Motion for Authority to Pay or Honor Prepetition and Postpetition Royalty Obligations and Other Obligations Under Oil & Gas Leases (the "Royalty Motion") [Docket No. 25]. With the Royalty Motion, the Debtors sought to pay prepetition obligations for royalty interest owners ("Royalty Interest Owners") and overriding royalty interest owners ("ORRI Owners"). Further, the Debtors sought to pay joint-interest billings ("JIBs") owed pursuant to joint operating agreements ("JOAs") as well as to pay lease operating expenses ("LOEs") that accrued prior to the Petition Date.

6.     On May 19 and May 20, 2009, the Bankruptcy Court held hearings on the first-day motions, including the Royalty Motion. The Bankruptcy Court heard testimony from Mr. Gary Grinsfelder ("Grinsfelder"), President of TXCO Resources, Inc., and Albert Conly ("Conly"), chief restructuring officer for the Debtors and senior managing director for FTI Consulting, which serves as financial advisors to the Debtors. After extensive testimony and cross-examination of Grinsfelder and Conly, the Bankruptcy Court determined that failure to grant the relief requested would cause irreparable harm to the Debtors and granted the Royalty Motion. On May 22, the Bankruptcy Court entered the Order on Motion for Authority to Pay or Honor Prepetition and Postpetition Royalty Obligations and Other Obligations Under Oil & Gas Leases (the "Royalty Order") [Docket No. 67].

3

7.      On June 1, 2009, Appellant filed its Notice of Appeal [Docket No. 97] appealing the Bankruptcy Court's entry of the Royalty Order.  On July 17, 2009, the United States District Court for the Western District of Texas (the "Court") docketed the appeal.

### III. STATEMENT OF THE FACTS

8.      The Royalty Motion made clear the substantial risk of harm presented to the estate if these obligations were not met.  The Debtors explained that the failure to pay the Royalty Interest Owners and ORRI Owners could jeopardize their oil and gas leases, comprising their primary asset.  Royalty Motion, ¶ 18.   With respect to the JIBs and LOEs, the Royalty Motion further explained that if the Debtors were to stop paying their obligations as they became due, the Debtors' operations would be severely impacted and production could cease on some wells.  *Id.* at ¶ 12.   As the Royalty Motion makes clear, "[t]hese occurrences would directly, immediately and negatively impact the Debtors' creditors and other parties in interest."  *Id.*  The Debtors further explained that the failure to pay such obligations could give rise to numerous statutory liens, which would burden the Debtors' assets and diminish the value of those assets to potential purchasers.  *Id.* at ¶16.  The Royalty Motion also articulated the concern of the Debtors that failure to pay the obligations at issue would likely impair the Debtors' relationship with current royalty owners, stating that "if these relationships are harmed, either though the non-payment of obligations as they become due, or through the perceived difficulties of dealing with chapter 11 debtors, the Debtors will likely encounter . . . corresponding harm to their businesses with the possible loss of the Debtors' going concern value . . . ."  *Id.* at ¶ 17.  Accordingly, the Debtors represented that the ongoing and regular payment of these expenses would protect the Debtors' assets and preserve value in the Debtors' estates.

4

9.     The Conly Declaration further explained the risk posed to the Debtors if these obligations were not paid, stating that the Debtors' operations will be severely impacted and production could completely cease for some wells.   *See* Conly Declaration, at ¶ 115. Specifically, the Conly Declaration explained:

> The Debtors ongoing operations depend, to a significant degree, on its relationship with the parties to whom LOE, JOA and JIB obligations are owed.  If these relationships are harmed, either through the non-payment of obligations as they become due, or through the perceived difficulties of dealing with chapter 11 debtors, the Debtors will likely encounter particularized controversies with each entity, unnecessary costs and distractions and corresponding harm to their businesses with the possible loss of the Debtors' going concern value.  Given the competitive nature of the Debtors' businesses, the strict lease provisions, and statutes, the counterparties to LOEs and JIBs may not have the same dependence upon the Debtors.

Conly Declaration, at ¶ 116.

10.     The testimony of both Conly and Grinsfelder further explain the necessity of payment of prepetition obligations sought by the Royalty Motion: failure to do so could cost the Debtors' estates significant assets and negatively impact their ability to continue current operations, thereby reducing the value of the estates and hindering the Debtors' ability to reorganize or sell their assets.  When asked about the effect of not paying Royalty Interest Owners, ORRI Owners, JOAs, JIBs, and LOEs, Grinsfelder explained:

> Q. Do you think that situation would change if TXCO didn't pay all royalties when due?
>
> A. Absolutely.
>
> Q. How?
>
> A. If the word -- If the knowledge is -- is obtained by them that we've not paid royalty, this is a small community of, like I said before, very wealthy landowners. The -- The landowners are -- are of a type that the bonus dollars are not necessarily significant to

5

them. They're more interested in the royalty coming from production. It's been our history to acquire and extend these leases for relatively small dollars because they know that we've historically either drilled these leases ourselves or caused these leases to be drilled by other -- bringing other parties in. So, there is a willingness to work with us. If we suspend royalty payments, there's a lot of interconnectivity amongst these landowners, either through attorneys or -- or other -- other -- at another level; some very wealthy people. If we're not paying royalty, then our ability to do this is probably severely compromised, I would guess.

Q. What other potential adverse consequences do you believe could flow from not paying the royalties when due?

A. Any current leases that we have from any of the landowners that we're not paying royalty on or anybody nearby that we're not paying royalty on, I would -- I would think that they would not be willing to work with us on whatever matter we need to work with, surface issues, to -- to drill wells, or whatever. I think our ability to perform in the basin just -- just as an operator would be compromised.

Q. Okay. What about the non-payment of LOEs after the bankruptcy -- LOEs, lease operating expenses, after the bankruptcy? Do you think that would have adverse consequences on TXCO?

A. Well, the lease operating expenses go to -- to various vendors, for the most part. And -- And by not paying for their work, they would not do the work, and our production would -- would -- would decrease in -- in some level -- to some level.

Q. What's the difference between a lease operating expense and a drilling expense?

A. Lease operating expenses are expenses incurred to maintain production, for the most part. Drilling expenses are to drill wells prior to being put on production.

Q. And, so, nonpayment of LOEs threaten the production revenue?

A. Correct.

Q. Okay. And what about current joint interest billings, JIBs?

6

> A. Certainly we've had that problem already, but -- but not paying
> -- not paying our partners for dollars that they've incurred on wells
> that we're in, at some point they're going to either withhold our --
> our revenue from that well or refuse to work with us on any basis
> going forward.

Transcript of May 19, 2009 Hearing, at 248-250.  Grinsfelder clearly explained the Debtors'

belief that failure to pay the claims approved by the Royalty Order would result in loss of value

to the estate and diminish the goodwill the Debtors have established.

11.    Subsequently, Mr. Grinsfelder was asked why, as president, he supported the

debtor-in-possession financing proposal (the "DIP Financing") which provided the funds needed

to make the payments under the Royalty Order.  Mr. Grinsfelder explained:

> To me, it's a question of -- of preserving the value of the -- of the
> company to -- to reach a point in the future to achieve a better
> result through bankruptcy, whether it's sale of the company, a plan
> of reorganization, a merger.  I'm not quiet sure yet what form that
> will take.  But if we don't maintain the -- the total assets, which
> includes undeveloped acreage, it's not just the production, the
> likelihood of attracting someone to a sale or to a -- to a plan going
> forward diminishes, in my opinion.

Transcript of May 19, 2009 Hearing, at 250-51.  The statements of Mr. Grinsfelder make clear

the Debtors' intention in paying the various prepetition claims covered by the Royalty Order was

to conserve assets of the estate and protect the value of the estate going forward to achieve the

best result possible, whether it be through a sale of the company, a reorganization, or merger, and

provide the best recovery to creditors.  By making a payment of approximately $2 million, the

Debtors sought to preserve substantial value in the estate, estimated by the Debtors at $160

million.[5]

---

[5]    *See* Transcript May 20, 2009 Hearing, at 85-86

7

12.    Similarly, Mr. Conly echoed the sentiments of Mr. Grinsfelder in his testimony

before the court:

> Q.  . . . In your opinion, you've done it on -- what are the
> consequences, if any, of the company not paying royalties, as due?
>
> A. Well, typically, an oil and gas company must pay royalties on a
> current basis.  If it fails to pay royalties in accordance with the
> lease agreement, you could lose the lease.  And, in addition to that,
> with this current situation, some of those leaseholders, if we don't
> pay timely, could be difficult to deal with in renewals and
> extensions, and other matters regarding drilling, such as surface
> access, and that sort of thing, as we--as we try to develop the
> properties.
>
> Q. And have you ever experienced adverse consequences from
> purchasers of production when you don't pay royalties?
>
> A.  A couple of cases, we've had purchasers withhold payment
> because of their concerns about actions by the royalty owners, that
> -- that they're actually holding, at least for a temporary period of
> time, the royalty owners' money -- money, and then submitting
> that to the operator for distribution, and that they have, out of an
> abundance of caution, perhaps, withheld payment until they have a
> court order protecting them.

Transcript of May 20, 2009 Hearing, at 49-50

13.    Based upon the testimony Mr. Conly and Mr. Grinsfelder, and the other evidence

in the record, the Bankruptcy Court concluded:

> But I think that we do need to pay the royalty owners.  And there
> may not be a legal equitable ownership by the royalty owners, but I
> think that the flow of business is just going to be so much
> smoother if we keep the royalty owners paid in the ordinary course
> of business.  I think it would cause irreparable harm to the Debtor
> not to pay them, because there could be possible termination
> actions, certainly adverse effects with lessees, farm-out
> arrangements, et cetera, if royalty owners aren't paid.  And it
> certainly doesn't help the Debtor going out soliciting new
> properties, either.  So, I mean, if they're not -- if they're not paying
> their royalty owners, that gets around in the industry.
> So, I think we'll pay the royalty owners . . . .

8

Transcript of May 20, 2009 Hearing, at 269-70.  The Bankruptcy Court had weighed the arguments of both the Debtors and those opposing the Royalty Order and concluded that entry of the Royalty Order was in the best interest of the estates.

## IV.  SUMMARY OF ARGUMENT

14.    Appellant incorrectly contends that *Oxford Management* articulates an absolute prohibition against payment of prepetition unsecured claims outside a plan of reorganization.  To the contrary, *Oxford Management* and subsequent case law in the Fifth Circuit clearly establish that payment of prepetition claims is permitted in certain circumstances.  While the DIP Lenders do not concede that *Coserv* governs the decision here, the Debtors nevertheless satisfied the requirements of *Coserv* and other cases interpreting *Oxford Management*.  As such, the Royalty Order should stand.

15.    Second, Appellant contends that certain evidentiary objections based on the best evidence rule were improperly overruled by the Bankruptcy Court.  As the record shows, the testimony at issue was of the witnesses' own personal knowledge, not an attempt to admit the terms of a writing.  Accordingly, the best evidence rule is inapplicable.  Yet even if the challenged testimony regarding the Debtors' oil and gas leases is excluded, the record nevertheless provides sufficient basis to support the entry of the Royalty Order.  Appellant therefore cannot carry its burden of demonstrating an abuse of discretion by the Bankruptcy Court.

16.    Finally, Appellant contends that Bankruptcy Rule 6003 prevents the Bankruptcy Court from granting the relief provided by the Royalty Order.  Rule 6003 by its own terms, however, allows the Bankruptcy Court to authorize payment of prepetition claims to avoid "immediate and irreparable harm."  In its ruling, the Bankruptcy Court specifically noted that

9

failure to make the payments would result in irreparable harm. As such, Rule 6003 is clearly

satisfied, and the Royalty Order should stand.

## IV. ARGUMENT

**A.      The Bankruptcy Court Properly Exercised its Authority to Authorize the Payment of Prepetition Claims.**

17.      "The ability of a Bankruptcy Court to authorize the payment of pre-petition debt

when such payment is needed to facilitate the rehabilitation of the debtors is not a novel

concept." *In re Ionosphere Clubs,* 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). Under the

"necessity of payment" doctrine, a bankruptcy court may exercise its equitable powers to

authorize a debtors to pay certain prepetition claims, even though such payment is not explicitly

authorized under the Bankruptcy Code. *See In re Gulf Air, Inc.,* 112 B.R. 152, 153 (Bankr. W.D.

La. 1989) ("the 'necessity of payment' doctrine has been applied in nonrailroad bankruptcies.")

(citing *In re Ionosphere,* 98 B.R. 174); *In re Just for Feet, Inc.* 242 B.R. 821, 824 (D. Del. 1999)

(holding that "certain pre-petition claims by employees and trade creditors, however, may need

to be paid to facilitate a successful reorganization. Section 105(a) of the Code provides a

statutory basis for the payment of pre-petition claims.").

18.      Other courts, across a wide array of jurisdictions, have also recognized that

certain circumstances may dictate payment of prepetition claims outside a plan of reorganization.

*In re Lehigh & New Eng. Ry. Co.,* 657 F.2d 570, 581 (3d Cir. 1981) (discussing the allowance of

payment to certain creditors where the payment "is in the interest of all parties . . . [and] will

facilitate the continued operation of the railroad"); *In re Quality Interiors, Inc.,* 127 B.R. 391,

396 (Bankr. N.D. Ohio 1991) ("A general practice has developed . . . where bankruptcy courts

permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor

will be unable to reorganize without such payment."); *In re Eagle-Picher Indus. Inc.,* 124 B.R.

1021, 1023 (Bankr. S.D. Ohio 1991) (stating that pre-petition payment of unsecured claims under section 105 can be permitted where "necessary to avert a serious threat to the [c]hapter 11 process."); *In re Wehrenberg, Inc.*, 260 B.R. 468, 469 (Bankr. E.D. Mo. 2001) (after explaining the debtor's ability to continue to receive films was critical to its reorganization, and that failure to pay prepetition claims would result in vendors ceasing the shipments of new films, the court allowed the debtor to pay prepetition claims, explaining "[p]ursuant to 11 U.S.C. § 105(a) the Court may authorize the payment of prepetition claims when such payments are necessary to the continued operation of the Debtor.").

1.    *Kmart Corp.* and *Oxford Management* do not Preclude the Payments Authorized by the Royalty Order.

19.    Appellant primarily relies on *In re Kmart Corp.* and *In re Oxford Mgmt., Inc.* in seeking reversal of the Royalty Order. *See In re Kmart Corp.*, 359 F.3d 866 (7th Cir. 2004); *Chiasson v. J. Louis Matherne and Assoc. (In re Oxford Mgmt, Inc.)*, 4 F.3d 1329 (5th Cir. 1993). Neither case sets forth an absolute bar against payment of prepetition claims, and *Kmart* is not binding in this Circuit. Further, *Oxford Management* has been expressly interpreted to permit payments such as those authorized in this case.

20.    While Appellant emphasizes certain preclusive language in the Seventh Circuit's *Kmart* decision, that case did not establish an absolute rule against payment of prepetition unsecured claims. In *Kmart*, the debtors sought to pay the prepetition claims of "critical vendors" on the basis that some suppliers would be unwilling to continue doing business with the debtors, thereby preventing the debtors from obtaining merchandise that its customers expect. *In re Kmart Corp.*, 359 F.3d at 868. The bankruptcy court entered an order authorizing the payment of approximately $300 million to these "critical vendors." *Id.* at 869. On appeal, the Seventh Circuit overturned the bankruptcy court's order. *Id.* at 874. The court in *Kmart*,

11

however, left open the possibility that the authority to pay prepetition claims could be found in §363(b)(1) if the debtor could establish that (i) the critical vendor would have ceased doing business with the debtor absent payment of the prepetition claim, (ii) there was no other alternative to the payment of the prepetition claim; and (iii) the disfavored creditors were at least as well off as they would have been had the order not been entered. *See In re CEI Roofing, Inc.*, 315 B.R. 50, 54 (Bankr. N.D. Tex. 2004) (interpreting the reasoning of *In re Kmart Corp.*, 359 F.3d 866, 873-74 (7th Cir. 2004)).

21.    Similarly, contrary to the Appellant's argument, *Oxford Management* does not establish a hard-line rule against payment of unsecured claims outside of a plan of reorganization.  As one court has explained, "[u]nder *Oxford Management*, §105(a), alone, cannot form the basis for a court's authority to authorize the payment of prepetition unsecured claims out of postpetition funds prior [to] the confirmation of a plan." *In re CEI Roofing, Inc.*, 315 B.R. at 55. The court in *Oxford Management* did not consider, however, "whether any *other* provision in the Code, either alone or in conjunction with § 105(a), could provide the authority for a court to authorize such payments." *Id.*  Thus, where another provision of the Code is used in conjunction with Section 105, an order authorizing payment would not be prohibited under *Oxford Management. Id. See also Internal Revenue Service v. Stern (In re Stern)*, Case No. 98-11240, 204 F.3d 1117 (5th Cir. Dec. 16, 1999) (referring to *Oxford Management* and explaining that section 105 "allows courts to issue orders, processes, or judgments they determine are necessary or appropriate to carry out the provisions of the Bankruptcy Code . . .").  As further described below, Section 1107(a) of the Bankruptcy Code provides a statutory basis to support payment of prepetition obligations prior to a plan of reorganization in a manner consistent with

12

the provisions of *Oxford Management*. *See In re Coserv, L.L.C.*, 273 B.R. 487, 496-97 (Bankr.

N.D. Tex. 2002).

22. Further, recent case law in the Fifth Circuit clearly shows a trend allowing

payment of prepetition claims in certain circumstances. *See In re Tri-Union Dev. Corp.*, 253

B.R. 808, 815 (Bankr. S.D. Tex. 2000) (holding that "since Texas provides for a security interest

in favor of interest owners (as that term is defined), the Debtor is authorized to pay the

prepetition royalties with respect to the Texas oil and gas leases."); *See In re Equalnet Commc'ns

Corp.*, 258 B.R. 368, 369-370 (Bankr. S.D. Tex. 2000) (noting that in certain cases, courts have

found exception to the general rule of nonpayment); *In re CoServ, L.L.C.*, 273 B.R. at 497

(noting that on certain occasions the debtor in possession may fulfill its duty, acting as Trustee,

to preserve the bankruptcy estate by the pre-plan satisfaction of a prepetition claim); *In re Mirant

Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003) (applying the reasoning in *CoServ* to

authorize payment of prepetition debts). As these cases clearly establish, circumstances exist in

which the Debtors can pay prepetition unsecured claims.

**2.      Case Law in the Fifth Circuit Permits Payment Under the Royalty Order.**

23. Case law in the Fifth Circuit post-*Oxford Management* demonstrates that

Appellant improperly interprets *Oxford Management*. Although not directly on point, the *Coserv*

opinion illustrates that there is no absolute preclusion against the payment of prepetition

obligations in the Fifth Circuit. In *Coserv*, the debtors sought to pay seven creditors, whom they

considered to be "critical vendors," approximately $563,183.00 for prepetition indebtedness. *In

re Coserv, L.L.C.*, 273 B.R at 490. The *Coserv* court explained that the absolute rule espoused

by Appellant barring payment of prepetition unsecured claims outside a plan is not the proper

interpretation of *Oxford Management*. The court explained:

13

> To get from section 105(a) to the Doctrine of Necessity, the
> Court must find a bridge that makes application to the Doctrine
> of Necessity 'necessary or appropriate to carry out the
> provisions of' the Bankruptcy Code (11 U.S.C. § 105(a)). The
> Court believes such a bridge exists in the debtor in possession's
> role as the equivalent of a trustee. *See* 11 U.S.C. § 1107(a). A
> debtor in possession, like a trustee, is a fiduciary holding the
> bankruptcy estate and operating the business for the benefit of
> its creditors and (if the value justifies) equity owners. Implicit
> in the duties of a Chapter 11 trustee or a debtor in possession as
> set out in Sections 1106 and 704 of the Bankruptcy Code is the
> duty of such a fiduciary to protect and preserve the estate
> including an operating business's going concern value. There
> are occasions when this duty can only be fulfilled by the preplan
> satisfaction of a prepetition claim.

*Id.* at 496-97 (citations omitted). As the court further explained, it is "only logical that the

bankruptcy court be able to use Section 105(a) of the Code to authorize satisfaction of the

prepetition claim in aid of preservation or enhancement of the estate." *Id.* at 497. This is exactly

what the Royalty Order seeks to achieve in this case. The testimony of Debtors' principals and

the evidence in the record establishes a substantial risk of both loss of assets and going concern

value to the Debtors if the payments under the Royalty Order are not made. The Bankruptcy

Court was clearly concerned about loss of value to the estate, noting that failure to pay these

claims would result in "irreparable harm" to the Debtors. Transcript of May 21, 2009 Hearing,

at 269-70.

24.    The *CoServ* court developed a three-part test for determining whether payment of

prepetition claims prior to a plan is permissible. *In re CoServ*, 273 B.R. at 497. As the court

explained, "If these three conditions are proven by a preponderance of the evidence, necessity of

payment has been shown, and this Court will authorize payment of the prepetition claim." *Id.* at

498. The three prongs of the test are: (i) it must be critical that the debtor deal with the claimant;

(ii) unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively,

14

loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim; and (iii) there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim. *Id. See In re Mirant Corp.,* 296 B.R. at 429.

25.    While *Coserv* is not binding in this district and did not address the types of payments at issue here, its underlying principal is instructive. A debtor-in-possession, acting in its role as a fiduciary of the estate, should be authorized to pay prepetition claims to preserve the going concern value of the estate.

26.    The bankruptcy court for the Southern District of Texas in *In re Equalnet Commc'ns Corp.,* addressed whether a debtor can pay prepetition claims prior to confirmation of a plan in a chapter 11 case. *In re Equalnet Commc'ns Corp.,* 258 B.R. at 369. Noting that the general rule is that payment of prepetition claims prior to confirmation of a plan is not allowed in the Fifth Circuit, the court determined that several exceptions apply. *Id.* As the court explained, "these exceptions arise primarily out of common sense and the presence of a legal or factual inevitability of payment." *Id.* at 369

27.    Examples of such exceptions provided by the court included: (i) turn over of cash collateral, recognizing that a properly noticed but unopposed motion to lift stay would in all likelihood be granted; (ii) in a case involving assumption of an executory contract or lease, the cure of past due amounts would be allowed as a proper and inevitable administrative expense; (iii) certain cases involving business transactions which are individually small but collectively immense and critical to the survival of the business of the debtor; and (iv) payment of certain types of claims which enjoy a priority status in addition to being sometimes critical to the ongoing nature of the business. *Id.* at 369-370.

15

28.    A case more directly on point for the issue on appeal is *In re Tri-Union Dev. Corp.*  In *Tri-Union*, the court analyzed whether a bankrupt oil and gas company could make payments for prepetition royalties with respect to oil and gas leases in Texas.  *In re Tri-Union Dev. Corp.*, 253 B.R. at 808.  The debtor in *Tri Union*, as the Debtors seek to do now, sought to make payments to royalty interest owners for prepetition royalty obligations.  *Id.* at 810.  The court allowed payment to the royalty interest owners holding that "since Texas provides a security interest in favor of interest owners (as that term is defined), the Debtor is authorized to pay the prepetition royalties with respect to the Texas oil and gas leases." *Id.* at 815.

29.    In *Tri-Union*, the security interest referenced by the court arose under TEX BUS. & COM. CODE §9.343[6].  *Id.* at 814.  Section 9.343 provides "a security interest in favor of interest owners, as secured parties, to secure the obligations of the first purchasers of oil and gas production, as debtor, to pay the purchase price."  TEX BUS. & COM. CODE §9.343(a).  Further, the "security interest provided by this section is perfected automatically without the filing of a financing statement." TEX BUS. & COM. CODE §9.343(b).  All that is required is that the interest of the secured party be evidenced by a deed, mineral deed, or reservation in an oil or gas lease. *Id.*

30.    In the present case, there has been no determination that the Royalty Interest Owners are secured creditors, and that issue is not the subject of the current appeal.  Nevertheless, the *Tri-Union* decision clearly demonstrates that post-*Oxford Management* courts in the Fifth Circuit have authorized payments to royalty interest owners, as provided here by the Royalty Order.

---

[6]    At the time of *Tri Union*, Tex Bus. & Com. Code §9.343 was Tex. Bus. & Com. Code §9.319.  No substantive changes have been made to this section since the decision in *Tri-Union*.

16

3.    **Application of Case Law to the Royalty Order.**

31.    As the foregoing cases establish, jurisprudence in the Fifth Circuit clearly authorizes payment of prepetition claims in circumstances necessary to protect the value of the debtor's business. The record here is clear:  failure to make the payments at issue could significantly impair the Debtors' business through the possible loss of existing property interests, harm to the Debtors' business reputation going forward, and potential constraint on the Debtors' ability to renew its current oil and gas leases and obtain new leases. *See* Transcript of May 19, 2009 Hearing, at 248-250; Transcript of May 19, 2009 Hearing, at 250-51; Transcript of May 20, 2009 Hearing, at 49-50; *See* Conly Declaration, at ¶¶ 112-117; Royalty Motion, at ¶¶ 12 and 17.

32.    Additionally, as the testimony made clear, the Debtors are in a competitive business, and failure to pay the obligations owed under the Royalty Order may severely impair their reputation in the industry. As the Debtors move forward to an asset sale or reorganization, the Debtors will need the ability to re-negotiate leases on property as they expire, as well as negotiate new leases and JOAs going forward. Having a reputation of failing to make payments to royalty interest owners and on account of LOEs and JIBs could impair the Debtors' ability to develop their business going forward, resulting in significant loss of value to the estates. Conly Declaration, at ¶ 117; Transcript of May 19, 2009 Hearing, at 248-250. Case law from the Fifth Circuit clearly allows for a debtor to make payments when seeking to protect the value of the estate, and, as such, the Royalty Order should be upheld.

33.    The Appellant argues that if the Court declines to impose an absolute bar against payment of prepetition claims prior to a plan, it should judge the propriety of the request under the standards set forth in *Coserv*. *See* Brief of Appellant, at 17-19. Although *Coserv* might provide guidance here, it is not binding on this Court, and it is factually distinguishable.  In

17

*Coserv,* the principal consideration was whether the debtors should be permitted to pay "critical" vendors and suppliers. The dispute hinged primarily on whether the failure to pay those parties would significantly impair the debtor's businesses or whether the debtors might be able to adequately replace those vendors.

34.    Unlike the situation in *Coserv*, the Debtors here are not simply dealing with third-party vendors or suppliers providing goods and services to the Debtors. Rather, the Royalty Interest Owners might have the right to terminate the Debtors' current interests in certain oil and gas leases (which constitute the Debtors' primary assets). Further, because the Debtors' business is dependent upon maintaining, renewing and acquiring oil and gas leases, their reputation for paying royalty owners and for developing their properties is of paramount importance to their business. Accordingly, *Coserv's* standard should not be strictly applied here. Nevertheless, the Royalty Order clearly satisfies *Coserv's* three-prong test.

35.    To satisfy the first element, the Debtors must show that dealing with the claimant is virtually indispensable to profitable operations or preservation of the estate. *In re Coserv,* 273 B.R. at 498. The record establishes that failure to make the payments at issue could result in the termination of Debtors' leases and the loss of goodwill, severely hampering the Debtors' ability to continue current operations, preserve estate assets and obtain leases in the future. As such, it is critical that the Debtors deal with the parties at issue to preserve the value of the estates.

36.    To meet the second element, TXCO must establish that "meaningful economic gain to the estate or the going concern value of the business will result or that serious economic harm will be avoided through payment of the prepetition claim, which itself is materially less than the potential loss to the estate or business." *Id.* at 498-99. Once again, the record is clear

18

that the primary concerns of the Debtors and the Bankruptcy Court were the possible loss of leases as well as the loss of reputation and goodwill the Debtors would suffer from failed payment. There is no evidence in the record refuting the fact that failure to pay Royalty Interest Owners, ORRI Owners, JIBs, and LOEs would do anything but have a significant adverse effect on Debtors' business going forward.

37.    Further, there is no practical or legal alternative to paying the prepetition Royalty Interest Owners. Failure to pay the amounts at issue could result in termination of the leases and would detrimentally affect the Debtors' continued operations. The Debtors contend that there is no alternative to payment that will prevent these losses. As such, TXCO satisfies the third and final element of *Coserv* and, as the Bankruptcy Court ruled, should be allowed to pay the prepetition claims at issue.

38.    Lastly, it should be noted that Congress has implicitly authorized the type of payment allowed by the Royalty Order. Bankruptcy Rule 6003 clearly states that "except to the extent that relief is necessary to avoid irreparable harm, the court shall not, within 20 days after filing the petition grant relief . . . to pay all or part of a claim that arose before the filing of the petition." *See* Bankruptcy Rule 6003. The rule implicitly authorizes a debtor to make payments on prepetition claims if the approval order is entered 20 days after the petition is filed. It even anticipates situations in which payments can be made within the first 20 days after the petition is filed, to "avoid irreparable harm." *Id.* If, as the Appellant argues, the Bankruptcy Code precluded the payments in question, the Bankruptcy Rules would presumably provide that no motion requesting such relief should be granted, rather than merely limiting the notice required for granting that relief. In its holding, the Bankruptcy Court specifically noted that the payments are authorized to prevent "irreparable harm," placing the Royalty Order within the requirements

19

of Congress for authorization of payment under Rule 6003. Transcript of May 20, 2009 Hearing, at 269-70. Accordingly, the Royalty Order should not be reversed.

**B.    Evidence at Trial was Properly Admitted.**

39.    Appellant contends that the Bankruptcy Court improperly admitted evidence at the hearing on the Royalty Order, violating FED. R. EVID. 1002, more commonly known as the "best evidence rule." According to Appellant, because this evidence was improperly admitted, the Royalty Order should be overruled.

40.    An appellate court shows "considerable deference" to the lower courts' evidentiary rulings, reviewing only for abuse of discretion. *Johnson v. Ford Motor Company*, 988 F.2d 573, 578 (5th Cir. 1993). Because of his or her involvement in the trial, "a district court judge often has superior knowledge and understanding of the probative value of evidence." *Id.* As the Fifth Circuit has explained, "we will reverse a judgment based on an improper evidentiary ruling 'only where the challenged ruling affects a substantial right of a party.'" *Id.* (citing *Jones v. Benefit Trust Life Ins. Co.*, 800 F.2d 1397, 1400 (5th Cir. 1986)). Thus, Appellant must not only show that the evidentiary ruling was improper under an abuse of discretion standard, but also that the error affected a substantial right of the party. Put differently, the alleged evidentiary error must be significant enough to alter the ultimate decision.

41.    The best evidence rule "is a rule of admissibility and is limited to situations involving the proof of the contents of a writing." *U.S. v. Ponder*, 475 F.2d 37, 39 (5th Cir. 1973) (citing *United States v. Duffy*, 454 F.2d 809 (5th Cir. 1972). Thus, "the best evidence rule 'comes into play only when the terms of a writing are being established,' not when a witness's testimony is based on personal knowledge." *Kiva Kitchen & Bath Inc. v. Capital Distributing,*

20

*Inc.*, No. 08-20303, 319 Fed. Appx. 316, 322 (5th Cir. April 2, 2009) (citing *In re Mobilift Equip. of Fla., Inc.*, 415 F.2d 841, 844 (5th Cir. 1969)).

42.    Appellant provides three instances in its brief objecting to testimony on the basis of best evidence.[7]  In all three instances, the line of questioning established that the witness was being asked about his understanding of what would happen if the Debtors did not take action, not about the specific contents or terms of a document.  The Bankruptcy Court recognized this distinction in ruling on the objections, noting that it was the witness' "opinion" or based on the witness' "personal knowledge" in each instance.    Accordingly, the testimony does not violate the best evidence rule, and the Bankruptcy Court's ruling should not be disturbed.

43.    Additionally, for the Court to overrule the Bankruptcy Court's decision, Appellant must show not only that an evidentiary ruling was in error, but also that a substantial right of the party has been affected.  *See Johnson v. Ford Motor Company*, 988 F.2d at 578 (5th Cir. 1993); FED. R. EVID. 103(a).  To do so, Appellant must show that had the evidence been excluded, the Bankruptcy Court's ruling would have changed.  *See U.S. v Sutherland*, 656 F.2d 1181, 1201 (5th Cir. 1981) (holding that "we cannot find that the district court committed a reversible error in admitting the transcripts, for the context in which they were used makes it clear that no substantial right of the defendants was affected by the government's failure adequately to authenticate the transcripts").

---

[7]    It should be noted that while Appellant contends that testimony concerning the Debtors' knowledge of the leases should have been excluded for violating the best evidence rule, Appellant cites similar testimony elicited during cross-examination by its own counsel to which no objection was asserted. *See* Brief of Appellant, at 7; Transcript of May 20, 2009 Hearing, at 99-100 ("Q.  ...Now, do you mean by that statement that the leases would automatically terminate if the royalty's not paid?  A. They could."). This uncontested testimony is sufficient to support the Bankruptcy Court's findings.

21

44.     In *Sutherland*, the defendants challenged the court's submission to the jury of written transcripts of tapes of the government on the basis of authenticity. *Id.* at 1200-1201. The court agreed with the defendant that the government failed to adequately authenticate the transcripts. *Id.* at 1201. However, as the court explained "although the government did not verify the accuracy of the transcripts, it did introduce independent evidence of the content of two out of the three subject conversations. In this context, it is clear that the defendants were not prejudiced by the government's failure to verify the accuracy of their transcriptions." *Id.*

45.     Similarly, the Debtors here introduced ample independent evidence outside of the challenged testimony to support the Royalty Order. The Bankruptcy Court heard substantial testimony as to the deleterious effects failure to pay the prepetition claims would have on the Debtors' ability to continue to operate and expand their opportunities in the region. *See* Transcript of May 19, 2009 Hearing, at 248-251; Transcript of May 20, 2009 Hearing, at 49-50. Further, the Conly Declaration made clear that failing to make these payments would result in substantial loss to the value of the Debtors' businesses. *See* Conly Declaration, at ¶¶ 112-115. Such evidence provides the basis for granting relief under applicable case law in the Fifth Circuit. Accordingly, even if the Bankruptcy Court clearly abused its discretion in overruling Appellant's best evidence objections (which it did not), the record otherwise provides sufficient evidence in support of the Royalty Order.

**C.    The Bankruptcy Court Satisfied Rule 6003(b).**

46.     Finally, Appellant contends that under Rule 6003(b), the Bankruptcy Court did not have authority to authorize the payment of prepetition claims. Rule 6003 provides that:

> Except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 20 days after the filing of the petition, grant relief regarding the following:

22

. . . .

> (b) a motion to use, sell, lease, or otherwise incur an obligation
> regarding property of the estate, including a motion to pay all or
> part of a claim that arose before the filing of the petition, but not a
> motion under Rule 4001; . . . .

FED. R. BANKR. 6003. Rule 6003, however, clearly provides an exception to the twenty-day rule

"to the extent that relief is necessary to avoid immediate and irreparable harm." *Id.*

Significantly, in its ruling, the Bankruptcy Court stated "it would cause irreparable harm to the

Debtor not to pay them, because there could be possible termination actions, certainly adverse

effects with lessees, farm-out arrangement, et cetera, if royalty owners aren't paid. And it

certainly doesn't help the Debtor going out soliciting new properties, either." *See* Transcript of

May 20, 2009 Hearing, at 269-70.

47.    The Bankruptcy Court satisfied Rule 6003(b), as it found the requisite

"irreparable harm" needed to authorize payment of prepetition claims within twenty days of

filing the petition. As more fully discussed above, the record provides ample evidence of the

negative impact that failing to make these payments could cause to the Debtors, both in the short

and long term. Significantly, neither Appellant nor any other party provided any evidence

refuting the contentions of the Debtors in this regard. As such, irreparable harm was established

by the record, and the Bankruptcy Court satisfied Rule 6003.

## V. CONCLUSION

48.    Appellant's reliance on *Kmart* and *Oxford Management* for the proposition that

prepetition unsecured claims can never be paid outside of a plan of reorganization is misplaced.

*Kmart* has not been adopted in the Fifth Circuit, and, by its own terms, provides an exception to

such a Draconian rule. Further, despite Appellant's contention to the contrary, recent case law in

23

the Fifth Circuit establishes that a court may authorize payment of prepetition obligations outside of a plan, thus demonstrating the Appellant's erroneous interpretation of *Oxford Management*.

49.    The Bankruptcy Court properly exercised its discretion in authorizing the payments permitted by the Royalty Order, and the Bankruptcy Court's decision should be affirmed.

Respectfully submitted the 18th day of August, 2009.

James Donnell
Texas Bar No. 05981300
WINSTON & STRAWN, LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 294-6700
Facsimile:  (212) 294-470

Paul D. Moak
Texas State Bar No. 00794316
Chasless Yancy
Texas State Bar No. 24033481
ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, Texas 77002
Telephone: (713) 220-4200
Facsimile   (713) 220-4285

ATTORNEYS FOR DEBTOR-IN-POSSESSION LENDERS

24

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2009, copies of the foregoing Brief of Putative Intervenor was served by overnight commercial carrier (Federal Express) upon the following counsel:

Deborah D. Williamson
Lindsey D. Graham
Patrick L. Huffstickler
Cox Smith Matthews Incorporated
112 East Pecan Street, Suite 1800
San Antonio, TX 78205
*(Counsel for Appellees)*

Edward L. Rothberg
Hugh Massey Ray, III
Weycer, Kaplan, Pulaski & Zuber, PC
11 Greenway Plaza, Suite 1400
Houston, TX 77046
*(Counsel for Appellant)*

Chasless Yancy

25